# EXHIBIT A

# LEASE AGREEMENT

Between

**LHT NORTH ATLANTA LLC**, as Landlord

and

**ASSOCIATED ORAL SPECIALTIES, INC.**, as Tenant

Property:

Doctors Center III at Emory Saint Joseph's Hospital
5671 Peachtree Dunwoody Road, N.E.
Atlanta, Georgia

01275908.8

# TABLE OF CONTENTS

Page

Section 1 – Summary; Premises, Term ........................................................................... 1
    1.1    Summary of Terms ............................................................................. 1
    1.2    Premises ........................................................................................... 1
    1.3    Project, Building, Common Areas ..................................................... 2
    1.4    Term ................................................................................................. 2
    1.5    Use; Compliance; Operation ............................................................. 2

Section 2 – Rent ............................................................................................................. 3
    2.1    Base Rent ......................................................................................... 3
    2.2    Additional Rent ................................................................................ 4
    2.3    Adjustments ..................................................................................... 5

Section 3 – Alterations ................................................................................................... 5
    3.1    Alterations ....................................................................................... 5
    3.2    Removal by Tenant .......................................................................... 6
    3.3    Liens ................................................................................................ 6
    3.4    Survival ........................................................................................... 6

Section 4 – Insurance ..................................................................................................... 6
    4.1    Tenant's Insurance ........................................................................... 6
    4.2    Form of Policy ................................................................................. 7
    4.3    Claims Made Policies' Requirements ............................................... 8
    4.4    Failure to Carry ............................................................................... 8
    4.5    Landlord's Insurance ....................................................................... 8

Section 5 – Repairs and Maintenance; Compliance; Services ......................................... 8
    5.1    Tenant's Maintenance Obligations ................................................... 8
    5.2    Landlord's Maintenance Obligations ............................................... 9
    5.3    Project Services ............................................................................... 9
    5.4    Additional Services ........................................................................ 10
    5.5    Interruption of Services .................................................................. 10

Section 6 – Damage to Premises ................................................................................... 11
    6.1    Destruction of Premises .................................................................. 11
    6.2    Right to Terminate ......................................................................... 11

Section 7 – Eminent Domain ........................................................................................ 11
    7.1    Total Condemnation ....................................................................... 12
    7.2    Partial Condemnation ..................................................................... 12
    7.3    Award ............................................................................................ 12

Section 8 – Assignment and Subletting ........................................................................ 12
    8.1    Assignment and Subletting ............................................................ 12

**TABLE OF CONTENTS (Continued)**

|  |  | Page |
|---|---|---|
| 8.2 | Tenant to Remain Obligated | 13 |
| 8.3 | Assignee to Assume Obligations | 13 |
| Section 9 – Signage | | 13 |
| Section 10 – Defaults and Remedies | | 14 |
| 10.1 | Tenant Events of Default | 14 |
| 10.2 | Landlord's Remedies | 15 |
| 10.3 | Landlord's Default; Tenant's Remedies | 16 |
| Section 11 – Covenant of Quiet Enjoyment | | 16 |
| Section 12 – Subordination | | 17 |
| 12.1 | Subordination, Attornment | 17 |
| 12.2 | Security Deposit | 17 |
| 12.3 | Definitions | 18 |
| Section 13 – Indemnification by Tenant | | 18 |
| 13.1 | Indemnity | 18 |
| 13.2 | Indemnity Claims Process | 18 |
| 13.3 | Survival | 18 |
| Section 14 – Surrender | | 18 |
| Section 15 – Hazardous Materials and Infectious Wastes | | 19 |
| 15.1 | Tenant Covenants | 19 |
| 15.2 | Indemnity | 19 |
| Section 16 – Holding Over | | 20 |
| Section 17 – Notices | | 20 |
| Section 18 – Broker's Representation | | 20 |
| Section 19 – Rights Reserved to Landlord | | 20 |
| Section 20 – Other Matters | | 21 |
| 20.1 | Interpretation | 21 |
| 20.2 | Partial Invalidity | 21 |
| 20.3 | Entire Agreement | 22 |
| 20.4 | Governing Law | 22 |
| 20.5 | Successors and Assigns | 22 |
| 20.6 | Waiver | 22 |
| 20.7 | Litigation and Arbitration Costs | 22 |
| 20.8 | Counterparts | 22 |
| 20.9 | Modifications to Lease | 22 |
| 20.10 | Accord and Satisfaction | 22 |
| 20.11 | Time of the Essence | 22 |
| 20.12 | WAIVER OF TRIAL BY JURY | 22 |

**TABLE OF CONTENTS (Continued)**

|  |  | **Page** |
|---|---|---|
| 20.13 | Areas Excluded From Demise | 23 |
| 20.14 | Due Authorization | 23 |
| 20.15 | Tenant Financials | 23 |
| 20.16 | Force Majeure | 23 |
| 20.17 | ERISA | 23 |
| 20.18 | Estoppel Certificates | 23 |
| 20.19 | Landlord's Interest | 23 |
| 20.20 | Staff Privileges | 24 |
| 20.21 | Joint and Several | 24 |
| 20.22 | Recordation; Confidentiality | 24 |
| 20.23 | Parking | 24 |
| 20.24 | Security | 24 |
| 20.25 | Security Amount | 24 |
| 20.26 | OFAC Certification | 25 |

<u>EXHIBITS</u>
| | |
|---|---|
| Exhibit A | Floor Plans |
| Exhibit B | Rules and Regulations |
| Exhibit C | Work Letter |
| Exhibit D | Acceptance of Occupancy |

<u>SCHEDULES</u>
| | |
|---|---|
| 1.1 | Definitions |

SUMMARY OF TERMS
("Summary of Terms")

TENANT: Associated Oral Specialties, Inc., whose address prior to the Rent Commencement Date (defined below) is 297 East Paces Ferry Road, North East, Suite 1006, Atlanta, GA 30305, Attention: Dr. Freddie J. Wakefield, Jr, and whose address after the Rent Commencement date is 5671 Peachtree Dunwoody Road, N.E., Suite 420, Atlanta GA 30342, Attention: Dr. Freddie J. Wakefield, Jr.

LANDLORD: LHT North Atlanta, LLC, whose address is 353 North Clark Street, Suite 3300, Chicago, IL 60654, Attention: EVP - Asset Management.

EFFECTIVE DATE:  Shall mean the latest date of execution of this Lease, as set forth on the signature page.

PREMISES:  Suite 420.

BUILDING: The medical office building located at 5671 Peachtree Dunwoody Road, N.E., in the City of Atlanta, State of Georgia.

RENTABLE SQUARE FEET:  Approximately 7,678.

TENANT'S PRO RATA SHARE: Approximately 2.19%

TERM:  10 Lease Years, commencing on the Rent Commencement Date

INITIAL BASE RENT:  $229,956.10 per annum ($29.95 per Rentable Square Foot).

ANTICIPATED COMPLETION DATE:  June 30, 2016

BASE YEAR:  calendar year 2016

RENT COMMENCEMENT DATE:  Shall mean the first to occur of the following two dates: (1) the date on which the Tenant opens for business from the Premises; or (2) the date on which Landlord delivers the Premises to Tenant with Landlord's Work having been substantially completed.

SECURITY DEPOSIT:  Amount equal to one monthly installment of Base Rent.

BROKER:  Tenant is represented by Ackerman & Co.

COMMERCIAL GENERAL LIABILITY INSURANCE LIMITS:  Commercial General Liability insurance including contractual liability coverage with respect to obligations under this Lease and property damage insurance with respect to the Premises and surrounding areas, on an occurrence basis, with limits to be reasonably set by Landlord from time to time but in any event not less than $1,000,000 each occurrence and $3,000,000 general aggregate.

GUARANTOR:  Dr. Freddie J. Wakefield, Jr.

01275908.8

<u>LANDLORD'S CONTRIBUTION</u> (for Tenant improvements):  $383,900.

LEASE AGREEMENT

THIS LEASE AGREEMENT (this "Lease") is executed as of the Effective Date by and between **LHT NORTH ATLANTA LLC**, a Delaware limited liability company ("Landlord"), and **ASSOCIATED ORAL SPECIALTIES, INC.**, a Georgia corporation ("Tenant").

W I T N E S S E T H:

That in consideration of the rents, covenants and conditions herein set forth, Landlord and Tenant agree as follows:

### Section 1 – Summary; Premises, Term

1.1     **Summary of Terms**. The Summary of Terms are made a part of this Lease, but the provisions of this Lease addressing such matters in detail shall control over any inconsistent provisions in the Summary of Terms. All terms capitalized but not otherwise defined herein shall have the respective meanings ascribed to them on Schedule 1.1 attached hereto and made a part hereof.

1.2     **Premises**. Tenant hereby leases from Landlord the premises outlined on the floor plans attached hereto as Exhibit A (the "Premises") consisting of approximately 7,678 Rentable Square Feet (defined below) and commonly referred to as Suite 420 of the Building. "Rentable Square Feet" shall be computed in accordance with the American National Standard of the Building Owners and Managers Association, International, Standard Method for Measuring Floor Area in Office Buildings. Except for the Landlord's Work (defined below), Tenant acknowledges that it is leasing the Premises "as is" without any representations or warranties.

Landlord shall, subject to Tenant Delays and events of Force Majeure, use commercially reasonable efforts to cause the work described as "Landlord's Work" on the work letter (the "Work Letter") attached hereto as Exhibit C to be substantially completed on or before the Anticipated Completion Date as such date is established in the Work Letter. Contemporaneously with the execution of this Lease, Landlord and Tenant shall execute and deliver the Work Letter and the other documents contemplated therein. By occupying the Premises, Tenant acknowledges that Landlord has satisfactorily completed all of the Landlord's Work and accepts the Premises as being in the condition required by this Lease, subject to any punch list timely delivered pursuant to the terms of the Work Letter. Upon such occupancy, Tenant shall execute an Acceptance of Occupancy certificate in the form of Exhibit D attached hereto.

If Landlord cannot deliver possession of the Premises to Tenant in accordance with the terms of the Work Letter by the Anticipated Completion Date, this Lease shall not be void or voidable, nor shall Landlord be liable to Tenant for any loss or damage resulting therefrom. Under such circumstances, as Tenant's sole remedy, if Landlord cannot deliver possession of the Premises within 180 days after the Anticipated Completion Date, this Lease may be terminated by either party by giving notice to the other within 30 days after the expiration of such 180-day period with the understanding that if such notice is not timely provided, the right to terminate shall be deemed waived. If Tenant timely elects to terminate this Lease, Tenant's notice must provide a date for termination which shall be not less than 30 days after the date of such notice. Landlord

shall have the right to nullify Tenant's termination notice by delivering possession of the Premises to Tenant in accordance with the terms of the Work Letter on or prior to the effectiveness of such termination. The Anticipated Completion Date shall be extended because of any delay caused by a Tenant Delay or events of Force Majeure.

1.3    **Project, Building, Common Areas**.    As used herein, the term "Project" collectively means the medical office building commonly known as the Doctors Center III at Emory Saint Joseph's Hospital, located at 5671 Peachtree Dunwoody Road, N.E., Atlanta Georgia 30342 (the "Building"), and the medical office buildings commonly known as the Doctors Center I and II at Emory Saint Joseph's Hospital located at 5669 and 5667 Peachtree Dunwoody Road N.E., Atlanta, Georgia 30342, respectively (collectively, with the Building, the "Buildings"), the adjoining parking structure (the "Parking Structure") as well as the land (the "Real Estate") ground leased by Landlord on which the Building and Parking Structure sit, together with the Common Areas and other improvements which are now, or may hereafter be, located on or otherwise benefit the Real Estate.  The Project is located on the campus of Emory Saint Joseph's Hospital.

1.4    **Term**.  This Lease shall be effective from the Effective Date and the term of this Lease (the "Term") shall commence upon the Rent Commencement Date, and shall expire upon the date that is 10 Lease Years after the Rent Commencement Date, unless sooner terminated as provided herein.

1.5    **Use; Compliance; Operation**.

(A)    **Permitted Use**.  Tenant shall continuously occupy and use the Premises for medical office purposes and lawful activities normally incidental thereto and for no other purpose. Tenant acknowledges that Landlord has not granted Tenant the right to be the exclusive provider of any medical service or procedure.

(B)    **Prohibited Use**.   Tenant shall not permit the Premises to be used or occupied to dispense or sell any drugs, medicines or sundries for remuneration, provided that this shall not be deemed to prevent Tenant, if a duly licensed physician, surgeon or dentist, from administering drugs or medicines (including samples) to any of his/her patients in accordance with all applicable Governmental Regulations which drugs or medicines are, in the judgment of the physician, surgeon or dentist, necessary in the treatment of his/her patient.

In addition, Tenant shall not permit the Premises to be used or occupied: (i) in any manner that violates, conflicts with or is objectionable under the Ethical and Religious Directives for Catholic Healthcare Services promulgated by the National Conference of Catholic Bishops (as revised from time to time), (ii) in any manner that competes on a commercial basis with the products or services which are available to outpatients or inpatients in the hospital operated by Emory Saint Joseph's Hospital of Atlanta or any of its affiliates (the "Hospital Parties") located at 5665 Peachtree Dunwoody Road, NE, Atlanta, Georgia 30342 (the "Hospital") or (iii) for any of the following activities: (a) cardiac catheterizations; (b) computerized tomography; (c) magnetic resonance imaging; (d) any procedure that involves the administration of a radio pharmaceutical for diagnosis; (e) nuclear medicine; (f) any procedure that requires anesthesia which must be administered by an anesthesiologist or certified registered nurse or other trained anesthetist (excluding procedures performed by dentists, oral surgeons or dermatologists), (g) any procedure

or activity for which a certificate of need is required or must be obtained under applicable Governmental Regulations or (h) any additional activities or procedures identified by the Hospital in a written notice to Landlord before the date of this Lease as a "Competitive Activity" under the Ground Lease (collectively, the restrictions set forth in subsections (i)-(iii) are referred to as the "Prohibited Activities"); except to the extent, with respect to clauses (ii) only, that such products or services are customarily used by Tenant or Tenant's partners or shareholders, in the treatment, within the Premises, of his/her or their own patients or patients referred to them for consultation. Tenant agrees that its breach of the provisions of this Section 1.5(B) will cause Landlord to suffer irreparable harm and that Landlord may, in addition to any of its other rights and remedies available under Section 10.2, at law or in equity, enjoin Tenant's breach of this Section 1.5(B).

(C)    **Compliance**.  At its cost, Tenant shall observe and comply, and shall cause Tenant's subtenants, assignees, agents, licensees, contractors, subcontractors, concessionaires and employees (collectively, "Tenant Parties") to observe and comply, with all Governmental Regulations and with the rules and regulations attached hereto as Exhibit B, together with any reasonable amendments, modifications or additions thereto (the "Rules and Regulations").

(D)    **Third Party Beneficiary**.  The Hospital Parties as well as any other operator of the Hospital are third party beneficiaries of the provisions of this Section 1.5 and shall be entitled to enforce breaches of such provisions directly against Tenant.

### Section 2 – Rent

2.1    **Base Rent**.

(A)    **Amount**.  Tenant shall pay to Landlord the annual rentals (the "Base Rent") set forth in the second paragraph of this Section 2.1(A).  Base Rent shall be paid in equal monthly installments on or before the first day of each month, in advance, commencing upon the Rent Commencement Date and continuing through the last calendar month which falls within the Term. If the Rent Commencement Date is not the first day of a calendar month, then the Base Rent due for such first month of the Term shall be prorated based upon the number of days in that month in which the Rent Commencement Date falls.

Base Rent from the Rent Commencement Date through the end of the first Lease Year shall be $229,956.10 per annum.  Commencing with the second Lease Year and on the commencement of each Lease Year thereafter during the Term, Base Rent shall be increased to an amount equal to the product of (1) the Base Rent amount in effect immediately prior to that increase, multiplied by (2.5%) 1.025.

(B)    **Manner of Payments**.  The payment of Base Rent, Additional Rent (herein, Base Rent, Additional Rent and any other sums due from Tenant to Landlord under this Lease are collectively referred to as "Rent") shall be made in lawful money of the United States of America and made payable to Landlord or such other person and at such place as Landlord shall designate in writing from time to time.  Landlord may at any time during the Term require that Tenant pay Landlord Rent electronically through Landlord's banking institution via e-check payments, ACH payments or such other method as Landlord may require.  Tenant's obligation to pay Rent is

independent of any obligation of Landlord hereunder and shall be paid without abatement, reduction, demand or set-off, except as otherwise specifically provided herein.

       (C)    **Late Payments**.  Notwithstanding anything in this Lease to the contrary, if any payment of Base Rent or Additional Rent is more than 10 days past due, Tenant shall pay to Landlord on demand an administrative charge equal to five percent of such past due amount.  In addition, any Base Rent or Additional Rent more than 30 days past due shall accrue interest from the due date at the rate (the "Default Rate") of 18% per annum (or the highest lawful rate allowable if less than 18%) until paid in full, and Tenant shall pay to Landlord on demand said interest.

    2.2    **Additional Rent**.

       (A)    **Amount**.  Commencing on the Rent Commencement Date, Tenant shall pay to Landlord at the same time as it is required to make payment of Base Rent, an amount (the "Additional Rent") equal to Tenant's Pro Rata Share of Excess Taxes and Excess Expenses attributable to the Project for any full or partial calendar year during the Term.

       (B)    **Payment**.  Prior to any such calendar year and from time to time during any calendar year, Landlord may notify Tenant as to monthly installments on account of Additional Rent payable by Tenant based on Landlord's reasonable estimate of each of Excess Taxes and Excess Expenses for such calendar year.  On the first day of the calendar month after Landlord's notice of any increase in such installments, Tenant shall pay to Landlord (in addition to the revised monthly estimate) a lump sum payment in an amount so that Tenant's total payments for the calendar year will equal Landlord's revised estimate of Tenant's Additional Rent.  Additional Rent for the first calendar year in which the Term falls (if the Rent Commencement Date is other than January 1) and the last calendar year in which the Term falls (if the Term ends on a date other than December 31) shall be prorated based upon the number of days in the Term falling within the calendar year in question.  Tenant shall pay to Landlord, at the same time as Tenant is required to pay Rent, an amount equal to all federal, state and local gross proceed taxes, privilege taxes, sales taxes, value added taxes, or similar taxes (collectively, "Rent Taxes") now or hereafter levied or assessed upon such Rent or other payment, or the payment or receipt thereof, or which Landlord will be required to pay as a result of its receipt of Tenant's payment thereof, except that, notwithstanding any provision in this Lease to the contrary, Tenant shall not be obligated to pay to Landlord any amount on account of any net income, estate, inheritance, succession or similar taxes if any, payable by Landlord.

       (C)    **Reconciliation**.  After Landlord shall have ascertained the actual amount of Excess Taxes and Excess Expenses for the prior calendar year, Landlord shall notify Tenant as to the amount of such Excess Taxes and Excess Expenses and the Additional Rent resulting therefrom (an "Annual Additional Rent Notice").  If the Additional Rent actually due exceeds total estimated payments made by Tenant on account of Additional Rent for such calendar year, then Tenant shall pay Landlord the full amount of any such deficiency within 10 days after receiving the Annual Additional Rent Notice.  If the Additional Rent actually due is less than the total estimated payments made by Tenant on account of Additional Rent for such calendar year, then Landlord shall, at its option, credit any such excess to Rent next owing by Tenant or refund such excess to Tenant.

(D)    **Taxes on Tenant Property**. Tenant shall be responsible for and shall pay before delinquent all municipal, county, state and federal taxes assessed during the Term against any leasehold interest of Tenant or any property owned by Tenant and located in the Premises. The provisions of this Section 2.2 shall survive the expiration or earlier termination of this Lease.

2.3    **Adjustments**. If the Project is not at least 95% leased during any portion of any calendar year, Landlord may, using sound accounting practices, adjust Expenses that are variable and therefore increase as leasing and occupancy of the Project increases to equal what would have been incurred by Landlord had the Project been 100% leased and occupied (an "Equitable Adjustment"). In no instance, however, shall Tenant pay more than the actual cost of the service for which an Equitable Adjustment is made. Landlord may incorporate the Equitable Adjustment in its estimates of Expenses.

## Section 3 – Alterations

3.1    **Alterations**.

(A)    **Alterations**. All improvements or alterations in or additions, changes or installations to the Premises ("Alterations"), performed by or on behalf of Tenant shall be governed by the terms of this Section 3. Tenant shall not permit any Alteration to be performed without first obtaining Landlord's prior consent. Landlord's consent shall not be unreasonably withheld, conditioned or delayed but may be withheld in Landlord's sole discretion if (1) an Event of Default exists hereunder or (2) the Alteration (i) impacts the structural components of the Project or (ii) impacts the utility or mechanical systems of the Project or (iii) impacts any other tenant's premises or is visible from the outside of the Premises.

(B)    **Procedures**. Prior to commencing any Alteration, Tenant shall submit detailed plans and specifications for Landlord's review and approval. Landlord shall notify Tenant of its approval or disapproval of such plans and specifications and the work described therein within 15 business days after receipt thereof. Landlord shall state in writing and in reasonable detail any objection to such Alteration. Tenant may revise its plans and specifications to incorporate such comments and, if Tenant does so, it may again request Landlord's consent pursuant to the process described above. Neither approval of the plans and specifications nor supervision of the Alteration by Landlord shall constitute a representation or warranty by Landlord as to the accuracy, adequacy, sufficiency or propriety of such plans and specifications or the quality of workmanship or the compliance of such Alteration with Governmental Regulations. If Tenant desires to revise any plans and specifications after obtaining Landlord's approval thereof, Tenant shall re-submit such plans and specifications to Landlord for its approval as provided above.

(C)    **Performance**. Tenant shall pay the entire cost of any Alteration permitted hereunder, including Landlord's reasonable charges for review of the plans and specifications for any Alteration and Landlord's reasonable charge for supervision of any approved Alteration. If requested by Landlord, Tenant shall provide evidence reasonably satisfactory to Landlord of Tenant's financial ability to pay the cost of such Alteration. All Alterations shall be performed in a good and workmanlike and first-class lien free manner, using new materials and in accordance with the plans and specifications submitted to and approved by Landlord as well as in accordance with all applicable Governmental Regulations. All Alterations shall be performed by contractors

and subcontractors who possess the requisite experiences, personnel, financial strength and other resources necessary to perform and complete the proposed Alteration in a good and workmanlike lien free manner, as reasonably approved by Landlord prior to the commencement of such work. Tenant shall provide to Landlord evidence reasonably satisfactory to Landlord that such contractors or subcontractors satisfy such requirements and possess the insurance required pursuant to Section 4. All contractors and subcontractors performing the Alteration shall work in harmony with Landlord's and other tenant's contractors and subcontractors. Tenant shall cause all Alterations to be performed in such manner so as not to obstruct access to the premises of any other tenant in the Project or any part of the Common Areas or disrupt any building service or equipment or any other tenant's equipment. Prior to commencing any Alteration, Tenant shall have obtained and delivered to Landlord complete copies of all permits and approvals required by applicable Governmental Regulations to commence and complete any Alteration.

3.2    **Removal by Tenant**. Each Alteration or other improvement made by Tenant in or upon the Premises (excepting only Tenant's furniture, equipment and trade fixtures), whether temporary or permanent in character, shall become Landlord's property upon its attachment to the Premises and shall remain upon the Premises at the expiration or termination of this Lease without compensation to Tenant; provided, however, that Landlord shall have the right to require Tenant to remove any Alteration. To the extent specifically requested in writing by Tenant, Landlord shall inform Tenant at the time Landlord consents to any Alteration whether Landlord shall require removal of such Alteration at the expiration or termination of this Lease. Tenant shall, at its cost and expense, effect such removal and restore the Premises to the condition existing immediately prior to the Alteration at the expiration or termination of this Lease.

3.3    **Liens**. Tenant shall keep all of the portions of the Project free and clear of all liens arising out of, or claimed by reason of, any work performed, material furnished or obligations incurred by or at the insistence of Tenant. Upon completion of any Alteration, Tenant shall promptly furnish Landlord with final sworn owner's and contractors' statements and full and final waivers of lien covering all labor and materials included in such Alteration. Should Tenant within 15 days after notice from Landlord fail to: (i) fully discharge any lien or claim of lien, or (ii) insure or bond over such lien by title endorsement or bond satisfactory to Landlord, Landlord's lender, if any (which endorsement or bond shall also cover costs of defense) as well as the ground lessor under the Ground Lease, Landlord may, at its option and without limitation of any of its other rights and remedies, pay the same or any part thereof, and the amount of such payment shall be due and owing to Landlord from Tenant with interest thereon at the Default Rate from the date incurred until the date paid in full. No liens of any character whatsoever created or suffered by Tenant shall in any way, or to any extent, attach to or effect the rights of Landlord or the ground lessor under the Ground Lease, as applicable, in the Premises, the Real Estate or the Project.

3.4    **Survival**. Tenant's obligations in this Section 3 shall survive the expiration or termination of this Lease.

### Section 4 – Insurance

4.1    **Tenant's Insurance**. Tenant shall, at its expense, including any insurance policy deductibles or self-insured retentions, keep in full force and effect the following insurance policies

during the Term and any extension thereof with carriers that maintain an A.M. Best Rating of A-VII or better:

(A)    Commercial property insurance, (a) insuring 100% of the full replacement cost on an agreed amount basis of all Alterations and other improvements or additions to the Premises made at Tenant's expense or direction during the performance of and when completed, and all other property owned or used by Tenant and located in the Premises, including business interruption and (b) covered against "all risk" or "special perils", including, but not limited to windstorm, flood and earthquake;

(B)    Commercial general liability ("CGL") insurance, including healthcare professional liability with limits to be reasonably set by Landlord from time to time but not less than $1,000,000 each occurrence and $3,000,000 general annual aggregate.  CGL insurance shall cover liability and property damage arising from premises, operations, medical payments coverage, independent contractors, products-completed operations, personal injury and advertising injury, non-owned and hired automobile liability and liability assumed under an insured contract, including this Lease;

(C)    Workers' compensation insurance to meet statutory and legal requirements and employer's liability insurance covering employment related injuries and illnesses with limits not less than $1,000,000 each accident, $1,000,000 bodily injury by disease each employee and $1,000,000 bodily injury by disease bodily limit;

(D)    Umbrella liability insurance covering in excess of the primary commercial general liability, employer's liability and automobile liability insurance policies with limits not less than $1,000,000 each occurrence and $1,000,000 annual aggregate; and

(E)    During the performance of all Alterations, Tenant shall maintain or, at its option, cause Tenant's contractor or subcontractor, as appropriate, performing such Alteration to maintain, (1) CGL insurance as described in Section 4.1(B), except for the healthcare professional liability insurance, but with limits not less than $1,000,000 each occurrence and $2,000,000 general annual aggregate; (2) workers' compensation insurance and employer's liability insurance as described in Section 4.1(C); (3) automobile liability insurance with a limit not less than $1,000,000 combined single limit for bodily injury (including death) and property damage each accident arising out of any automobile (including owned, hired, leased and non-owed vehicles) used in connection with such Alteration; and (4) umbrella liability insurance covering in excess of the primary commercial general liability, employer's liability and automobile liability insurance policies with limits not less than $1,000,000 each occurrence and $1,000,000 annual aggregate.

4.2    **Form of Policy**.  All policies of insurance carried by Tenant, and policies of insurance Tenant causes any contractors and/or subcontractors to maintain shall (i) be issued by insurers, acceptable to Landlord in its reasonable discretion, authorized to do business in the state in which the Premises is located; (ii) on the CGL policy and umbrella policy, if applicable, name the Landlord Indemnified Parties (as defined below) as additional insureds (with the exception of Tenant's or Tenant's contractor's or subcontractor's workers' compensation and employer's liability policy); (iii) name Landlord as loss payee on property insurance covering any Alterations or other improvements or additions to the Premises; (iv) contain a waiver of any rights of

subrogation and all rights of recovery in favor of and against the Landlord Indemnified Parties; and (v) be primary and non-contributing with any insurance maintained by the Landlord Indemnified Parties. Tenant shall, at least 10 days before the Rent Commencement Date, and within 10 days before the expiration of each such policy, deliver to Landlord certified copies of the policies or certificates of insurance (in form and substance reasonably acceptable to Landlord), executed by a duly authorized representative of each insurer, showing compliance with the insurance requirements set forth above. Tenant shall provide 30 days' prior written notice to Landlord (10 days for non-payment of premium) in the event of cancellation of any insurance referred to therein.

4.3     **Claims Made Policies' Requirements**. In the event Tenant's insurance, or Tenant's contractors or subcontractors insurance, is written on a claims made policy form, Tenant shall, or shall cause its contractors or subcontractors to, (i) confirm that the retroactive date precedes the Effective Date (in the case of Tenant) or the commencement of the Alterations (in the case of Tenant's contractor or subcontractor), (ii) keep in force the claims made insurance for at least three years after the expiration or termination of this Lease (in the case of Tenant) or the completion of the Alterations (in the case of Tenant's contractor or subcontractor) or acquire or purchase extended reporting coverage on the policy existing as of the expiration or termination of this Lease (in the case of Tenant) or the completion of the Alterations (in the case of Tenant's contractor or subcontractor) that has a term of at least three years after the expiration or termination of this Lease (in the case of Tenant) or the completion of the Alterations (in the case of Tenant's contractor or subcontractor), and (iii) if the retroactive date is advanced or the policy is cancelled or not renewed and not replaced with a policy with the same retroactive date, acquire or purchase extended reporting coverage for such cancelled or non-renewed policy for at least three years following the date such policy was cancelled or not renewed. The obligations referenced in clauses (ii) and (iii) of this Section 4.3 shall survive the expiration or termination of this Lease.

4.4     **Failure to Carry**. Without limiting Landlord's remedies set forth in Section 10.2, if Tenant fails to carry and maintain the insurance coverages set forth in this Section 4, Landlord may, upon 10 days prior notice to Tenant (unless such coverages will lapse within such time period and in which event no such notice shall be necessary), procure such policies of insurance and Tenant shall promptly reimburse Landlord the cost thereof with interest thereon at the Default Rate from the date incurred until the date paid.

4.5     **Landlord's Insurance**. Landlord shall, during the Term, maintain commercial property insurance for 100% of the full replacement costs of the Project (exclusive of land, foundations and footings).

### Section 5 – Repairs and Maintenance; Compliance; Services

5.1     **Tenant's Maintenance Obligations**. Tenant shall make and pay for all maintenance, replacement, alterations and repairs necessary to keep the interior of the Premises and all equipment and facilities exclusively serving the Premises in a good state of repair consistent with an office suite in a medical office building of similar age and character as the Building in the Metropolitan Area, in compliance with all Governmental Regulations and in tenantable, safe condition. Tenant shall, at its own expense, install and maintain fire extinguishers and other fire

protection devices in the Premises as may be required from time to time by any Governmental Regulations or the insurance underwriters insuring the Project in which the Premises are located.

5.2    **Landlord's Maintenance Obligations**.  Landlord shall maintain the Project in a manner consistent with a medical office building of similar age and character as the Building in the Metropolitan Area, in compliance with applicable Governmental Regulations and in a tenantable, safe condition which may include necessary maintenance and repairs to the roof, foundation, outer walls and structural portions of the Project as well as cleaning, re-surfacing and snow and ice removal of the Common Areas.

5.3    **Project Services**.  Landlord shall furnish the following services:

(A)    **Heating and Cooling**.  During normal business hours, 7:00 a.m. - 6:00 p.m. Monday through Friday and 8:00 a.m. - 1:00 p.m. Saturday, holidays excluded ("Business Hours"), Landlord shall furnish heating and air conditioning to provide a comfortable temperature, in Landlord's reasonable judgment, for office business operations, assuming customary office density with respect to the number of people per Rentable Square Foot and no machinery or equipment which generates above normal heat.  To the extent Tenant conducts business at the Premises outside Business Hours or uses above normal capacity, Tenant shall pay any additional costs incurred by Landlord in connection with such use.  Tenant shall provide Landlord with at least 24 hours prior notice of its need for such services after Business Hours.

(B)    **Elevators**.  Landlord shall provide elevator service to Tenant in common with Landlord and other tenants of the Project.

(C)    **Janitorial Service**.  Landlord shall furnish nightly janitorial services, Monday through Friday (holidays excepted) including surface cleaning, trash removal and vacuuming carpeted areas.  If Tenant desires supplementary janitorial service, such additional services shall be at Tenant's cost and expense and responsibility and the contractor shall be reasonably approved by Landlord.  Tenant shall, at its cost and expense, store and remove all Hazardous Materials and Infectious Wastes in accordance with the terms of Section 15.

(D)    **Water**.  Landlord shall furnish cold water for drinking and toilet purposes and cold and hot water for lavatory purposes and other normal, customary medical office building uses.  To the extent Tenant needs water for any other purposes and such purpose is approved by Landlord, Tenant shall pay, as Additional Rent, the cost of installing separate meters for such water as well as the cost for such water at rates fixed by Landlord.  Tenant shall not permit water to be wasted.

(E)    **Electricity**.  Electricity for outlets and overhead lights used in the Premises may be supplied through a separate meter.  If separately metered, Tenant shall be responsible for contracting directly with the electric utility chosen by the ground lessor under the Ground Lease to serve the Project or chosen by Landlord to serve the Project and shall pay, as and when due, the cost of such service.   If the Premises are not separately metered, Landlord shall pay for such electricity and Tenant shall pay Tenant's proportionate share of such cost, such allocation determined in relation to the other spaces in the Building that are not separately metered.  Landlord

shall, at Tenant's expense, maintain the light fixtures and install lamps, bulbs, ballasts and starters in the Premises.

5.4    **Additional Services**.

(A)    **Communication Services**. If Tenant desires signal, communication, alarm or other utility or similar service connections installed or changed, Tenant shall not install or change the same without the approval of the Landlord, and then only under direction of Landlord and at Tenant's expense and in accordance with the requirements relating to Alterations. Tenant shall not install in the Premises any equipment which requires a substantial amount of electrical current (that is, above 110 volts of dedicated electrical current) without the advance consent of the Landlord, which consent may be conditioned upon, among other things, Tenant installing at its cost and expense and in accordance with the requirements relating to Alterations, such meters and other equipment as required by Landlord. Tenant shall ascertain from the Landlord the maximum amount of load or demand for use of electrical current which can safely be permitted in the Premises, taking into account the capacity of the electric wiring in the Building and the needs of other tenants of the Building, and shall not in any event connect a greater load than such safe capacity. Tenant shall not tamper with any other Building utility system without authorization from Landlord. The running of cable or pipe between suites also requires Landlord authorization and will occur at Tenant's expense if approved.

(B)    **Telephone**. Tenant shall arrange for telephone service in the Premises directly with the telephone service provider selected by Landlord. Tenant shall pay directly to such provider, as and when due, the costs related to such installation and service.

(C)    **Separate Service**. If Landlord is not required to provide certain services to all tenants of the Project, but provides such services to Tenant, or to Tenant and some, but not all, tenants of the Project, then the cost of such services shall be apportioned among the tenants provided with such services. If Tenant is the sole party to whom Landlord provides the service, Tenant shall pay to Landlord the entire cost of such service.

5.5    **Interruption of Services**. Except as provided in the immediately succeeding sentence, no interruption of services caused by repairs, replacements or alterations to the service system, or by any other cause, shall be deemed an eviction or disturbance of Tenant's possession of any part of the Premises or render Landlord liable to Tenant for damages, or otherwise affect the rights and obligations of Landlord or Tenant under this Lease. However, if: (i) Landlord ceases to furnish any service in the Building as a result of a condition which affects only the Building (that is, which does not affect buildings in general in the vicinity of the Building) and (ii) Tenant notifies Landlord of such cessation in writing within one business day after such cessation begins and (iii) such cessation is not caused by Force Majeure (defined below) and (iv) such cessation has not arisen as a result of an act or omission of Tenant or the Tenant Parties and (v) as a result of such cessation, the Premises (or a material portion thereof) is rendered untenantable and Tenant in fact ceases to occupy such space in the manner used prior to such cessation, then, as Tenant's sole and exclusive remedy for such cessation, on the sixth consecutive day after all of the foregoing conditions have been met, the Base Rent payable hereunder shall be equitably abated based on the percentage of the Premises so rendered untenantable and in fact not used by Tenant. Such

abatement shall begin retroactively from the date of such cessation and continue until the date the Premises become tenantable again by the removal of such cessation of services.

### Section 6 – Damage to Premises

6.1    **Destruction of Premises**.

(A)    Subject to Section 6.2, if the Project is damaged by fire or other casualty, Landlord shall restore the damage to the Premises to the same condition as existed on the Rent Commencement Date exclusive of any Alterations.    Landlord shall commence the repair, restoration or rebuilding thereof within 90 days after such damage (subject to delays in the adjustment of insurance) and shall substantially complete such restoration, repair or rebuilding of the Premises to the same condition as existed on the Rent Commencement Date (but excluding any Alterations) as promptly as practicable after the commencement thereof, subject to delays caused by events of Force Majeure or Tenant Delays. Landlord shall promptly and diligently seek adjustment of insurance proceeds after any casualty.

(B)    If the fire or other casualty or the repair, restoration or rebuilding required by Landlord shall render the Premises untenantable in whole or in part, the Rent shall proportionately abate from the date when the damage occurred until the date on which the Premises are in the condition required by this Section 6.1, such proportion to be computed on the basis that the Rentable Square Feet of the portion of the Premises rendered untenantable and not occupied by Tenant bears to the aggregate Rentable Square Feet of the Premises.

6.2    **Right to Terminate**.

(A)    If the casualty results in damage to the Premises which Landlord reasonably estimates will take in excess of  (i) 12 months after the beginning of restoration to restore the Premises to the same condition as existed on the Rent Commencement Date (but excluding Alterations) and occurs at any time during the Term or (ii) three months after the beginning of restoration to restore the Premises to the same condition as existed on the Rent Commencement Date (but excluding Alterations) and occurs during the last two years of the Term, as extended, then in either case either Landlord or Tenant may elect to terminate this Lease upon giving notice of such election to the other within 60 days after such casualty.  If the casualty results in damage to the Project that results in the same restoration periods as set forth above with respect to the Premises, or such restoration is prohibited by any Governmental Regulation or the insurance proceeds are insufficient or otherwise not available, then Landlord may elect to terminate this Lease upon giving notice of such election to Tenant within 65 days after such casualty.

(B)    If this Lease is terminated as provided above, such termination shall be effective on the date specified in the first notice received by the other party, but no earlier than 30 days after the occurrence of the event causing such damage.  In such event, Tenant shall be obligated to pay the Rent accrued to the effective date of such termination, less any Rent abated pursuant to Section 6.1 which obligation shall survive such termination.  Unless this Lease is terminated by either party as provided in this Section 6, this Lease shall remain in full force and effect, notwithstanding such damage or casualty.

### Section 7 – Eminent Domain

7.1     **Total Condemnation**.  In the event of a Substantial Taking of the Project (defined below), both Landlord and Tenant shall have the right to terminate this Lease by notice to the other within 30 days after the date of the effectiveness of such taking.  "Substantial Taking of the Project" means a Taking (defined below) either of (i) the entire Project; or (ii) a portion thereof, and in Landlord's commercially reasonable opinion, the remainder of the Project cannot be restored to an economically viable first-class medical office building without either substantial alteration of the Project or relief from Governmental Regulation.  "Taking" means a taking or condemnation for a public or quasi-public use by a competent governmental authority.  If this Lease is terminated pursuant to this Section 7.1, the Term shall terminate upon the delivery of possession to the condemning authority and Tenant shall pay the Rent accruing to the date of termination.  If neither Landlord nor Tenant terminates this Lease within the applicable time period, this Lease shall continue in full force and effect, as modified pursuant to Section 7.2.

7.2     **Partial Condemnation**.  If a Taking occurs that does not entitle Landlord or Tenant to terminate this Lease pursuant to Section 7.1 or if neither Landlord nor Tenant exercises a right to terminate this Lease granted pursuant to Section 7.1, then Landlord shall repair and restore the Project to the extent practicable, to the condition as existed on the Rent Commencement Date, excluding any Alterations, except that Landlord shall not hereby be required to expend for repair and restoration any sum in excess of an amount equal to the Award (defined below).  If as a result of the Taking, the Rentable Square Feet of the Premises is  permanently reduced, Base Rent and Additional Rent shall proportionately abate from the date when possession of such portion of the Premises is given to the condemning authority.  In addition, if the repair, restoration or rebuilding required by Landlord as a result of such Taking shall render the Premises untenantable in whole or in part, Base Rent and Additional Rent shall proportionately abate from the date when possession of the Premises is given to the condemning authority until the date on which the Premises are, as nearly as practicable, in the condition as existed on the Rent Commencement Date, excluding any Alterations.  The proportionate abatement shall be computed on the basis that the Rentable Square Feet of the Premises either reduced or rendered untenantable and not occupied by Tenant bears to the aggregate Rentable Square Feet area of the Premises.

7.3     **Award**.  Any award, compensation or damages (the "Award") for a partial or total taking shall be paid to and be the sole property of Landlord; provided that, Tenant shall have the right, to the extent the Award is not diminished, to make a separate claim against the condemning authority for such compensation as may be separately awarded to a tenant.

**Section 8 – Assignment and Subletting**

8.1     **Assignment and Subletting**.

(A)     Tenant shall not assign, pledge or encumber this Lease or any interest under it or sublet all or any portion of the Premises (individually or collectively, a "Transfer"), without Landlord's (and, if required by the terms of a mortgage or ground lease, the mortgagee's and ground lessor's) consent.  Landlord's consent shall not be unreasonably withheld with respect to an assignment or sublease and, in the case of a sublease, shall be approved by Landlord if (i) the sublessee is the lessor under the Ground Lease for the Building at that time and (ii) the other terms of this Section 8 are satisfied.  Any transfer (including any dissolution, merger, consolidation or other reorganization of Tenant but excluding the transfer or exchange of any publicly traded stock)

or any issuance, sale, gift, transfer or redemption of any capital stock of Tenant or other interest in Tenant (whether voluntary, involuntary or by operation of law, or any combination of the foregoing) or transfer of any of the direct or indirect power to affect the management or policies of Tenant or any direct or indirect change in 25% or more of the ownership interest in Tenant shall constitute a "Transfer" subject to the provisions of this Section 8. Landlord may condition its consent on its receipt of any excess rent generated by any assignment or sublease and may, instead of granting its consent, recapture, and terminate this Lease with respect to, any space proposed to be assigned or sublet.

(B)    In addition, Landlord shall not be deemed to have unreasonably withheld its consent to an assignment or sublease if Landlord's consent is withheld because: (1) an Event of Default then exists hereunder; (2) in the event of a sublease, the portion of the Premises which Tenant proposes to sublease, including the means of ingress thereto and egress therefrom, or the remaining portion of the Premises, or any combination of the above, will violate any Governmental Regulations; (3) in the reasonable judgment of Landlord, the proposed subtenant or assignee is not sufficiently financially responsible to perform its obligations under the proposed sublease or assignment; (4) the proposed subtenant or assignee is either a current tenant of the Project or a party with whom Landlord has offered to lease space in the Project in the past six months; (5) the proposed assignment or sublease would result in a prohibited transaction under ERISA (defined below); or (6) the proposed assignment or sublease is not approved by the ground lessor pursuant to the terms of the Ground Lease. The foregoing, however, are merely examples of reasons that Landlord may withhold its consent and should not be deemed to be exclusive of any other reasons for reasonably withholding consent, whether similar to or dissimilar from the foregoing examples.

8.2    **Tenant to Remain Obligated**.    No Transfer shall relieve Tenant from any covenant, liability or obligation hereunder (whether past, present or future) and Tenant shall remain liable under this Lease as a principal and not as a surety. Landlord's consent to a Transfer shall not be deemed to be a consent to any subsequent Transfer. Tenant shall pay all of Landlord's costs, charges and expenses, including reasonable attorney's fees not to exceed $1,000, incurred in connection with any Transfer requested or made by Tenant.

8.3    **Assignee to Assume Obligations**.    If Tenant shall assign this Lease as permitted herein, the assignee shall expressly assume all of the obligations of Tenant hereunder from and after the date of assignment and agree to comply with and be bound by all of the terms, provisions and conditions of this Lease. Such assumption shall be evidenced in a written instrument satisfactory to Landlord. If Tenant shall sublease the Premises as permitted herein, such sublease shall be satisfactory to Landlord and contain the agreement of such subtenant to attorn to Landlord, at Landlord's option and request, in the event this Lease terminates before the expiration of the sublease.

## Section 9 – Signage

Landlord shall install a building directory on which Tenant's name and suite numbers will be identified. The location of such directory shall be reasonably determined by Landlord. If Tenant desires the individual physicians comprising Tenant to also be named on such directory, Landlord shall do so at Tenant's sole cost and subject to available space. Tenant shall not install or affix any sign, plaque, picture, advertisement, name, notice, lettering or direction on any part of

the Project or on any part of the inside of the Premises which can be seen from outside of the Premises, without in each instance first obtaining the prior consent of the Landlord.

## Section 10 -- Defaults and Remedies

10.1    **Tenant Events of Default**.  Each of the following shall constitute an event of default (an "Event of Default") hereunder:

(A)    **Rent**.  If Tenant fails to pay Rent on the date due and such failure continues for a period of five days after notice to Tenant from Landlord; or

(B)    **Insurance**.  If Tenant fails to maintain the insurance required to be maintained by Tenant hereunder and such failure is not cured within the time period set forth in Section 4.4; or

(C)    **Abandonment**.  Tenant abandons or vacates all or a material portion of the Premises; or

(D)    **Transfer**.  A Transfer occurs without Landlord's consent as provided herein; or

(E)    **Bankruptcy**.  One of the following credit defaults occurs:

(1)    Tenant or any guarantor of this Lease commences any proceeding under any law relating to bankruptcy, insolvency, reorganization or relief of debts, or seeks appointment of a receiver, trustee, custodian or other similar official for Tenant or any guarantor of this Lease or for any substantial part of its respective property, or any such proceeding is commenced against Tenant or any guarantor of this Lease and either remains undismissed for a period of 60 days or results in the entry of an order for relief against Tenant or any guarantor of this Lease which is not fully stayed within 30 days after entry; or

(2)    Tenant or any guarantor of this Lease becomes insolvent or bankrupt, does not generally pay its respective debts as they become due, or admits in writing its inability to pay its debts, or makes a general assignment for the benefit of creditors; or

(3)    Any third party obtains a levy or attachment under process of law against Tenant's leasehold interest or other property or assets or any property or assets of any guarantor; or

(F)    **Violation of Prohibited Activities**.  If Tenant or any other party using or occupying the Premises engages in any of the Prohibited Activities; or

(G)    **Other Defaults**.  If Tenant shall be in default under any other provision of this Lease (other than those specified above) and shall remain so for a period of 30 days after Landlord has provided notice to Tenant of such default, provided that if any such default cannot reasonably be remedied by Tenant within 30 days after notice of default, then Tenant shall have such additional time as shall be reasonably necessary to remedy such default (but in no event

01275908.8                                          -14-

longer than 90 days), provided that during such time Tenant is continuously and diligently pursuing the remedy necessary to cure such default.

10.2    **Landlord's Remedies.**

(A)    **Landlord's Remedies.**    Upon the occurrence of an Event of Default, Landlord may, either:

(1)    **Termination of Lease.**    Terminate this Lease and Tenant shall pay to Landlord, upon demand, an accelerated lump sum amount equal to the amount by which Landlord's commercially reasonable estimate of the aggregate amount of Rent owing from the date of such termination through the scheduled expiration date of the Term, plus Landlord's commercially reasonable estimate of the aggregate expenses of reletting the Premises (which expenses shall include brokerage fees, unamortized leasing commissions and tenant concessions incurred or estimated to be incurred by Landlord and costs of removing and storing Tenant's or any other occupant's property, repairing, altering, remodeling or otherwise putting the Premises into condition acceptable to a new tenant or tenants, and all reasonable expenses incurred by Landlord in pursuing its remedies, including reasonable attorneys' fees and court costs [collectively, "Reletting Costs"]), exceeds Landlord's commercially reasonable estimate of the fair rental value of the Premises for the same period (after giving effect to the time needed to relet the Premises) both discounted to present value at the rate at which U.S. Treasuries are then yielding for a term closest to the scheduled expiration date of the Term; or

(2)    **Termination of Possession.**    Terminate Tenant's right of possession of the Premises without termination of this Lease, re-enter the Premises by summary proceedings or otherwise, expel Tenant and remove all property therefrom, using the level of effort mandated by the laws of the state where the Premises are located to relet the Premises at market rent (it being acknowledged that Landlord shall be permitted to relet any other vacant space in the Building prior to reletting the Premises) and receive the rent therefrom, provided, however, Tenant shall not be entitled to receive any such rent and shall remain liable for the equivalent of the amount of all Rent reserved herein less the avails of reletting, if any, after deducting therefrom the Reletting Costs. Any and all monthly deficiencies so payable by Tenant pursuant to this clause shall be paid monthly on the date herein provided for the payment of Base Rent; or

(3)    **Application of Amounts Owed to Tenant.**    Apply against any amounts owed by Landlord to Tenant, any amounts then due and payable by Tenant to Landlord; or

(4)    **Right to Cure.**    Landlord may at its option, but shall not in any event be obligated to, perform any obligation of Tenant under this Lease and, if Landlord so elects, all costs and expenses incurred by Landlord in performing such obligations, together with interest thereon at the Default Rate from the date incurred until paid in full, shall be reimbursed by Tenant to Landlord on demand and shall be considered Rent for purposes of this Lease; or

(5)    **Property.**    Re-enter, seize and take possession of Tenant's personal property, fixtures and equipment located at the Premises, all of which shall be deemed abandoned by Tenant and to sell such property at public or private sale.

(B)    **Additional Landlord Remedies**.  In addition to the remedies set forth in Section 10.2(A), if Landlord incurs any attorneys' fees or other costs or expenses in connection with any Event of Default or any act or omission by Tenant that with the giving of notice, the passage of time, or both would constitute an Event of Default, Tenant shall reimburse Landlord upon demand for any such attorneys' fees or other costs and such reimbursement shall constitute a part of the Rent.  Additionally, upon an Event of a Default under Section 10.1(E), Tenant shall pay any and all Rent for the month of any petition and thereafter promptly and the failure of Tenant to do so shall constitute an Event of Default entitling Landlord to immediate relief from the automatic stay and to terminate the Lease.  Tenant further agrees that the Rent constitutes the value of Tenant's occupancy of the Premises, and if Tenant fails to pay any Rent as set forth herein, such unpaid Rent shall constitute an allowed super-priority administrative expense in favor of Landlord to which Landlord is entitled to immediate payment, in full, and Tenant shall agree to enter into an order to such effect in a bankruptcy case.

(C)    **Landlord Remedies Cumulative**.  Any and all remedies of Landlord set forth in this Lease:  (i) shall be in addition to any and all other remedies Landlord may have at law or in equity, (ii) shall be cumulative, and (iii) may be pursued successively or concurrently as Landlord may elect.  The exercise of any remedy by Landlord shall not be deemed an election of remedies or preclude Landlord from exercising any other remedies in the future.

10.3    **Landlord's Default; Tenant's Remedies**.

(A)    Landlord shall be in default under this Lease if Landlord breaches any provision of this Lease and such breach shall remain uncured for a period of 30 days after Tenant has provided notice to Landlord of such breach, provided that if any such breach cannot reasonably be remedied by Landlord within 30 days after notice of breach, then Landlord shall have such additional time as shall be reasonably necessary to remedy such breach, provided that during such time Landlord is continuously and diligently pursuing the remedy necessary to cure such breach.

(B)    If Tenant claims or asserts that Landlord has violated or failed to perform a covenant of Landlord not to unreasonably withhold, delay, or condition Landlord's consent or approval under this Lease, or in any case where Landlord's reasonableness in exercising its judgment is in issue, Tenant's sole remedy shall be an action for specific performance, declaratory judgment, or injunction, and in no event shall Tenant be entitled to any monetary damages for a breach of any such covenant or unreasonable exercise of judgment, and Tenant hereby specifically waives the right to any monetary damages or other remedies in connection with any such breach or unreasonable exercise of judgment. Without limitation of the foregoing and notwithstanding anything in this Lease to the contrary, Tenant agrees that no breach or default by Landlord under this Lease shall excuse Tenant from performing, or constitute a defense to Tenant's performance of, any duty, liability, or obligation of Tenant under this Lease and in no event shall any breach or default by Landlord under this Lease entitle Tenant to terminate this Lease, or abate Rent, in whole or in part. Additionally, Tenant waives any right it may have under law or in equity to cure any default by Landlord under this Lease.

**Section 11 – Covenant of Quiet Enjoyment**

Landlord covenants that Tenant, on payment of the Rent and performance of the covenants and agreements set forth herein, shall peaceably and quietly have, hold and enjoy the Premises during the Term without interference of any person claiming through Landlord.

## Section 12 – Subordination

12.1    **Subordination, Attornment**.

(A)    Unless elected otherwise by the ground lessor, ground lessee or mortgagee, as the case may be, this Lease shall be subordinate to any present or future ground lease or mortgage respecting the Project, and any amendments thereto.  Such subordination shall automatically be effective without any action or notice by such ground lessor, ground lessee or mortgagee to Tenant provided the ground lessor, ground lessee or mortgagee recognizes the validity of this Lease and the ground lessor or mortgagee agrees that, and by having the Lease be so subordinate such party is deemed to have agreed that, notwithstanding any default by Landlord with respect to said ground lease or mortgage or any termination or foreclosure thereof, Tenant's possession and right of use under this Lease and the rights of Tenant under this Lease  in and to the Premises shall not be disturbed by such ground lessor or mortgagee unless and until an Event of Default shall have occurred hereunder.

(B)    If any ground lease is terminated or mortgage foreclosed or deed in lieu of foreclosure given, Tenant shall attorn to such ground lessor or mortgagee or purchaser at such foreclosure sale and this Lease shall continue in effect as a direct lease between Tenant and such ground lessor, mortgagee or purchaser.  The ground lessor, ground lessee or mortgagee or purchaser shall (i) be liable as Landlord only for the obligations of Landlord accruing after such ground lessor, ground lessee or mortgagee or purchaser has taken fee title to the Building or Project and (ii) not be liable for (a) any Rent paid more than 30 days in advance, (b) any offsets, claims or defenses which Tenant may have against the previous Landlord or (c) any warranty, act or omission of the previous Landlord.  Tenant shall within 10 days after request by Landlord or ground lessor, ground lessee, mortgagee or purchaser (in case of attornment), execute and deliver to the requesting party a subordination, non-disturbance and attornment agreement substantially in the form then used by the requesting party.

Tenant acknowledges that the Landlord holds a leasehold interest in the Real Estate pursuant to a ground lease (herein, as the same may be amended or restated from time to time, together with any new lease entered into pursuant thereto, the "Ground Lease" and, any related agreements including service agreements, utility agreements, covenants, easements or restrictions whether or not of record and as the same may be amended or restated from time to time, the "Ground Lease Documents").  In the event such Ground Lease is terminated or suspended for any reason, Tenant shall attorn to the holder of fee title for the Building, whether that party is also the holder of fee title to the Real Estate or a subsequent ground lessee, including any mortgagee of Landlord's leasehold interest (or their successors or assigns) who may enter into a subsequent ground lease with the fee owner of the Real Estate.

12.2    **Security Deposit**. Any ground lessor, ground lessee, mortgagee or purchaser shall be responsible for the return of any security deposit and rent voluntarily paid in advance by Tenant

01275908.8                                      -17-

only to the extent the security deposit or rent is received by or credited to such ground lessor, ground lessee, mortgagee or purchaser.

12.3    **Definitions**. As used in this Section 12, "mortgage" shall include "trust deed" and "deed of trust" and "mortgagee" shall include "trustee", "beneficiary" and the mortgagee of any ground lessee, and "ground lessor", "mortgagee", and "purchaser at a foreclosure sale" shall include, in each case, all of its successors and assigns, however remote.

### Section 13 – Indemnification by Tenant

13.1    **Indemnity**. Tenant shall protect, indemnify, defend, and save harmless Landlord, its affiliates and their respective directors, officers, shareholders, members, managers, partners, agents, employees, representatives, successors and assigns (collectively, the "Landlord Indemnified Parties") for, from, against, and regarding any and all foreseeable or unforeseeable liability, expense, loss, cost, deficiency, fine, penalty, or damage (including consequential or punitive damages) of any kind or nature (collectively, "Claims"), including reasonable attorneys' fees, on account of any matter or thing, action, or failure to act arising out of or in connection with this Lease, the Premises, or the operations of Tenant on any portion of the Premises. Notwithstanding anything in this Lease to the contrary, Tenant's indemnification obligations under this Lease shall include, and extend to, any and all Claims regardless of whether the possibility of any such Claims has been disclosed to Tenant in advance or whether the possibility of any such Claims could have been reasonably foreseen by Tenant.

13.2    **Indemnity Claims Process**. Tenant shall pay any amounts that become due to Landlord under this Section 13 within 10 days after Landlord's demand, and if not timely paid, such amounts shall bear interest at the Default Rate from the date of such demand until paid. Tenant, at its expense, shall contest, resist, and defend any such claim, action, or proceeding asserted or instituted against Landlord or any Landlord Indemnified Parties, with counsel acceptable to Landlord, in its discretion, and shall not, under any circumstances, compromise or otherwise dispose of any suit, action, or proceeding without obtaining Landlord's prior consent. Tenant shall have the right to control the defense or settlement of any Claim provided that (a) Tenant shall first confirm in writing to Landlord that Tenant is obligated under this Section 13 to indemnify Landlord, (b) Tenant shall pay any and all amounts required to be paid in respect of such Claim, and (c) any compromise or settlement shall require the prior approval of Landlord, which approval shall not be unreasonably withheld provided Landlord (or the applicable Landlord Indemnified Party) is irrevocably released from all liabilities and losses in connection with such Claim as part of such settlement or compromise. Landlord, at its election and sole cost and expense, shall have the right, but not the obligation, to participate in the defense of any Claim. If Tenant does not act promptly and completely to satisfy its indemnification obligations hereunder, Landlord may resist and defend any such Claims against Landlord or any Landlord Indemnified Party at Tenant's sole cost.

13.3    **Survival**. The provisions of this Section 13 shall survive the expiration or termination of this Lease with respect to any Claims asserted against Landlord within any applicable statute of limitations.

### Section 14 – Surrender

Upon the expiration or earlier termination of this Lease, Tenant shall peaceably leave and surrender the Premises to Landlord broom clean and otherwise in the condition in which the Premises are required to be maintained by the terms of this Lease, reasonable wear and tear excepted. Tenant shall surrender all keys for the Premises to Landlord at the place then fixed for the payment of Rent and shall inform Landlord of the combinations to all locks, safes and vaults in the Premises. Tenant shall, at its expense, remove from the Premises on or prior to expiration or earlier termination of this Lease all furnishings, fixtures and equipment situated thereon as well as those Alterations that are required to be removed pursuant to Section 3.2. However, Tenant shall not remove any equipment, conduits and fixtures providing water, plumbing, electrical, heating, ventilation, air conditioning, lighting, life safety, sprinkler and sewer service to the Premises, regardless of whether the same were installed by or on behalf of Tenant or Landlord, all of which, together with any other furnishings, fixtures and equipment not removed by Tenant as provided above, shall become the property of Landlord upon the expiration or earlier termination of this Lease and shall be conclusively presumed to have been conveyed to Landlord under this Lease via a bill of sale without further payment or credit by Landlord to Tenant. In addition, Tenant shall, at its expense, on or prior to such expiration or earlier termination of this Lease, repair any damage caused by such removal. Any property not so removed that Landlord requires to be removed, may be removed by Landlord and stored and/or retained or sold by Landlord and the cost of such removal, storage and disposition as well as the cost of repairing any damages caused by such removal, shall be paid by Tenant within 30 days after demand and such sums shall accrue interest at the Default Rate from the date incurred until paid in full. Tenant's obligation under this Section 14 shall survive the expiration or earlier termination of this Lease.

## Section 15 – Hazardous Materials and Infectious Wastes

15.1    **Tenant Covenants**. Tenant covenants that it will, and will cause the Tenant Parties to (i) not use, maintain, generate, store, treat or dispose of any Hazardous Materials or Infectious Wastes in or on the Premises or the Project other than de minimus amounts of materials that are required for the normal maintenance and operation of the Premises for normal medical office use and that are used, stored and disposed of in accordance with all Environmental Requirements, (ii) clean or remediate in accordance with all Environmental Requirements any Hazardous Materials or Infectious Wastes which may contaminate, or emanate from, any part of the Project, the Premises or the soils, ground water or aquifer under the Project as a result of Tenant's or the Tenant Parties' use or occupancy of the Premises, (iii) not place or permit to be placed any Hazardous Materials or Infectious Wastes in any receptacle not specifically designated for such materials, (iv) cause all Hazardous Materials and Infectious Wastes to be disposed of by licensed, reputable contractors approved by Landlord and (v) promptly provide Landlord with any notice received by Tenant or the Tenant Parties concerning Hazardous Materials or Infectious Wastes.

15.2    **Indemnity**. Without limiting the indemnification contained in Section 13 above, Tenant shall indemnify, defend (with counsel reasonably approved by Landlord) and hold the Landlord Indemnified Parties harmless from and against any Claims, including cleanup, engineering and attorneys' fees and expenses that Landlord or such indemnified parties may incur by reason of (1) a violation of the covenants set forth in Section 15.1 above, (2) Tenant's or the Tenant Parties' use, maintenance, generation, storage, treatment or disposal of any Hazardous Materials or Infectious Wastes in, on or under the Project or the Premises, (3) the violation of any applicable Environmental Requirement by Tenant or the Tenant Parties and relating to the

Premises or Tenant's or the Tenant Parties' use, occupancy or operation thereof, (4) any Claim brought or asserted against Landlord or such indemnified parties, regardless of when brought, which directly or indirectly relates to or arises out of any of the matters indemnified in this Section 15.2 or (5) any investigation or claim of any governmental agency or third party for any actions taken by Tenant or the Tenant Parties on or about the Premises.  Tenant's indemnity obligations under this Section 15.2 shall survive the cancellation or termination of this Lease.

## Section 16 – Holding Over

If Tenant remains in occupancy of any portion of the Premises after the expiration of the Term, Tenant shall become a month to month tenant upon all terms of this Lease as might be applicable to such month to month tenancy, except that Tenant shall pay Base Rent and Additional Rent at a rate equal to 150% of the greater of (i) the rate effective immediately prior to such holdover and (ii) the then fair market rent for the Premises, as determined by Landlord.  Tenant shall also be liable for any and all damages incurred by Landlord as a result of such holding over. No acceptance of Rent payable pursuant to this Section 16 by Landlord or the creation of such month to month tenancy shall operate as a waiver of Tenant's default or as a waiver of Landlord's right to regain possession of the Premises or any other remedy.

## Section 17 – Notices

All notices and demands, consents, approvals, requests, or other commitments required or permitted to be to be given under this Lease shall be in writing and sent by United States certified mail, return receipt requested, postage prepaid, or by Federal Express or similar generally recognized overnight courier regularly providing proof of delivery, addressed to the parties as set forth in the Summary of Terms (subject to the right of any party to designate a different address for its receipt of notices hereunder within the 48 contiguous continental United States of America by notice duly given).  Any notice so given shall be deemed to have been given as of the first to occur of (i) actual delivery, (ii) if mailed, the second business day after being deposited in the U.S. Mails, proper postage prepaid, addressed as provided above, or (iii) if sent by overnight courier, on the first business day after being delivered to such courier with all charges for overnight delivery having been prepaid.

## Section 18 – Broker's Representation

Except for the broker, if any, identified on the Summary of Terms, Landlord represents that it dealt with no broker or brokers and Tenant represents that it dealt with no broker or brokers in connection with the negotiation, execution and delivery of this Lease.  Landlord and Tenant shall, and do hereby, agree to indemnify and hold the other harmless from and against any losses, damages, penalties, claims or demands of whatsoever nature arising from a breach of its foregoing representation including reasonable attorneys' fees and expenses.  The representations and indemnifications set forth in this Section 18 shall survive the cancellation or termination of this Lease.

## Section 19 – Rights Reserved to Landlord

The following rights, exercisable without notice and without affecting any of Tenant's obligations under this Lease, are all reserved by Landlord:  (1) to change the name or street address

01275908.8                                     -20-

of the Project or the Building numbers thereof; (2) to install and maintain signs on the exterior and interior of the Project; (3) to retain at all times, and to use in appropriate instances, pass keys to the Premises; (4) to grant to anyone the exclusive right to conduct any business provided, however, that the granting by Landlord of any such exclusive right shall in no way prohibit Tenant from using the Premises for the purposes for which it is using the Premises as of the Effective Date; (5) to render any service in the Project, including providers furnishing electricity, telephone service, ice, water, towels, toilet supplies, shoe shines, sign painting, beverage or food service or other services to the Project, so long as the rates therefore are reasonably competitive for medical office buildings in the Metropolitan Area; (6) upon reasonable notice, to, or have its agents, exhibit the Premises at reasonable hours to prospective purchasers, mortgagees, and ground lessors of the Project and, in the final nine months of the Term, to prospective tenants; (7) to, or have its agents, decorate, remodel, repair, alter or otherwise prepare the Premises for reoccupancy at any time after Tenant vacates or abandons the Premises; (8) to, or have its agents, enter the Premises after reasonable notice at reasonable hours (except in the event of an emergency, when no notice need be given) for reasonable purposes, including inspection, the provision of services and the performance of the obligations of Landlord hereunder; (9) to regulate access to telephone, electrical and other utility lines and closets in the Project and to require use of designated contractors for any work involving access to the same; (10) to approve, in its discretion and prior to installation, any shades, blinds, ventilators or window treatments of any kind, as well as any lighting within the Premises that may be visible from the exterior of Building; and (11) to approve the weight, size, placement and time and manner of movement within the Premises and the Project of any safe or other heavy article of Tenant's Property, without any liability on account of such approval. Landlord shall also have the right to substitute for the Premises other premises (herein referred to as "the new premises") provided: (a) the new premises shall be similar to the Premises in area and use for Tenant's purpose (with similar level of finish and upgrades) and shall be located in the Building; (b) Landlord shall pay the expense of Tenant for moving from the Premises to the new premises and for improving the new premises so that they are substantially similar to the Premises; (c) such move shall be made during evenings, weekends, or otherwise so as to incur the least inconvenience to Tenant; and (d) Landlord shall first give Tenant at least 30 days' notice before making such change. If Landlord shall exercise its right hereunder, the new premises shall thereafter be deemed for the purposes of this Lease as the Premises and Tenant shall execute an acknowledgment of the same.

## Section 20 – Other Matters

20.1    **Interpretation**. Captions of this Lease are solely for convenience of reference and shall not in any way limit or amplify the terms and provisions hereof. Whenever the words "including", "include", or "includes" are used in this Lease, they shall be interpreted in a non-exclusive manner as though the words "without limitation" immediately followed.

20.2    **Partial Invalidity**. If any term, covenant or condition of this Lease or the application thereof to any person or circumstance shall, to any extent, be invalid or unenforceable, the remainder of this Lease or the application of such term, covenant or condition to persons or circumstances other than those as to which it is held invalid or unenforceable shall not be affected thereby and each term, covenant or condition of this Lease shall be valid and be enforced to the fullest extent permitted by law.

20.3    **Entire Agreement**. All understandings and agreements, oral or written, previously made between the parties are merged into this Lease and this Lease fully and completely expresses the agreement between Landlord and Tenant. This Lease cannot be amended or modified except by a written instrument executed by Landlord and Tenant.

20.4    **Governing Law**. This Lease, and all disputes arising under or related to this Lease, shall be governed by and construed in accordance with the internal laws of the State in which the Project is located.

20.5    **Successors and Assigns**. Subject to Section 8 and Section 12, the conditions, covenants and agreements contained in this Lease shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors and assigns.

20.6    **Waiver**. No failure by either party to exercise, or delay in exercising, any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege hereunder preclude any other or further exercise thereof, or the exercise of any other right, power or privilege. Any consent or approval given by Landlord in any one instance shall not constitute consent or approval for any subsequent matter, even if similar to the matter for which such consent or approval was originally given.

20.7    **Litigation and Arbitration Costs**. In the event of any litigation or arbitration between Tenant and Landlord to enforce any provision of this Lease or any right of either party hereto, the unsuccessful party to such litigation or arbitration shall pay to the successful party all costs and expenses, including reasonable attorneys' fees, incurred by the successful party therein.

20.8    **Counterparts**. This Lease may be executed in any number of counterparts, each of which shall be deemed to be an original and all of which, when taken together, shall constitute one and the same agreement.

20.9    **Modifications to Lease**. If, in connection with Landlord's obtaining financing for the Project, the proposed lender shall request reasonable modification of this Lease as a condition of such financing, Tenant shall not unreasonably withhold or delay its agreement to such modifications so long as such modifications do not materially increase the obligations or materially and adversely affect the rights of Tenant under this Lease.

20.10    **Accord and Satisfaction**. No payment by Tenant or receipt by Landlord of a lesser amount than the Rent stipulated herein shall be deemed to be other than on account of the earliest stipulated Rent, nor shall any endorsement or statement on any check or any letter accompanying any check or payment of Rent be deemed an accord and satisfaction. Landlord shall accept such check or payment without prejudice to Landlord's right to recover the balance of such Rent or to pursue any other remedy in this Lease.

20.11    **Time of the Essence**. Time is of the essence of each provision of this Lease.

20.12    **WAIVER OF TRIAL BY JURY. EACH PARTY WAIVES TRIAL BY JURY IN THE EVENT OF ANY LEGAL PROCEEDING BROUGHT BY THE OTHER IN CONNECTION WITH THIS LEASE. EACH PARTY SHALL BRING ANY ACTION AGAINST THE OTHER IN CONNECTION WITH THIS LEASE IN A FEDERAL OR**

**STATE COURTS LOCATED IN THE DISTRICT WHERE THE PROJECT IS LOCATED, CONSENTS TO THE JURISDICTION OF SUCH COURTS, AND WAIVES ANY RIGHT TO HAVE ANY PROCEEDING TRANSFERRED FROM SUCH COURTS ON THE GROUND OF IMPROPER VENUE OR INCONVENIENT FORUM.**

20.13    **Areas Excluded From Demise**.  The exterior walls of the Premises and the area beneath the finished floor of the Premises as well as the area above the finished ceiling level of the Premises are not demised hereunder, and the use thereof together with the right to install, maintain, use, repair and replace  pipes, ducts, conduits, wires, heating, ventilating, cooling, plumbing, electrical and other systems as well as structural elements leading through or a part of the Premises in locations that will not materially interfere with Tenant's use thereof are hereby reserved unto Landlord.

20.14    **Due Authorization**.  Landlord and Tenant hereby covenant, warrant and represent that: (1) the individual executing this Lease on its behalf is duly authorized to execute and deliver this Lease in accordance with the organizational documents of such party; (2) this Lease is binding upon such party and (3) the execution and delivery of this Lease will not result in any breach of, or constitute a default under any mortgage, deed of trust, lease, loan, credit agreement, partnership agreement or other contract or instrument to which it is a party or by which it may be bound.

20.15    **Tenant Financials**.  If Landlord is required to furnish such information in connection with the closing of a proposed sale or refinancing of the Project or if Tenant is in default hereunder, Tenant shall provide Landlord, upon 10 days' prior notice from Landlord, with a current financial statement for Tenant's business.  Any information provided hereunder by Tenant shall be kept confidential by Landlord and Landlord's lender or prospective purchaser, except to the extent already a part of the public domain or as disclosure is required by applicable Governmental Regulations or to enforce the terms of this Lease.

20.16    **Force Majeure**.  Both Landlord and Tenant shall be excused from performing their obligations or undertakings provided in this Lease, in the event of, but only so long as the performance of any such obligations are prevented or delayed, retarded or hindered by, an event of Force Majeure; provided, however, this Section 20.16 shall not apply to any obligation to pay money or perform any financial obligations hereunder.

20.17    **ERISA**.  Tenant represents and warrants that it is not and is not acting on behalf of (i) an "employee benefit plan" within the meaning of Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), (ii) a "plan" within the meaning of Section 4975 of the Internal Revenue Code of 1986, as amended or (iii) an entity deemed to hold "plan assets" within the meaning of 29 C.F.R. § 2510.3-101 of any such employee benefit plan or plans.

20.18    **Estoppel Certificates**.  Within 10 days after request by Landlord, Tenant shall execute and deliver to Landlord a written certificate as to the status of this Lease, any existing defaults, the status of the payments and performance of the parties required hereunder and such other information that may be reasonably requested.

20.19    **Landlord's Interest**.  Landlord's liability under this Lease is limited solely to Landlord's equity in the Project, and in no event shall recourse be had to any other property or

01275908.8                                        -23-

assets of Landlord or against any property or assets of any member, partner, shareholder, trustee, officer or director of Landlord or its members, partners or shareholders. If Landlord shall at any time transfer its interest in the Project or this Lease, Landlord shall be released of any obligations occurring after such transfer, and Tenant shall look solely to Landlord's successors for performance of such obligations.

20.20   **Staff Privileges.**   Tenant represents that Tenant enjoys staff privileges at the Hospital, or, in the case of a corporate, limited liability company or partnership tenant, the individual (direct or indirect) shareholders, members and partners of Tenant, and the employees and independent contractors of Tenant who are physicians, enjoy staff privileges at the Hospital. If at any time during the Term, Tenant or, in the case of a corporate or partnership Tenant, the individual (direct or indirect) shareholders, members or partners of Tenant, or the employees and independent contractors of Tenant who are physicians, shall cease to enjoy staff privileges at said Hospital, Landlord may, at its option, cancel this Lease by giving 60 days' notice of its intention to do so, and this Lease shall then terminate at the expiration of said 60 day period.

20.21   **Joint and Several**.   If Tenant is more than one person, all obligations of Tenant hereunder and under the Work Letter shall be joint and several obligations of each person executing this Lease as Tenant.

20.22   **Recordation; Confidentiality**.   Tenant shall not record or file, or permit to be recorded or filed, a copy of this Lease (or a memorandum thereof) or otherwise disclose the terms of this Lease without first obtaining Landlord's consent which consent may be granted or withheld in Landlord's sole discretion.

20.23   **Parking**.   Parking in the Common Areas shall be made available to Tenant and the Tenant Parties on a non-exclusive basis in accordance with the terms of the Parking Agreement and the REA. Tenant shall at all times adhere to all reasonable rules and regulations imposed by Landlord or the manager under the Parking Agreement in connection with parking at the Project.

20.24   **Security**.   Landlord has no duty to provide security for any portion of the Premises and Tenant assumes sole responsibility and liability for the security of itself, its employees, customers and invitees and their respective property, in the Premises. To the extent Landlord provides security to the Common Areas, Landlord does not warrant the efficacy of any such security personnel, services, procedures or equipment. Landlord shall not be responsible for or liable in any manner for failure of any such security personnel, services, procedures or equipment to prevent or control, or apprehend anyone suspected of, personal injury or property damage in, on or around the Project.

20.25   **Security Amount**. Tenant shall pay to Landlord upon the execution and delivery of this Lease an amount (the "Security Amount") equal to one monthly payment of Base Rent as of the Effective Date (subject to increase as described in Section 20.25(C)) as security (the "Security Deposit") for the full and faithful performance by Tenant of each and every term, provision, covenant, and condition of this Lease. The Security Deposit shall not be deemed an advance payment of Rent or a measure of Landlord's damages for any default under this Lease by Tenant, nor shall it be a bar or defense to any action that Landlord may at any time commence against Tenant. The Security Deposit shall be the property of Landlord and Landlord may

commingle the Security Deposit with other assets of Landlord or its affiliates and use the Security Deposit to reduce the indebtedness of Landlord or its affiliates, and Tenant shall not be entitled to any interest on the Security Deposit.

(A) **Application of Security Deposit.** Upon the occurrence of any Event of Default, Landlord, at its option and in such order as Landlord in its discretion may determine, may apply the Security Deposit to any (1) obligation of Tenant under this Lease or (2) loss or expense that Landlord may incur in connection with, or related to this Lease, or any Event of Default under this Lease, whether such obligation or loss or expense accrues before or after the Event of Default.

(B) **Transfer of Security Deposit.** If Landlord sells or transfers the Building or Landlord ceases to have an interest in the Building, Landlord may remit any unapplied part of the Security Deposit to the successor owner of the Building, and from and after such payment or transfer, Landlord shall be relieved of all liability with respect thereto.

(C) **Increase; Restoration of Security Deposit.** Within five days after any increase in Base Rent or the required Security Amount, Tenant shall deposit with Landlord cash in the amount necessary to make the Security Deposit equal to one monthly installment of Base Rent. If Landlord applies the Security Deposit (or any portion thereof) from time to time as provided in this Lease, Tenant shall replenish the Security Deposit in full, within 10 days after demand by Landlord, by paying to Landlord the amount of the Security Deposit so applied.

(D) **Return of Security Deposit at Expiration or Termination of Lease.** If: (1) no Event of Default has occurred and is continuing under this Lease and (2) Tenant has fully performed and satisfied all of its obligations under this Lease, then Landlord shall pay the Security Deposit, or the remaining unapplied portion thereof, to Tenant within 30 days after the expiration or earlier termination of this Lease and the surrender of the Premises to Landlord in accordance with the terms of this Lease; provided, however, that Landlord may retain an amount of the Security Deposit, as it shall reasonably determine, to secure the payment of any Rent, the amount of which Landlord is then unable to determine finally (and Landlord shall return any such retained amount to Tenant promptly following the final determination of such Rent amount and the full payment to Landlord of such Rent).

20.26 **OFAC Certification.**

(A) Tenant represents, warrants and covenants to Landlord that Tenant, its affiliates, and their respective officers, directors, members, partners, shareholders and other equity interest holders are not and will not at any time from the Effective Date through the end of the Term be (1) in violation of any of the Anti-Terrorism Laws (as defined in this Section 20.26), or (2) a Prohibited Person (as defined in this Section 20.26). Tenant further certifies that it has not entered into this Lease, directly or indirectly on behalf of any Prohibited Person or for the purpose of effecting any act that would violate the Anti-Terrorism Laws.

(B) "Anti-Terrorism Laws" shall mean any federal law, regulation, rule or order relating to terrorism or money laundering that may now or hereafter be in effect, including Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001, any regulations of the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC") related to Specially

Designated Nationals and Blocked Persons that may now or hereafter be in effect, and the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Public Law 107-56) as amended, International Money Laundering Abatement and Financial Anti-Terrorism Act of 2001, the Bank Secrecy Act, the Trading with the Enemy Act, and the International Emergency Economics Powers Act and the rules and regulations promulgated under such acts.

        (C)    "Prohibited Person" shall mean any person or entity owned or controlled by, affiliated with, or acting for or on behalf of, any person, group or entity or nation named by any Executive Order or the United States Treasury Department as a "specially designated national and blocked person", or a terrorist on the then most current list published by OFAC at its official website, http://www.treas.gov/offices/enforcement/ofac/sdn/t11sdn.pdf, or at any replacement website or other replacement official publication of such list.

*SIGNATURES ON FOLLOWING PAGE*

IN WITNESS WHEREOF, the parties hereto have duly executed and delivered this Lease as of the Effective Date.

<u>TENANT</u>:

**ASSOCIATED ORAL SPECIALTIES, INC.,**
a Georgia corporation

By: *Dr. Freddie J Wakefield, Jr.*

Name: *Fred Blake DMD*

Title: *CEO*

Date: *3/14/16*

<u>LANDLORD</u>:

**LHT NORTH ATLANTA, LLC,**
a Delaware limited liability company

By: 

Name: **Rex A. Noble**
~~Authorized Representative~~

Title: 

Date: *3/21/16*

EXHIBIT A

FLOOR PLANS



Key Plan

Suite 3-420 (approximately 7,678 RSF)

ASSOCIATED   ORAL   SPECIALTIES,
INC.,

01275908.8

EXHIBIT B

RULES AND REGULATIONS

1.    **Use:**  Tenant shall not use or permit any part of the Premises to be used for any purposes other than those set forth in this Lease.

2.    **Maintenance:**   Tenant shall maintain all portions of the Premises and immediately adjoining areas in a clean and safe condition.   Tenant shall comply with any waste recycling, waste separation or other waste program imposed from time to time by the Hospital, the provider of the waste removal services or Landlord.

3.    **Common Areas and Doormats:**  The Common Areas shall not be obstructed.   No doormats shall be placed or left in any public corridor.  Laboratory specimen boxes may only be left in public corridors during non-business hours.

4.    **Exterior:**   No awnings or other projections shall be attached to the outside walls of the Building.   No curtains, blinds, shades or screens shall be used in connection with any window or door of the Premises, without the prior consent of Landlord.

5.    **Signs:**    No signs, insignia, advertisement, object, notice or other lettering shall be exhibited, inscribed, painted or affixed on any part of the Premises or the Building without prior consent of Landlord.  In the event of the violation of the foregoing by any Tenant, Landlord, upon 24-hours' notice, may remove the same without any liability, and may charge the expense incurred in such removal to the Tenant violating this rule.  Interior signs and lettering on doors and directory tablet should be inscribed, painted or affixed for each Tenant by Landlord at the expense of such Tenant shall be of a size, color and style acceptable to Landlord.  At the expiration of the term Tenant is to remove all signs from such windows, doors and directory board.

6.    **Air Flow:**  The sashes, skylights, windows, and doors that admit light and air into the halls or other public places in the Building shall not be obstructed, nor shall any parcels or other articles be placed on the window sills or on the peripheral air conditioning enclosures.

7.    **Use of Water and Plumbing:** The water closets and other plumbing fixtures shall not be used for any purpose other than those for which they were designed or constructed, and no sweeping, rubbish, acids or other substances shall be thrown or deposited therein.  All damages resulting from any misuse or the fixtures shall be borne by the Tenant who, or whose employees, agents, visitors, or licensees shall have, caused the same. Any cuspidors or containers or receptacles used as such in the Premises, or for garbage or similar refuse, shall be emptied, cared for and cleaned by and at the expense of Tenant.

8.    **Bikes and Animals:**  No bicycles, animals (other than guide dogs accompanying visually handicapped persons) or birds of any kind shall be brought into or kept in or about the Premises or the Building.  Tenant may maintain fish in a properly maintained aquarium.

9.    **Noise:**  No noise, including music or the playing of musical instruments, recordings, radio or television, which, in the judgment of Landlord, might disturb other tenants in the

01275908.8

Building shall be made or permitted by any tenant. Nothing shall be done or permitted in the Premises by any tenant which would impair or interfere with the use or enjoyment by any other tenant of any other space in the Building.

10. **Locks and Access:** Additional locks shall not be placed upon any doors or windows by Tenant. Nor shall any changes be made to the locks which shall make such locks inoperable by Landlord's master key. Landlord will furnish two keys for each lock in the Premises. Additional keys will be ordered through Landlord and paid for by Tenant. Tenant will return all keys upon termination of this Lease. The agent and janitor of the Building shall be allowed admittance to the Premises, to cover any emergency, or required examination that may arise.

11. **Delivery and Moving:** All removals, or the carrying in or out of any safes, freight, furniture, and any other object must take place during such hours and in such elevators as Landlord or its agent may determine from time to time. Any damage done to the Building shall be paid for by the Tenant causing it.

12. **Passes:** Landlord may require any person leaving the Building with any package or other objects to submit a pass, listing such package or object or matter, from the tenant from whose Premises the package or object or matter is being removed. The establishment and enforcement of such requirement shall not impose any responsibility on Landlord for the protection of any tenant against the removal of property from the Premises of such tenant.

13. **Safes:** Safes and other heavy articles shall be placed by the Tenant in such places only as may be specified in writing by the Landlord.

14. **Advertising:** Landlord shall have the right to prohibit any advertising or identifying sign by any tenant which, in Landlord's judgment, tends to impair the reputation of the Building or its desirability as a building for offices. Upon notice from Landlord, such tenant shall refrain from or discontinue such advertising or identifying sign. Tenant shall not use the name of the Building for any purpose, other than that of the business address.

15. **Visitors & Employees:** Landlord reserves the right to exclude from the Building during hours other than Business Hours all persons connected with or calling upon Tenant who do not present a pass to the Building signed by Tenant. Tenant shall furnish Landlord with a facsimile of such pass. All persons entering and/or leaving the Building during hours other than Business Hours may be required to sign a register.

16. **Building Security:** Tenant assumes full responsibility for protecting the Premises from theft and robbery. Upon the request of the Landlord, the Tenant shall furnish to Landlord, information including the name and telephone number of an individual designated by Tenant who should be contacted in the case of an emergency, the name of all individuals to whom Tenant has given entrance keys, and the names of all individuals authorized by Tenant to enter the Premises at other than Business Hours.

17. **Closing Doors and Windows:** Tenant, before closing and leaving the Premises at any time, shall see that all operable windows are closed and all lights are turned out. All

entrance doors in the Premises shall be left locked by Tenant when the Premises are not in use. Entrance doors shall not be left open at any time.

18. **Telephone:** Landlord will direct the electricians as to where and how telephone wires are to be introduced. Unless approved in advance by Landlord, no boring or cutting for wires will be permitted.

19. **Lodging:** The Premises shall not be used for lodging or sleeping.

20. **Service Requests:** Service requests shall be directed to the Building office. Employees of Landlord shall not perform any work for Tenant unless under instructions from Landlord.

21. **Canvassing:** Canvassing, soliciting and peddling in the Building are prohibited and each tenant shall cooperate to prevent the same.

22. **Moving Equipment:** Hand trucks and moving equipment used by Tenant in the Building must be equipped with rubber tires, side guards and other safeguards as Landlord requires and be approved in advance in writing by Landlord.

23. **Odors:** Tenant shall not cause any odors to emanate from the Premises. No cooking shall be done in the Premises.

24. **Machinery:** Tenant shall not use machinery or stoves at the Premises, or carry on any mechanical business on Premises, or use or store inflammable fluids in the Premises without the consent of the Landlord.

25. **Utilities:** Tenant shall not waste electricity, water, or air conditioning and shall cooperate with Landlord to assure the most effective operation of the Building's heating and air conditioning. Tenant shall not adjust any controls, other than room thermostats installed for Tenant's use.

26. **Smoking:** Smoking of tobacco products anywhere within the Building is prohibited.

27. **Tenant's Responsibility for Others:** Tenant shall be responsible for the observance of all of the foregoing rules and regulations by Tenant's employees, agents, clients, customers, and guests. In addition to the Landlord's other remedies for Tenant's breach of any of the foregoing rules and regulations, Tenant shall pay Landlord for all damage resulting from the violation thereof.

28. **Narcotics:** The holding of any narcotic drugs within the Premises requires notification to Landlord, to include the location of such narcotic drugs and the security measures used by Tenant during the time the Premises are not occupied. Tenant shall comply with all policies of the Hospital in connection with the holding of any narcotic drugs within the Premises, including taking all necessary security measures. Landlord may require Tenant, at Tenant's expense, to provide additional security measures if, in Landlord's opinion, Tenant has not sufficiently safeguarded such narcotic drugs against theft from the Premises. Such suggested security measures are not to be construed as Landlord's acceptance of any liability as a result of theft or guarantees against such theft.

29.    **Changes to Rules:** Landlord reserves the right to rescind, alter or waive any rule or regulation at any time.

EXHIBIT C

WORK LETTER

This Work Letter (this "Work Letter") is entered into as of _____, 2016, by and between Associated Oral Specialties, Inc., a Georgia corporation ("Tenant") and LHT North Atlanta, LLC, a Delaware limited liability company ("Landlord").

RECITALS

WHEREAS, Landlord and Tenant have entered into that certain Lease Agreement of even date herewith (as the same may be amended or restated, the "Lease");

WHEREAS, pursuant to the terms of the Lease and this Work Letter, Landlord has agreed to construct certain improvements to the Premises (as defined in the Lease);

WHEREAS, all terms capitalized but not defined herein shall have the meanings ascribed to them in the Lease;

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Landlord and Tenant hereby agree as follows:

1.    Recitals.  The recitals set forth above are true and correct and incorporated herein by reference.

2.    Landlord's Work.

Subject to the other terms of this Work Letter, Landlord shall cause the work ("Landlord's Work") described on the space plan (the "Space Plan") attached hereto as Exhibit A to be constructed in the Premises.  Within 10 days after the date hereof, Tenant, working with Landlord's space planner, shall provide Landlord with all information reasonably required by Landlord in order to prepare detailed plans and specifications sufficient to obtain a building permit and up to four definitive bids for Landlord's Work.  Such information may include, but not be limited to, (a) the location of file cabinets, special equipment and furniture, (b) any electrical, special air conditioning and plumbing requirements, (c) any telephone equipment requirements, and telephone outlet locations, (d) electrical outlet and switch locations, (e) room sizes and locations, (f) lighting requirements, (g) cabinet work or other millwork item requirements, (h) acoustical or special wall requirements, (i) color and material selections for finishes (based on Landlord's standards), (j) required data wiring and computer locations and (k) equipment specifications and locations.  Landlord shall obtain at least two bids for Landlord's Work.

Within a reasonable time after receiving such information, Landlord shall prepare or cause to be prepared plans and specifications for Landlord's Work that are based upon the Space Plan, such information provided by Tenant and the space planner's discussions with Tenant ("Landlord's Plans").  Landlord's Plans shall be submitted to Tenant for its approval, which shall not be unreasonably withheld, delayed or conditioned.  Tenant shall have a period of five business

days after receipt of Landlord's Plans within which to either approve Landlord's Plans or to make reasonable detailed comments thereon. If Tenant does not object to Landlord's Plans within such five business day period, Tenant shall be deemed to have approved the same. If Tenant objects by making reasonable, detailed comments to Landlord's Plans, Landlord shall revise Landlord's Plans in accordance with Tenant's comments and resubmit them to Tenant for approval. Tenant shall then have five business days after receipt of such revised Landlord's Plans to approve such revised Landlord's Plans. If Tenant fails to timely object to such revised Landlord's Plans, Tenant shall be deemed to have approved the same. If Tenant objects by making reasonable, detailed comments to the revised portion of Landlord's Plans, the revision process described herein shall be repeated until finally approved.

3.    Additional Work.  If Tenant shall require changes in Landlord's Work or other work or materials in the Premises in addition to or in substitution for the Landlord's Work (collectively, "Additional Work"), all plans and specifications for the Additional Work (the "Additional Plans") (together with any changes to the Final Plans for the Landlord's Work which may be required as a result of the Additional Work) shall be prepared by Landlord's architect for the Building. Prior to commencing any such Additional Work, Landlord shall submit to Tenant a tenant requested work order (a "Tenant Requested Work Order") authorizing such work and setting forth the cost of such Additional Work (including costs for delay and out of sequence work) . If Tenant shall fail to execute such Tenant Requested Work Order within five days from receipt thereof, the same shall be deemed disapproved in all respects by Tenant and Landlord shall not be obligated to perform such additional work. 50% of the estimated cost of such Additional Work shall be paid to Landlord in full prior to Landlord's commencement of such Additional Work. At such time as the Tenant Requested Work Order is fully executed, such Additional Work shall be deemed a part of "Landlord's Work" and such Tenant Requested Work Order shall be deemed attached to and incorporated into this Work Letter. The Landlord's Plans that are finally approved or deemed approved, together with the Additional Plans, if any, are referred to herein as the "Final Plans".

4.    Cost and Payment.

(a)    Except for the Landlord's Contribution (defined below), all costs and expenses relating to the preparation and completion of Landlord's Plans, the Additional Plans, the Final Plans and the performance of Landlord's Work and the Additional Work (including the costs of all permits and licenses) shall be paid for by Tenant (collectively, the "Cost of Landlord's Work").

(b)    Subject to the terms and conditions hereof, Landlord shall make a contribution ("Landlord's Contribution") to the Cost of Landlord's Work in an amount equal to the lesser of (i) the total Cost of Landlord's Work (both hard and soft) or (ii) $383,900. If the conditions for the application of Landlord's Contribution are not satisfied within the first Lease Year, Landlord's obligation to thereafter provide the Landlord's Contribution shall cease. Landlord's Contribution may be used for hard and soft construction costs, and a construction management fee not to exceed three percent of the hard construction costs. In no event shall the Landlord Contribution be used to purchase trade fixtures, furniture, equipment or other personal property of Tenant.

(c)     The Cost of Landlord's Work shall be paid as follows:

(1)     50% of the amount equal to the estimated total Cost of Landlord's Work less Landlord's Contribution, shall be paid to Landlord prior to commencement of Landlord's Work, and

(2)     An amount equal to the unpaid balance, if any, of the estimated total Cost of Landlord's Work shall be paid on or before the earlier of (i) the date that is 30 days following the commencement of Landlord's Work, or (ii) the date that Landlord's Work is substantially completed, and

(3)     50% of the amount equal to the estimated total cost of any Additional Work less that portion of Landlord's Contribution not previously allocated pursuant to subparagraph (c)(1) above, shall be paid to Landlord prior to commencement of any Additional Work, and

(4)     An amount equal to the unpaid balance, if any, of the estimated total cost of any Additional Work shall be paid on or before the earlier of (i) the date that is 30 days following the commencement of such Additional Work, or (ii) the date that Landlord's Work is substantially completed, and

(5)     Notwithstanding the foregoing, an amount equal to the unpaid balance, if any, of the actual Cost of Landlord's Work shall be paid to Landlord upon substantial completion of Landlord's Work, and prior to initial occupancy by Tenant.

(d)     All sums due hereunder from Tenant shall be deemed to be Rent for any and all purposes of the Lease and Landlord shall have all of its rights and remedies under the Lease on account of Tenant's failure to timely pay such amounts. Tenant shall have sole responsibility for the Cost of Landlord's Work in excess of Landlord's Contribution. All amounts to be paid by Tenant hereunder shall be due and payable within 10 days after Landlord's delivery to Tenant of an invoice for such costs.

(e)     The provisions of this Section 4 shall survive the expiration or termination of the Lease.

5.     <u>Substantial Completion.</u>

(a)     Landlord shall, subject to Tenant Delays and events of Force Majeure, use commercially reasonable efforts to cause Landlord's Work to be substantially completed in accordance with the Final Plans on or prior to June 30, 2016 (the "<u>Anticipated Completion Date</u>").

(b)     As soon as possible after notice from Landlord to Tenant that Landlord believes Landlord's Work to be substantially completed, Landlord and Tenant, or their representatives, shall inspect the Premises. Landlord and Tenant shall mutually create, at the time of such inspection, a list of deficiencies and deviations from Landlord's Work (a "<u>Punch List</u>") to be corrected. If no such punch list is created at the time of such inspection, Tenant shall be deemed to have accepted the Premises in its condition at the time of the inspection and as being in the

condition in which Landlord is required to deliver the Premises in accordance with this Lease. If a punch list is delivered, the existence of a punch list shall not postpone the Rent Commencement Date provided the items on the punchlist are of a nature so as not to unreasonably interfere with Tenant's use or occupancy of the Premises and will not prevent the Premises from being legally occupied. Landlord shall correct or cure any punch list items within 30 days, or such longer period as may be necessary, provided Landlord is proceeding with due diligence to complete such items. Landlord shall have the right to enter the Premises to correct or cure such punch list items during non-business hours by providing tenant 48 hours of advanced notice, or as otherwise agreed to by Landlord and Tenant.

(c)    If substantial completion would have occurred earlier but for a Tenant Delay, then substantial completion will be deemed to have occurred on the date it would have occurred but for the Tenant Delay, and the term of the Lease and all obligations of Tenant under the Lease will commence on what would have been the Rent Commencement Date but for the Tenant Delay. As used herein, "Tenant Delay" shall mean any delay on account of any of the following: (i) Tenant's failure to timely provide Landlord with any information reasonably required by Landlord to prepare Landlord's Plans, (ii) Tenant's failure to approve or disapprove of Landlord's Plans in the time frames or the manner set forth herein, (iii) changes, deletions or additions to Landlord's Work requested by or resulting from acts or omissions of Tenant or the Tenant Parties and (iv) delays caused by the preparation, review, approval and performance of any Additional Plans or Additional Work, whether or not such Additional Work actually becomes a part of Landlord's Work.

6.    Early Access.

(a)    Landlord shall permit Tenant and its agents, to enter the Premises prior to the Rent Commencement Date to prepare the Premises for testing and installation of Tenant's diagnostic and surgical equipment, telephone and computer lines and other above-ceiling work. Tenant shall not have early access for any other reason. Any such permission shall constitute a license only, conditioned upon Tenant's: (a) working in harmony with Landlord and Landlord's agents, contractors, workmen, mechanics and suppliers and with other tenants and occupants; and (b) depositing with Landlord in advance of any work Tenant's contractor's affidavit for the proposed work and as necessary, from time to time, waivers of lien from Tenant's contractor and all subcontractors and suppliers of material; and (c) furnishing Landlord with the insurance required of Tenant pursuant to the Lease, and causing all other parties entering the Building to perform such work on behalf of Tenant, to provide Landlord with the same types, and amounts, of coverages required of the Tenant in the Lease.

(b)    Landlord shall not be liable in any way for any injury, loss or damage which may occur to any of Tenant's property or installations in the Premises (including but not limited to Tenant's diagnostic and surgical equipment) prior to the Rent Commencement Date. Tenant waives any claims therefore and shall protect, defend, indemnify and save harmless Landlord and the Landlord Indemnified Parties from all liabilities, costs, damages, fees and expenses arising out of the activities of Tenant or its agents, Tenant's contractor, other contractors, suppliers or workmen in the Premises or the Building. Tenant agrees that any such entry into and occupation of the Premises shall be deemed to be under all of the terms, covenants, conditions and provisions

of the Lease except as to the covenant to pay Rent. If Tenant fails to comply with any of the conditions set forth above, such license may immediately be terminated by Landlord.

    7.    <u>Miscellaneous</u>.

    (a)    This Work Letter shall not be deemed applicable to any additional space added to the original Premises at any time or from time to time, whether by any options under the Lease or otherwise, or to any portion of the original Premises or any additions thereto in the event of a renewal or extension of the initial term of the Lease, whether by any options under the Lease or otherwise, unless expressly so provided in the Lease or any amendment or supplement thereto.

    (b)    The failure by Tenant to pay any monies due Landlord pursuant to this Work Letter within the time period herein stated shall be deemed an Event of Default under the terms of the Lease, for which Landlord shall be entitled to exercise all remedies available to Landlord for nonpayment of Rent. All late payments shall bear interest and be subject to late charges permitted pursuant to the Lease.

    (c)    Tenant shall be solely responsible to determine at the site all dimensions of the Premises and the Building which affect any work to be performed by Tenant hereunder.

    (d)    This Work Letter may be executed in any number of counterparts and all of such counterparts shall be deemed to be one and the same instrument.

    (e)    Any notices required to be sent hereunder shall be in writing and sent in the manner set forth in the Lease.

    (f)    Landlord reserves the right to make substitutions of material of equivalent grade and quality if any specified material is not reasonably available and to make changes necessitated by conditions met during the course of construction, provided Tenant's approval of any substantial change (and any increase of cost incident thereto) is first obtained, which approval shall not be unreasonably withheld.

*SIGNATURES ON THE FOLLOWING PAGE*

IN WITNESS WHEREOF, the undersigned have duly executed and delivered this Work Letter as of the date first set forth above.

TENANT:

**ASSOCIATED ORAL SPECIALTIES, INC.,**
a Georgia corporation

By: *Dr. Freddie J. Wakefield, Jr.*

Name: *Fred Bailey, DMD*

Title: *CEO*

LANDLORD:

**LHT NORTH ATLANTA, LLC,**
a Delaware limited liability company

By: _____

Name: **Rex A. Noble**
Authorized Representative

Title: _____

EXHIBIT A TO WORK LETTER

LANDLORD'S PLANS



## EXHIBIT D

### ACCEPTANCE OF OCCUPANCY

| | |
|---|---|
| **TENANT:** | Associated Oral Specialties, Inc. |
| **LANDLORD:** | LHT North Atlanta, LLC |
| **BUILDING:** | Doctors Center III at Emory Saint Joseph's Hospital |
| **PREMISES:** | 420 |

**DATE OF**
**ORIGINAL LEASE:**

This Acceptance of Occupancy is executed by Tenant and Landlord pursuant to the provisions of the Lease referenced above. All terms capitalized but not defined herein shall have the respective meanings ascribed to them in the Lease.

1. Tenant acknowledges that it has inspected the Premises and finds same to be substantially complete and now suitable for Tenant's permitted use. Tenant and Landlord hereby agree that all work done to the Premises is acceptable and that only work remaining to be done to the Premises, all of which is of a minor nature, is as follows (collectively, the "Punch List"):

Such Punch List is the responsibility of Landlord to complete. Said party hereby agrees to promptly undertake the completion of same. Tenant agrees that such work may be completed after it has taken occupancy, and the Term of the Lease had commenced or is to commence on the Rent Commencement Date set forth in the Lease. Tenant shall not be entitled to any abatement of Rent on account of the performance of such Punch List.

2. Tenant and Landlord hereby agree that the actual Rent Commencement Date shall be _____, 201_, and that the Rent shall commence as of such date, and the Term shall expire on _____.

*SIGNATURES ON FOLLOWING PAGE*

01275908.8

Executed this _____ day of _____, 2016.

TENANT:

**ASSOCIATED ORAL SPECIALTIES, INC.,**
a Georgia corporation


By: _____

Name: _____

Title: _____



LANDLORD:

**LHT NORTH ATLANTA, LLC,**
a Delaware limited liability company


By: _____

Name: _____

Title: _____

SCHEDULE 1.1

Definitions

"Base Year" means calendar year 2016.

"Common Areas" means the parking areas; driveways, roadways and truckways; pedestrian sidewalks and tunnels; courtyards, loading docks, delivery areas and service areas; landscaped areas, detention basins and related control structures and facilities; public bathrooms and comfort stations; public stairways, elevators, escalators and corridors; public lobbies and all other areas, equipment or improvements which may be provided by Landlord for the convenience and use in common by Landlord and the tenants of the Project including all heating, ventilating and cooling systems provided by Landlord for all tenants.

"Environmental Requirements" collectively shall mean and include all present and future laws and any amendments (whether common law, statute, rule, order, regulation or otherwise), permits, and other requirements or guidelines of governmental authorities applicable to the Premises and relating to the environment and environmental conditions or to any Hazardous Materials and/or Infectious Wastes (including the Comprehensive Environmental Response Compensation, and Liability Act of 1980, 42 U.S.C. §§ 9601 et seq., the Federal Resource Conservation and Recovery Act of 1976, 42 U.S.C. §§ 6901 et seq., the Hazardous Materials Transportation Act, 49 U.S.C. §§ 6901 et seq., the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 et seq., the Clean Air Act, 33 U.S.C. §§ 7401 et seq., the Clean Air Act, 42 U.S.C. §§ 7401 et seq., the Toxic Substances Control Act, 15 U.S.C. §§ 2601-2629, the Safe Drinking Water Act, 42 U.S.C. §§ 300f-300j, the Emergency Planning and Community Right-To-Know Act, 42 U.S.C. §§ 1101 et seq., and any so-called "Super Fund" or "Super Lien" law, environmental laws administered by the Environmental Protection Agency, any similar state and local laws and regulations, all amendments thereto and all regulations, orders, decisions, and decrees now or hereafter promulgated thereunder).

"Excess Expenses" shall mean the amount by which the Expenses for the applicable calendar year exceed the Expense Base.

"Excess Taxes" shall mean the amount by which the Taxes for the applicable calendar year exceed the Tax Base.

"Expenses" shall mean all costs and expenses paid or incurred by or on behalf of Landlord for operating, maintaining, repairing, upgrading, replacing, and managing the Project, including the costs of heating, cooling and lighting; costs and expenses imposed against or attributed to the Project pursuant to the Ground Lease Documents; rent under the Ground Lease; snow and ice and trash removal; painting; cleaning; landscaping and grounds maintenance; window cleaning; repair and maintenance (including Landlord's repair, maintenance and service obligations set forth in Section 5.2 and 5.3 hereof) of the Project; the rental value of the Project's management office; maintenance and repair of all personal property of Landlord used or useful in connection with the Project; loading docks and truck docks; fuel, gas, water, sewer, steam, electricity and other utility charges (other than utilities metered directly to and paid by other tenants); insurance and insurance deductibles; security or traffic control forces or equipment (not to be construed to require Landlord

to provide such services or equipment); uniforms, supplies; holiday decorations; sales and use taxes on purchased goods; costs paid to service providers and contractors; costs incurred with respect to any "shuttle" bus, valet, car pooling or other transportation service servicing the Project; and other labor costs, payroll taxes, insurance, training and wages, salaries and fringe benefits of persons engaged in the accounting, operation, management, maintenance or repair of the Project; allocation of costs and expenses from Landlord's corporate offices, including costs and expenses for information technology, accounting and other centralized administrative functions provided to the Project; a market rate management fee and any other expense or charge which, in accordance with generally accepted accounting or management principles, would be considered as an expense of operating, maintaining, upgrading, replacing, managing or repairing the Project.

Expenses shall not include items included within the meaning of the term Taxes; costs of capital improvements to the Project (except as hereinafter provided); depreciation or amortization charges with respect to a capital improvement (except as hereinafter provided); interest and principal payments on mortgages; and brokerage and leasing commissions; cost of constructing and installing or reconstructing the Common Areas or the Project; interest and penalties on any Expenses, except to the extent incurred as a result of a default by Tenant in its obligation to make timely payments of Tenant's Pro Rata Share of Expenses; costs incurred to procure or negotiate leases with any existing or prospective tenants; costs to enforce leases against other tenants; the cost of correcting any violations in the Project of any applicable Governmental Regulations in existence as of the date of this Lease; cost of improvement and re-decorating allowances provided to other tenants; any cost or expenditure for which Landlord is reimbursed solely by other tenants (other than contributions for Taxes and Expenses); and any items for which Landlord is reimbursed by insurance or compensated for due to loss or damage, to the extent of such compensation or reimbursement.

Expenses shall include the cost of any capital improvements made on or after the Rent Commencement Date which are made or installed either for the purpose of reducing any cost included within Expenses or which are required under any applicable Governmental Regulations which were not applicable to the Project on the date of this Lease, in each case amortized over the useful life of such capital improvement (as determined in accordance with generally accepted accounting principles), together with interest on the unamortized cost of such improvement at the prime rate of interest on the date the cost of such capital improvement was incurred.  To the extent that Expenses include the costs of capital improvements as provided in this paragraph, Landlord shall be permitted to do the same with respect to the costs of leasing such capital item.

"Expense Base" shall mean the Expenses attributable to the Project for the Base Year.  If the Project is less than 95% leased and occupied during the Base Year, the Expense Base shall be equitably adjusted to reflect 100% occupancy.

"Force Majeure" shall mean acts of God, fire, earthquake, flood, explosion, actions of the elements, war, invasion, insurrection, riot, mob violence, sabotage, inability to procure or general shortage of labor, equipment, facility, materials or supplies in the open market, failure of transportation, strikes, lock outs, actions of labor unions, condemnation, requisition, laws, governmental action or inaction, orders of government or civil or military or naval authorities or any cause, whether similar or dissimilar to the foregoing, not within their reasonable control of, as

applicable, the Landlord or the Landlord Indemnified Parties, or the Tenant or the Tenant Parties. In no event, however, shall a lack of money be grounds for Force Majeure.

"Governmental Regulations" shall mean all instruments of record that burden the Real Estate and all requirements, rules, orders, codes and regulations of the federal, state and municipal governments or other duly constituted public authority, and of any board of insurance regulators or underwriters, health officer, fire marshal, and/or building inspector affecting or relating to the Premises, the business conducted in the Premises and Tenant's use of the Premises including the making of Alterations.

"Hazardous Materials" means, at any time, (i) asbestos and any asbestos containing material, (ii) any substance that is then defined or listed in, or otherwise classified pursuant to, any Environmental Requirements or any applicable laws or regulations as a "hazardous substance", "hazardous material", "hazardous waste", "infectious waste", "toxic substance", "toxic pollutant" or any other formulation intended to define, list, or classify substances by reason of deleterious properties such as ignitability, corrosivity, reactivity, carcinogenicity, toxicity, reproductive toxicity, or "EP toxicity", or (iii) any petroleum and drilling fluids, produced waters, and other wastes associated with the exploration, development or production of crude oil, natural gas, or geothermal resources, (iv) petroleum products, polychlorinated biphenyls, urea formaldehyde, radon gas, radioactive matter and medical waste, or (v) any product that is inflammable, combustible, corrosive, caustic, poisonous, explosive or hazardous.

As defined in Environmental Requirements, Tenant is and shall be deemed to be the "operator" of Tenant's "facility" and the "owner" of all Hazardous Materials or Infectious Wastes brought on the Premises by Tenant, its subtenants, assignees, agents, employees, contractors or invitees, and the wastes, by-products, or residues generated, resulting, or produced therefrom.

"Infectious Wastes" shall mean: any solid waste capable of producing an infectious disease, including all bulk blood, blood products; cultures of specimens from medical, pathological, pharmaceutical, research, commercial and industrial laboratories; human tissues; organs, body parts, secretions, blood and body fluids removed during surgery and autopsies; the carcasses and body parts of all animals exposed to pathogens in research, used in the vivo testing of pharmaceuticals or that died of known or suspected infectious diseases; needles, syringes and scalpel blades.

"Lease Year" shall mean each consecutive 12-month period beginning with the Rent Commencement Date, except that if the Rent Commencement Date is other than the first day of a calendar month, then the first Lease Year shall be the period from the Rent Commencement Date through the date 12 months after the last day of the calendar month in which the Rent Commencement Date occurs, and each subsequent Lease Year shall be the period of 12 months following the last day of the prior Lease Year.

"Metropolitan Area" shall mean the area covered by Fulton county, located in the State of Georgia.

"Tax Base" shall mean the Taxes due and payable with respect to the Project for the Base Year.

"Parking Agreement" means that certain Parking Revenue and Expense Agreement between Landlord and Saint Joseph's Hospital of Atlanta, Inc., dated as of March 24, 2000, and amended as of December 31, 2001, as the same may be amended and restated from time to time.

"REA" means that certain Reciprocal Easement and Operating Declaration between Landlord, Saint Joseph's Hospital of Atlanta, Inc. and Saint Joseph's Real Estate Management Corporation, dated as of March 24, 2000, as the same may be amended or restated from time to time.

"Taxes" shall mean all taxes and assessments, special or ordinary, and all other impositions of every kind and nature whatsoever (including any transit tax, sewer rents, impact fee, school district assessments and taxes based on gross receipts of rent or payments received for services), which may be levied, assessed, charged or imposed (including those imposed pursuant to the Ground Lease Documents) upon the Project or any personal property owned or leased by Landlord and used therewith, together with all fees and costs incurred by Landlord for the purpose of contesting or protesting the amounts or rates of Taxes. Taxes shall not include any income tax (or tax that Landlord determines in its reasonable discretion is a successor thereto) or any excess profit, franchise, capital stock, estate or inheritance tax payable by Landlord except as specifically provided in the next sentence. If at any time during the Term the method of taxation prevailing at the Rent Commencement Date shall be altered so that any new or additional tax assessment, levy, imposition, or charge, or any part thereof, shall be imposed in place or partly in place of any Taxes or contemplated increase therein, including any tax, assessment, levy, imposition or charge on Rent, then all such taxes, assessments, levies, impositions or charges shall be deemed to be Taxes for the purpose hereof, to the extent that such Taxes would be payable if the Project was the only property of Landlord subject to such tax. If any assessments constituting Taxes are or may be payable to the applicable taxing authority in installments over more than one calendar year then, to the extent permitted by its lender, Landlord shall cause such Taxes to be paid in installments, and only those installments (plus any interest thereon) payable during a calendar year in which the Term falls shall be included in Taxes for such calendar year in which payment is due. Otherwise, Taxes "for" a calendar year shall be deemed to refer, at Landlord's option, either to Taxes payable in such calendar year or to Taxes levied, assessed or otherwise accrued or imposed for such calendar year without regard to when such Taxes are payable. Taxes shall not include interest and penalties for late payment, except to the extent that such penalty or interest is attributable to Tenant's failure to remit on a timely basis Tenant's Pro Rata Share of Taxes. If such interest or penalty is attributable solely to Tenant's failure to remit Tenant's Pro Rata Share of Taxes, then Tenant shall be solely responsible for payment of such interest and/or penalty. If such interest or penalty is attributable to such failure by Tenant and to other tenants' failure to pay their pro rata share of Taxes, Tenant shall pay its proportionate share of the amount of such interest and/or penalty.

"Tenant's Pro Rata Share" shall mean the percentage computed from the fraction equal to the Rentable Square Feet within the Premises, divided by the total Rentable Square Feet in the Project; provided, however, (i) that the Project's Rentable Square Footage shall be reduced by any below grade space not used for normal medical office purposes (e.g. storage or warehouse) and (ii) if any portion of the Project is exempt from Taxes, the Rentable Square Feet in such exempt portion shall not be included in the Rentable Square Feet of the Project for purposes of determining Tenant's responsibility for paying its share of Taxes with the understanding that the tenant or

occupant of such exempt space shall be entitled to receive the full benefit of such exemption. Tenant's Pro Rata Share may be adjusted from time to time upon notice from Landlord on account of any reduction to or expansion of the Premises or the Project, whether from casualty, condemnation, alteration or otherwise.

# GUARANTY OF LEASE

THIS GUARANTY OF LEASE ("Guaranty") is made effective as of _March 21_, 2016, by DR.
FREDDIE J. WAKEFIELD, JR., an individual ("Guarantor"), in favor of LHT NORTH ATLANTA, LLC, a
Delaware limited liability company ("Landlord").

RECITALS:

A.    Landlord and Associated Oral Specialties, Inc., a Georgia corporation ("Tenant"), are
entering into that certain Lease Agreement, dated on or around the date of this Guaranty (the "Lease").
Capitalized terms used in this Guaranty but not defined herein shall have the meaning given to them in the
Lease.

B.    Guarantor holds a beneficial ownership interest in Tenant.  In order to enter into the
Lease with Tenant, Landlord requires that this Guaranty be provided by Guarantor.

AGREEMENT:

NOW, THEREFORE, Guarantor hereby agrees as follows:

1.    **Guaranty.**    Guarantor absolutely, unconditionally and irrevocably guarantees to
Landlord (a) the full, prompt and faithful performance of all of the terms and conditions of the Lease, and
all modifications, renewals and extensions thereof, by Tenant and any successor or assign of Tenant
(whether by operation of law or otherwise) including, but not limited to, the payment of all installments of
Rent and other sums due to Landlord thereunder and (b) the full and prompt payment of any attorneys'
fees, court costs and other expenses incurred by Landlord on account of any failure of Tenant to perform
its obligations under the Lease and on account of the enforcement of this Guaranty including, without
limitation, those set forth in Section 9 hereof.  All such obligations of Tenant under the Lease (and under
all modifications, renewals and extensions thereof) are referred to in this Guaranty as the "Obligations"
and shall be payable by Guarantor to Landlord immediately on demand in the event of any default of
Tenant with respect to the Obligations or any part thereof.

2.    **Rights of Landlord.**  Guarantor authorizes Landlord at any time, in its discretion, to alter
any of the terms of the Lease or Obligations, to release Tenant of its liability for all or any part of the
Lease or Obligations, to release, substitute or add any one or more guarantors, and to assign this Guaranty
in whole or in part.  Landlord may take any of the foregoing actions upon any terms and conditions as
Landlord may elect, without giving notice to Guarantor or obtaining the consent of Guarantor and without
affecting the liability of Guarantor to Landlord.

3.    **Independent Obligations.**  Guarantor's obligations under this Guaranty are joint and
several with those of any other guarantors of the Lease and are independent of those of Tenant.  Landlord
may bring a separate action against any one or more guarantors of the Lease without first proceeding
against Tenant or any other person and without pursuing any other remedy.  Landlord's right under this
Guaranty will not be exhausted by any action by Landlord until all of the Obligations have been fully paid
and performed.  This Guaranty is an absolute, unconditional and continuing guaranty without regard to
the validity or enforceability of any Obligation.  Further, Guarantor expressly agrees that its obligations
hereunder shall not in any way be terminated, affected or impaired by reason of the granting by Landlord
of any indulgences to Tenant or by reason of the assertion against Tenant of any of the rights or remedies
reserved to Landlord pursuant to the provisions of the Lease or by relief of Tenant from any of Tenant's
obligations under said Lease whether by operation of law or otherwise, Guarantor hereby waiving all
suretyship defenses and all other defenses other than strict payment and performance in full of all of the

Obligations.  Guarantor further covenants and agrees that this Guaranty shall remain and continue in full force and effect as to any renewal, modification or extension of the Lease and any assignment or other transfer thereof or any interest therein by Tenant (including the assignment of any interests in Tenant) or by operation of law, whether or not Guarantor shall have received any notice of or consent to such renewal, modification, extension or assignment.

   **4.**  **Waiver of Defenses.**  Guarantor waives:  (a) all statutes of limitations as a defense to any action brought against Guarantor by Landlord, to the fullest extent permitted by law; (b) any defense based upon any legal disability of Tenant or any discharge or limitation of the liability of Tenant to Landlord, whether consensual or arising by operation of law or any bankruptcy, insolvency, or debtor-relief proceeding, or from any other cause; (c) presentment, demand, protest and notice of any kind; (d) any defense based upon or arising out of any defense which Tenant may have to the payment or performance of any part of the Obligations; (e) all rights of subrogation, and all rights to enforce any remedy that Landlord may have against Tenant, until the Obligations have been paid and performed in full; and (f) all defenses, statutory or otherwise, which might result because any other guarantor or guarantors of the Lease is released from its obligations.

   **5.**  **Tenant's Financial Condition.**  Guarantor assumes full responsibility for keeping fully informed of the financial condition of Tenant and all other circumstances affecting Tenant's ability to perform its Obligations to Landlord, and agrees that Landlord shall have no duty to report to Guarantor any information which Landlord receives about Tenant's financial condition or any circumstances bearing on Tenant's ability to perform.

   **6.**  **Waiver of Rights Against Tenant.**  In further consideration of the Lease made by Landlord to Tenant, Guarantor hereby unconditionally and irrevocably waives and relinquishes any and all rights and claims it may have, at law or in equity, for reimbursement, indemnification, exoneration, subrogation and contribution against Tenant or any other person or entity primarily, contingently, secondarily, directly or indirectly liable on all or any part of the Obligations, or against any collateral or any security for the Obligations, that otherwise would arise out of or result from any payment by Guarantor to Landlord under or pursuant to the Guaranty.

   **7.**  **Bankruptcy.**  Guarantor agrees that if Tenant shall become insolvent or shall be adjudicated bankrupt, or shall file a petition for reorganization, arrangement or similar relief under any present or future provisions of the Federal Bankruptcy Code, or any similar law or statute of the United States or any state thereof, or if such a petition filed by creditors of Tenant shall be approved by a court, or if Tenant shall seek a judicial readjustment of the rights of its creditors under any present or future federal or state law or if a receiver of all or part of its property and assets is appointed by any state or federal court, then:

   **(a)**  If the Lease shall be terminated or rejected, or the obligations of Tenant thereunder shall be modified, Landlord shall have the option either (i) to require Guarantor, and Guarantor hereby so agrees, to execute and deliver to Landlord a new lease as tenant for the balance of the term then remaining as provided in the Lease and upon the same terms and conditions as set forth therein, or (ii) to recover from Guarantor that which Landlord would be entitled to recover from Tenant under the Lease in the event of a termination of the Lease by Landlord because of a default by Tenant, and such shall be recoverable from Guarantor without regard to whether Landlord is entitled to recover the same from Tenant in any such proceeding.

   **(b)**  If any obligation under the Lease is performed by Tenant and all or part of such performance is avoided or recovered from Landlord as a preference, fraudulent transfer or otherwise, in any bankruptcy, insolvency, liquidation, reorganization or other proceeding involving Tenant, the liability

of Guarantor under this Guaranty shall remain in full force and effect and such Obligations shall be deemed to have continued in existence to the extent that such payment or other transfer is rescinded, avoided or returned, and this Guaranty shall be reinstated as to such Obligations as though such prior application or transfer to Landlord had not been made or otherwise taken into account. The provisions of this Section 7(b) shall survive the payment and satisfaction of either or both of the Obligations and this Guaranty as well as the delivery of any instruments of release, satisfaction or termination that may be delivered in connection with the Lease or this Guaranty.

(c)    If Guarantor has a claim against Tenant, whether in administration, bankruptcy or otherwise, Guarantor hereby assigns to Landlord all of Guarantor's rights to any such payments or distributions to which Guarantor would otherwise be entitled to the extent of Guarantor's obligations under this Guaranty.

8.    **Default.**  Landlord may declare Guarantor in default under this Guaranty if Guarantor or any other guarantor of the Lease fails, on demand, to perform any of its obligations under its guaranty or becomes the subject of any bankruptcy, insolvency, arrangement, reorganization or other debtor-relief proceeding under any federal or state law, whether now existing or hereafter enacted.

9.    **Costs and Expenses.**  Guarantor agrees to pay Landlord's reasonable out-of-pocket costs and expenses, including but not limited to, legal fees and disbursements, incurred in any effort to collect or enforce any of the obligations or this Guaranty, whether or not any lawsuit is filed. Until paid to Landlord, such sums shall bear interest at the rate of 18% per annum.

10.    **Delay; Cumulative Remedies.**  No delay or failure by Landlord to exercise any right or remedy against Tenant, Guarantor or any other guarantor of the Lease shall be construed as a waiver of that right or remedy. It is agreed that the failure of Landlord to insist in any one or more instances upon strict performance or observance of any of the terms, provisions or covenants of the Lease or to exercise any right therein contained shall not be construed or deemed to be a waiver or relinquishment for the future of such term, provision, covenant or right, but the same shall continue and remain in full force and effect. Receipt of any Rent shall not be deemed a waiver of such breach. All remedies of Landlord against Tenant and each guarantor of the Lease are intended to be distinct, separate and cumulative and no such right and remedy therein or herein is intended to be to the exclusion of or a waiver of any other.

11.    **Does Not Supersede Other Guarantees.**  The obligation of Guarantor hereunder shall be in addition to any obligations of Guarantor under any other guarantees of Tenant or any other persons heretofore given or hereafter to be given to Landlord, unless said other guarantees are expressly modified or revoked in writing, and this Guaranty shall not affect or invalidate any such other guarantees.

12.    **Subordination.**  Guarantor hereby postpones and subordinates to the claims of Landlord against Tenant any indebtedness or other claim which Guarantor may have against Tenant, whether now existing or arising in the future, until all Obligations of Tenant to Landlord are fully satisfied.

13.    **Miscellaneous.**  The invalidity or unenforceability of any one or more provisions of this Guaranty shall not affect any other provision. This Guaranty shall be governed by the laws of the State of Illinois, and may be amended only by a written instrument executed by Guarantor and Landlord. The obligations of Guarantor under this Guaranty shall bind and benefit the heirs, executors, administrators, legal representatives, successors and assigns of Guarantor and Landlord; provided, however, Guarantor shall not assign or delegate its obligations hereunder without the prior written consent of Landlord. Whenever the context requires, all terms used in the singular include the plural and vice versa, and each gender includes the other gender. The term "Tenant" means both the named Tenant and any other person or entity at any time assuming or otherwise becoming primarily liable on all or any part of the

Obligations. Landlord may, without notice, assign this Guaranty in whole or in part, or may assign all of its interests in and to the Lease, and, in such event, each and every successive assignee of the landlord's interest in the Lease or of the Guaranty will have the right to enforce this Guaranty, by suit or otherwise, for the benefit of such assignee as fully as if such assignee were named herein. Executed versions of this Guaranty may be delivered by Guarantor via facsimile transmission or email, either or both of which shall constitute delivery of an original.

      14.    **Authority**. Guarantor warrants and represents that it has the legal right power, authority and capacity to execute this Guaranty, that such execution does not violate any loans or other agreements by which Guarantor is bound and that this Guaranty is fully binding and enforceable against Guarantor.

      15.    **ERISA**. Guarantor represents and warrants that it is not and is not acting on behalf of, and covenants that during the term of the Lease or this Guaranty it will not be nor will it act on behalf of, (a) an "employee benefit plan" within the meaning of Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended, (b) a "plan" within the meaning of Section 4975 of the Internal Revenue Code of 1986, as amended or (c) an entity deemed to hold "plan assets" within the meaning of 29 C.F.R. § 2510.3-101 of any such employee benefit plan or plans.

      16.    **Notices.** All notices to be sent hereunder shall be sent in the manner and deemed delivered at the times set forth in the Lease; with the exception that notices sent to Guarantor shall be sent to the address of Tenant.

      17.    **WAIVER OF JURY TRIAL**. LANDLORD AND GUARANTOR EACH WAIVE ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING TO ENFORCE OR DEFEND ANY RIGHTS UNDER THIS GUARANTY AND LANDLORD AND GUARANTOR EACH AGREE THAT ANY SUCH ACTION OR PROCEEDING SHALL BE TRIED BEFORE A COURT AND NOT A JURY.

      18.    **Warranties as to Guarantor's Financial Status.** Guarantor hereby represents and warrants to Landlord that any financial statements (a) delivered by Guarantor to Landlord were or will be, at the time of such delivery, complete and accurate in all material respects, and (b) previously delivered to Landlord are still now complete and accurate in all material respects. If any such representation or warranty shall at any time prove to have been, be, or become untrue or inaccurate, such condition shall constitute an event of default hereunder and under the Lease, entitling Landlord forthwith to exercise all of its rights and remedies against Tenant or Guarantor.

[signature page follows]

IN WITNESS WHEREOF, Guarantor executes and delivers to Landlord this Guaranty as of the date first set forth above.

GUARANTOR:

_____
DR. FREDDIE J. WAKEFIELD, JR., an individual