UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

IN RE:                                      )
                                            )
DENTCORP MANAGEMENT, LLC,                   )        CASE NO. 22-54412-bem
                                            )
        Debtor                              )        CHAPTER 7
_____)

## MOTION TO APPROVE SALE OF ESTATE'S INTEREST IN PROPERTY

COMES NOW Neil C. Gordon, Chapter 7 trustee ("Trustee") for the bankruptcy estate of DentCorp Management, LLC ("Debtor"), and hereby files the *Motion to Approve Sale of Estate's Interest in Property* (the "Motion"), showing as follows:

### Background

1.      Timothy Kiser ("Kiser") initiated a civil action in the Superior Court of Fulton County, Case No. 2021CV355806 (the "Litigation") against Freddie Wakefield, Jr., DMD ("F. Wakefield"), Daryl Wakefield ("D. Wakefield")(collectively, the "Wakefields"), and Debtor alleging, among other things, that the Wakefields defrauded Kiser into investing in Debtor.

2.      On or about January 25, 2022, the Superior Court entered an Order (the "Receivership Order") in the Litigation appointing Christopher Tierney as receiver (the "Receiver") to "manage all necessary operations of the company…." The Receivership Order identified the Receivership Estate as including all "property and assets of [Debtor] and its corporate affiliates, wherever located…."

3.      On or about May 9, 2022, the Superior Court entered an Order authorizing the Receiver to file a voluntary petition for relief under the United States Bankruptcy Code for Debtor and its affiliates.

18737182v1

4.      On June 9, 2022 (the "Petition Date"), the Receiver filed a voluntary Chapter 7 petition for Debtor.

5.      Trustee was appointed interim trustee for Debtor's bankruptcy estate. Following conclusion of the Section 341(a) meeting of creditors on September 6, 2022, Trustee became permanent Chapter 7 trustee for Debtor's bankruptcy estate.

**The Property**

6.      Pursuant to a *Practice Assets Sale Agreement* entered into December 8, 2020 (the "Sale Agreement"), Debtor and Scott Huynh ("Huynh") jointly acquired from Robert S. Israel, DDS and Wildwood Management, LLC a dental practice located at 1230 Satellite Blvd., Suite 100, Suwanee, GA 30024 (the "Suwanee Practice"). The *Bill of Sale and Assignment* of the assets and business of the Suwanee Practice (the "Suwanee Assets") was made jointly to Debtor and Huynh (the "Bill of Sale"). A copy of the Sale Agreement is attached hereto as Exhibit "A." A copy of the Bill of Sale is attached as Exhibit "B."

7.       Huynh desires to acquire all of the estate's interest in and to the Suwanee Assets acquired under the Sale Agreement and Bill of Sale.

8.      Zions Bancorporation, N.A. ("Zions") asserts a security interest in and to, among other things, all of the Suwanee Assets pursuant to a Commercial Security Agreement dated on or about December 4, 2020.

**Relief Requested**

9.      By this Motion, Trustee seeks authority to sell to Huynh or an entity owned and controlled by Huynh all of the estate's interest in and to the Suwanee Assets for the price of $25,000. The sale will be subject to all existing liens and security interests, including the security interest of Zions.

18737182v1

10.     Huynh will escrow the full purchase price with his counsel no later than seven (7) days prior to the hearing on the Motion.

**Basis for Relief**

11.     Section 363 of the Bankruptcy Code authorizes a trustee "after notice and a hearing . . . to use, sell, or lease other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).

12.     Trustee, exercising his business judgment after a thorough review of Debtor's current financial condition, has concluded that the offer from Huynh for the purchase of the estate's interest in and to the Suwanee Assets, subject to all existing liens and security interests, including the security interest of Zions,  (i) is fair and reasonable; (ii) is in the best interests of Debtor's creditors and estate; and (iii) constitutes fair value, full and adequate consideration, reasonably equivalent value, and reasonable market value for the Suwanee Assets.

WHEREFORE, Trustee prays that this Court approve the sale of the estate's interest in and to the Suwanee Assets, subject to all existing liens and security interests, including the security interest of Zions, to Huynh for $25,000, and that the Court grant such other relief as is appropriate.

Dated: September 24, 2022

Respectfully submitted,

ARNALL GOLDEN GREGORY LLP

By: /s/ Neil C. Gordon
     Neil C. Gordon
     State Bar No. 302387
Attorneys for Chapter 7 Trustee

171 17th Street, N.W., Suite 2100
Atlanta, Georgia 30363-1031
(404) 873-8596
Neil.Gordon@agg.com

18737182v1

**EXHIBIT "A"**

**Practice Assets Sale Agreement**

18737182v1

# PRACTICE ASSETS SALE AGREEMENT

FOR

**ROBERT S. ISRAEL, DDS**

**WILDWOOD DENTAL CARE, PC**

And

**SCOTT L. HUYNH, DMD**

**DENTCORP MANAGEMENT, LLC**

TABLE OF CONTENTS PRACTICE ASSET SALE AGREEMENT

Page

1.  PURCHASE PRICE AND TERMS ....................................................................... 5
2.  THE CLOSING ................................................................................................. 5
3.  ASSETS BEING PURCHASED AND ALLOCATIONS ........................................... 6
4.  TITLE EXAMINATION ..................................................................................... 9
5.  PREPAID FEES AND PROCEDURES IN PROGRESS ........................................... 9
6.  THE CORPORATION'S ACCOUNTS RECEIVABLE DEFINITION ...................... 10
7.  SELLERS' WARRANTIES, REPRESENTATIONS, ACKNOWLEDGMENTS ........... 11
8.  PURCHASER'S REPRESENTATIONS AND WARRANTIES ............................... 14
9.  SERVICES LIABILITY AND PATIENT RETREATMENT ..................................... 15
10. CORPORATION'S EMPLOYEES ..................................................................... 16
11. BILLS OF SALE AND ASSIGNMENT ............................................................... 16
12. THE CORPORATION'S PATIENT RECORDS .................................................... 16
13. USE OF THE SELLER'S NAME ....................................................................... 17
14. PREMISES USE ............................................................................................ 17
15. LETTERS TO PATIENTS AND REFERRAL SOURCES ....................................... 18
16. FAMILY TREATMENT ................................................................................... 18
17. TAXES ........................................................................................................ 18
18. SPECIFIC PERFORMANCE ............................................................................ 18
19. DISPUTES; MEDIATION AND ARBITRATION ................................................ 18
20. EXPENSES ................................................................................................... 19
21. INDEMNIFICATION ..................................................................................... 19
22. DISCLAIMER OF PARTNERSHIP ................................................................... 20
23. CHOICE OF LAW ......................................................................................... 20
24. BINDING EFFECT, ASSIGNMENT ................................................................. 20
25. SEVERABILITY ............................................................................................ 21
26. MISCELLANEOUS ........................................................................................ 21
27. NOTICE ...................................................................................................... 21
28. REPRESENTATIONS AND THE PARTIES' RIGHTS TO COUNSEL ..................... 21
29. WAIVER OF BREACH OR VIOLATION NOT DEEMED CONTINUING ............... 22

INITIALS
DR. HUYNH                               PAGE 2                               INITIALS
                                                                             DR. ISRAEL

**30.**   COMPLETE AGREEMENT ................................................................................ 22

**31.**   SURVIVAL OF COVENANTS ........................................................................... 22

**32.**   INTERPRETATION/NO PRESUMPTION ........................................................... 22

**33.**   FURTHER ASSURANCES ............................................................................... 22

**34.**   CONSENT IN LIEU OF MEETINGS .................................................................. 24

**35.**   BILL OF SALE AND ASSIGNMENT .................................................................. 25

**36.**   BILL OF SALE AND ASSIGNMENT .................................................................. 26

**37.**   NON-COMPETITION AGREEMENT .................................................................. 27

**38.**   PERSONAL NON-COMPETITION AGREEMENT ............................................... 32

**39.**   ASSIGNMENT OF TELEPHONE, WEBSITE, SOCIAL MEDIA & ADVERTISING RIGHTS .................... 37

**40.**   MISCELLANEOUS PRORATION AGREEMENT ................................................. 39

**41.**   POST-SALE PROVIDER AGREEMENT ............................................................. 40

**42.**   PREPAID SERVICES/PATIENT CONTRACTS/ SERVICES IN PROGRESS ............................ 47

**43.**   EQUIPMENT EXHIBIT EQUIPMENT FURNITURE AND FIXTURES ........................ 48

**44.**   ASSETS EXCLUDED FROM SALE EXHIBIT ...................................................... 49

**45.**   IMMEDIATE FAMILY NAMES EXHIBIT ........................................................... 50

INITIALS
DR. HUYNH

INITIALS
DR. ISRAEL

## PRACTICE ASSETS SALE AGREEMENT

The concepts and ideas contained in this **"Practice Assets Sale Agreement"** are the result of over fifteen years experience working with hundreds of attorneys, CPAs, and well known dental practice consultants across the country in similar transactions. These Agreements are provided for your convenience, as well as that of your legal and tax advisors.  However, **this Agreement is <u>not</u> intended to replace the independent advice of your legal, tax, and other advisors, so please have them review this information, and we will be happy to either provide them this agreement on computer disk, and/or make any of their desired modifications.**

**A SPECIAL NOTE:** There are many unique as well as sensitive issues to consider in a transaction of this nature, and it is crucial that as much care as possible be exercised in carrying out the entire process from a *"win-win" philosophy*. Oftentimes business transactions are carried out from an *adversary* ("win-lose") posture, with the parties and their respective advisors "firing canons" at each other in an effort to "protect their interests". This posture often destroys all trust between the parties in the process, permanently damaging the most necessary and critical component of the entire transition....the relationship!  It makes no sense to win the battle and lose the war!

The purpose of this Agreement is to represent an *equitable balance* of the special needs of <u>both parties</u> in the transaction, reflecting the spirit of "marriage" as opposed to treating the transaction as if it were a "divorce". I hope that you and your advisors will find them helpful.

All rights reserved.  No part of this agreement or the attached exhibits may be reproduced or utilized in any form or by any means, electronic or mechanical, including photocopying, recording or by any information storage and retrieval system, without permission in writing from U.S. Dental Transitions.

INITIALS
DR. HUYNH

PAGE 4

INITIALS
DR. ISRAEL

**PRACTICE ASSETS SALE AGREEMENT**

**THIS PRACTICE ASSETS SALE AGREEMENT** entered into on December 8, 2020, (the "Signature Date"), by and between the following parties:

ROBERT S. ISRAEL, DDS (referred to individually in this Agreement as "the Seller").

WILDWOOD DENTAL CARE, PC, a professional corporation operating under the laws of the State of Georgia (referred to individually in this Agreement as the "Corporation"). The Seller and the Corporation are sometimes referred to collectively in this Agreement as the "Sellers."

SCOTT L. HUYNH, DMD (referred to individually in this Agreement as the "PURCHASER").

DENTCORP MANAGEMENT, LLC, a limited liability company operating under the laws of the State of Georgia. PURCHASER and the Corporation are sometimes referred to collectively in this agreement as the "Purchaser".

WHEREAS, the Corporation owns and operates a professional dental practice (referred to as the "Practice") located at 1230 Satellite Blvd., Ste. 100, Suwanee, GA 30024 (referred to as the "Premises").

WHEREAS, the Seller organized the Corporation and has conducted his professional practice in the form of the Corporation.

WHEREAS, the Sellers desire to sell and assign to the Purchaser their respective title, interest, and rights to the assets described in this Practice Assets Sale Agreement, subject to the terms and conditions as described within this Agreement.

In consideration of the mutual covenants and conditions set forth in this Practice Assets Sale Agreement, the parties agree as follows:

1. **PURCHASE PRICE AND TERMS**: The total purchase price for the assets of the Practice as described in this Agreement shall be SEVEN HUNDRED THIRTY NINE THOUSAND THREE HUNDRED EIGHTY TWO AND 00/100 DOLLARS ($739,382.00) (referred to as the "Purchase Price"). The Purchase Price shall be payable to the Sellers in cash at Closing in the amounts set forth herein to be wired to accounts designated by the respective Sellers.

2. **THE CLOSING**: The Closing ("Closing") shall take place on December 8, 2020 (the "Closing Date"), or at such other time and place as the parties shall otherwise agree and shall be effective as of 11:59 P.M. on the Closing Date. The respective advisors of the Purchaser and Sellers shall have reviewed prior to the Closing this Practice Assets Sale Agreement, along with any other documents to be signed by the parties.

INITIALS                                    PAGE 5                                    INITIALS
DR. HUYNH                                                                              DR. ISRAEL

**CLOSING AND DATE OF POSSESSION**:  The Date of Possession shall be the same as the Closing Date.

As of the Date of Closing, the Purchaser shall also have purchased and shall maintain public liability insurance on the Practice, in such form and consistent with amounts common to the profession and professional malpractice insurance with limits of no less than $1,000,000 per occurrence, $3,000,000 aggregate.

**3.    ASSETS BEING PURCHASED AND ALLOCATIONS**:  The Corporation is conveying to the Purchaser the following Practice assets, and specifically excluding any assets listed on the attached Exhibit, ASSETS EXCLUDED FROM THE SALE.

**TAX RETURNS**:  The Sellers and the Purchaser have consulted with their respective tax advisors concerning the tax ramifications of this transaction, and shall file tax returns reflecting the allocations of the purchase price as described in this Agreement.

| CORPORATE ASSETS OF WILDWOOD DENTAL CARE, PC | ALLOCATION OF PURCHASE PRICE |
|---|---|
| • EQUIPMENT | $110,000.00 |
| • FURNITURE AND FIXTURES | $10,000.00 |
| • SUPPLIES/SMALL INSTRUMENTS | $5,000.00 |
| • PATIENT RECORDS | $5,000.00 |
| • CORPORATE GOODWILL | $7,876.40 |
| • NON-COMPETITION AGREEMENT. | $10,000.00 |
| TOTAL | $147,876.40 |

| PERSONAL ASSETS OF ROBERT S. ISRAEL, DDS | ALLOCATION OF PURCHASE PRICE |
|---|---|
| • PERSONAL GOODWILL | $581,505.60 |
| • NON-COMPETITION AGREEMENT | $10,000.00 |
| TOTAL | $591,505.60 |

| **TOTAL ASSETS CORPORATE & PERSONAL** | $739,382.00 |
|---|---|

**EQUIPMENT**:  All of the clinical, office, and laboratory equipment located in the Practice located in the Premises, including, but not limited to those items listed on the attached Exhibit,

INITIALS                                                    INITIALS
DR. HUYNH                        PAGE 6                     DR. ISRAEL

EQUIPMENT, FURNITURE AND FIXTURES:  Any telephone systems used in the operation of the practice (whether leased or owned) shall be included in this Equipment.

**FURNITURE AND FIXTURES**:  All of the furniture and fixtures of the Practice in the Premises as listed on the attached Exhibit, EQUIPMENT, FURNITURE AND FIXTURES.

**OFFICE AND CLINICAL SUPPLIES/SMALL INSTRUMENTS**:  All of the office and clinical supplies and small clinical instruments of the Practice in the Premises at the time of Closing.  The Corporation is expected to transfer to the Purchaser at Closing, a reasonable and customary inventory of these items.

**PATIENT RECORDS**:  Subject to any applicable state or dental regulatory board requirements, the Corporation is assigning to the Purchaser all the financial, clinical, recall, and other treatment records of the patients of the Practice.

**GOODWILL**:  As part of this Practice sale, the Corporation is conveying its goodwill of the Practice to the Purchaser and the Seller is conveying his personal professional goodwill relating to the Practice to the Purchaser.  In conjunction with the sale of the assets of the Practice, the Sellers shall provide the Purchaser with assistance in the transition of the Practice to the Purchaser (referred to collectively as "Practice Transition Services").  Such services shall include the normal introduction of the patients to the Purchaser when deemed appropriate, and on those occasions when the Seller is scheduled in the Purchaser's office.  In addition, the Sellers agree to have any necessary discussions with the Purchaser (which may be done by telephone) concerning any existing or proposed treatment plan on any patients previously treated by the Sellers.

**NON-COMPETITION AGREEMENTS**:  In conjunction with the sale of the assets of the Practice, and to protect the goodwill being conveyed, each of the Corporation and the Seller is agreeing to all of the terms and conditions of the attached respective NON-COMPETITION AGREEMENTS.

**ASSETS INSPECTION AND WARRANTIES**:  The Corporation shall guarantee all equipment to be in working condition at the time of Closing. Subject to this guarantee, the Purchaser is accepting the assets "as is" at the time of Closing.

All transferable manufacturer's warranties and maintenance agreements on the Corporation's equipment being sold shall be conveyed to the Purchaser at Closing, and the Purchaser shall be responsible for the costs of continuing any such maintenance agreements.

**ASSETS INCLUDED IN THE SALE**:  The Corporation shall also sell to the Purchaser the following non-cash assets of the Practice:

**A)**    Telephone Number and Directory Advertisements:   the Corporation's interest in the existing telephone number(s) of the Practice (if assignable) and any telephone directory

INITIALS                                              INITIALS
DR. HUYNH                        PAGE 7            DR. ISRAEL

advertising contracts of the Practice.  The Purchaser agrees to reimburse the Corporation for any telephone security deposit of the Corporation that may be transferred to the Purchaser as part of this sale.

**B)**    <u>Trademarks & Trade Name.</u> For the period of one (1) year after the date of the Closing, Purchaser shall be permitted to use all trademarks and trade names, websites (or website content), service marks logos, or other marks in which the Sellers have an interest are included; and

**C)**    <u>Office Forms and Manuals:</u>  any forms and/or manuals (including employee manuals) used in the Practice and lists of suppliers and referral sources.

**D)**    <u>Practice Appointment Book</u>: the existing appointment book of the Practice, and

**E)**    <u>Patient List</u>:  a list of all patients of the Practice for the three year period prior to the Closing, including addresses and telephone numbers, and

**F)**    <u>Referral Source List</u>:  where applicable, a list of all referral sources of the Practice.

**G)**    <u>Any Equipment</u> located within the premises used to perform dentistry on the patient of record;

**H)**    <u>Computer Software and Licenses</u>: the existing software used in the Practice, to the extent assignable.  Should there be any cost for the transfer of the computer software license to the Purchaser, the following shall apply;

> If the license transfer cost is $300 or less, then the Corporation shall pay for the total cost.

> If the license transfer cost is $300 or greater, then the Corporation and Purchaser shall divide and pay for the total cost equally.

**I)**    <u>Websites and Social Media:</u> For the period of one (1) year after the date of the Closing, Purchaser shall be permitted to use all existing websites (or website content), social media pages, handles, and accounts to include any blogs, Facebook, and Twitter accounts are included.

<u>Responsibility For Assets</u>: Prior to the Closing, the Corporation shall assume all risk of loss of any of the tangible assets being purchased and shall replace any lost, stolen, or damaged assets with like assets.  In the event of a substantial loss of the assets occurring prior to this time (defined as any amount in excess of Ten Thousand and 00/100 Dollars ($10,000.00)), the Purchaser shall have the right to immediately terminate this Practice Assets Sale Agreement by

INITIALS                                    PAGE 8                                    INITIALS
DR. HUYNH                                                                          DR. ISRAEL

giving written notice to the Corporation, and the earnest money paid by the Purchaser shall be returned in full.

**ASSETS EXCLUDED FROM THE SALE**:  Unless otherwise specifically addressed in this Practice Assets Sale Agreement, this sale of the Corporation's assets does not include the sale of any of the Corporation's:

> Tax and business records of the Practice;

> Cash on hand in banks or other cash assets;

> Stock, prepaid expenses, or retirement funds;

> Personal effects of the Seller, including the Seller's professional library, diplomas, and works of art;

> Motor vehicles owned by sellers

> Monetary obligations receivable, including the existing accounts receivable of the Corporation, defined as all fees due and payable to the Corporation for professional services rendered prior to the Closing;

> Premises Real Estate

**4.    TITLE EXAMINATION**:  The Purchaser shall have the right to perform a lien search of the Practice assets prior to Closing.  Should this lien search reveal any legal defect to title to the assets being conveyed in this Practice Assets Sale Agreement, the following shall occur:

The Corporation shall have twenty (20) days after receiving written notice from the Purchaser in which to correct such defect.  If the Corporation has not corrected such defects by the end of that twenty (20) day period, then the Purchaser shall have the option of correcting such defects and deducting that amount from the Purchase Price as described in this Agreement, or not closing on this Practice Asset Sale transaction, and having any and all earnest money returned.

Any of the Corporation's Practice related liabilities (not being assumed by the Purchaser) left unpaid following the Closing shall be paid by the Corporation within ten (10) days of receiving written notice from the Purchaser.

**5.    PREPAID FEES AND PROCEDURES IN PROGRESS**:  At Closing, the Corporation shall provide the Purchaser with lists of:

**A)**    all patients who have prepaid any fees for dental services not yet begun prior to the Closing ("Prepaid Fees"), and

INITIALS                                          PAGE 9                                          INITIALS
DR. HUYNH                                                                                       DR. ISRAEL

**B)**    all patients who have had dental services begun but not yet completed ("Treatment In Progress"), and

**C)**    where applicable, all outstanding patient contracts for services being or to be rendered.

These lists shall be affixed to the attached PREPAID SERVICES/PATIENT CONTRACTS /SERVICES IN PROGRESS Exhibit.  Should any patient who has prepaid for services desire not to have such services rendered, then those prepaid fees shall be refunded to that patient promptly upon his request.

**POST-SALE CLINICAL SERVICES BY THE CORPORATION**: The Corporation shall be compensated for any post-sale clinical services as they are rendered per the terms of a POST-SALE PROVIDER AGREEMENT attached to this Practice Assets Sale Agreement, where applicable.

**TREATMENT IN PROGRESS: FEE PRORATION METHOD**:  For any services that have been partially completed prior to the Closing (termed Treatment In Progress) and are to be completed by the Corporation following the Closing, the following shall apply:

Following the Closing, the Corporation agrees to complete all prepaid and partially completed services and shall receive all fees paid for such services.  In addition, the Corporation agrees to pay for all direct costs associated with such services, including supply, staff, and laboratory costs (where applicable).

Any fees received by the Purchaser for these services shall be paid directly to the Corporation, and shall not be counted as part of the post-sale Provider's collections (as described in the attached Post-Sale Provider Agreement).  Should any patient who has prepaid for services desire not to have such services rendered, then those prepaid fees shall be refunded to that patient promptly upon his request.

**PATIENT CREDITS:** In an event that a patient has a credit on his or her account that accrued prior to the practice Sale, the Seller shall reimburse the Purchaser the amount of such credit within 7 days of receiving a notice about the treatment.

**6.    THE CORPORATION'S ACCOUNTS RECEIVABLE DEFINITION**: The Corporation's "Accounts Receivable" are defined as all fees due the Corporation for services performed by the Practice prior to and up to the Closing.  All payments received from patients (or agents or insurers of the patient) shall be credited on the FIFO method.  (FIFO is defined as First in, First out, i.e., with any of the Corporation's outstanding accounts being paid before any new services are paid for. However, no credit will be given for any disputed amounts until the dispute has been resolved and payment made.  This FIFO method shall apply to patient families, with account balances of families paid first).  However, payments made by patients with a previous balance for which post-Closing emergency services are rendered shall be credited fifty percent (50%) to the previous balance, and fifty percent (50%) to the post-Closing emergency service balance.

INITIALS                                        INITIALS
DR. HUYNH                    PAGE 10                    DR. ISRAEL

**COLLECTION BY THE PURCHASER:** The Purchaser shall collect the Corporation's pre-Closing Accounts Receivable that remain outstanding free of charge for the first ninety (90) days following the Closing. From ninety (90) to one hundred and eighty (180) days following the Closing, the Purchaser shall receive, as fee for collecting, ten percent (10%) of collected Corporation's Accounts Receivable.  The Purchaser's responsibility to collect Corporation's accounts receivable shall be limited to collection of Corporation's Accounts Receivable within ninety (90) days of treatment, and shall only include normal and customary in-office collection procedures, including but not limited to, billing and postage, telephone follow-up, and in-office collection letters for the Corporation's Accounts Receivable.   All uncollected Accounts Receivable of the Seller shall become the asset of the Purchaser following 180 days.

**LIABILITY FOR DISPUTED BILLINGS:**  The parties acknowledge and agree that the Purchaser is not assuming responsibility for any liability, contingent or otherwise, resulting from any disputed billings by any former patient of the Corporation for services rendered by the Corporation prior to the Closing.

**7.    SELLERS' WARRANTIES, REPRESENTATIONS, and ACKNOWLEDGMENTS**:    The Sellers jointly and severally represent and warrant that:

**A)**    The Sellers have valid and marketable title to the assets being conveyed in this Practice Assets Sale Agreement. There will be no judgments, claims, liens, or encumbrances pending against the Corporation which could affect the Corporation's title to the assets being conveyed

**B)**    Such assets are free and clear of any liens and encumbrances, with the exception of any loan or lease assumptions being expressly assumed by the Purchaser in writing.

**C)**    That all outstanding debts of the Practice shall be paid in a timely manner.   The Corporation has filed all tax returns and tax reports as required by law on a timely basis (including, but not limited to, income, sales and use, property, excise, franchise, social security, withholding, unemployment tax returns or reports), and all such returns and reports are materially true and correct.

**D)**    The Corporation is a validly organized corporation and in good standing under the laws of the State of Georgia, and has the power to own all of its properties and assets and to carry on the Practice as it is now being conducted.

**E)**    To the best knowledge of the Sellers, there are no claims, actions, suits or proceedings pending or threatened against or affecting the Corporation or the Seller, at law or equity, or before any federal, state, municipal, or other governmental agency which would materially and adversely affect the Practice or Sellers' ability to transfer the Practice to the Purchaser with this Agreement.

INITIALS
DR. HUYNH

INITIALS
DR. ISRAEL

**F)**    There are no written contracts of employment between the Corporation and any officer or other employee which will not be terminated or assigned to the Purchaser on or before Closing, and all oral contracts of employment are terminable without cause upon not more than thirty (30) days notice.  The Corporation has complied with all state, local and federal laws regarding its employment practices with respect to all persons working on behalf of the Corporation.

**G)**    No representation or warranty made by Sellers in this Agreement, and no document, statement or certificate furnished or to be furnished to the Purchaser in connection with the transactions contemplated hereby, is false, inaccurate, or misleading in any material respect, or omits any material fact necessary to make the statements contained therein not misleading.

**H)**    The Seller is licensed to practice dentistry in the State of Georgia.

**I)**    Sellers have no knowledge of any facts which would materially and adversely affect the Practice of the Sellers or their title to the respective assets to be conveyed and assigned hereunder after the Closing of this transaction.

**J)**    Pro-ration at closing.  At the Closing  any accrued and unpaid personal property taxes, utility bills, advertising contracts, and insurance shall be prorated between the parties.

**K)**    Insurance. All inventories, equipment, supplies, building and fixed assets owned or leased by the Corporation are, and will be, adequately insured for their full value against fire or other casualty until the Closing Date and valid policies therefore are, and will be, outstanding and in force and the premiums due thereon paid prior to the Closing Date.  The Corporation has maintained and is maintaining amounts and coverages of insurance against risk and losses reasonably prudent in its business.

**L)**    Obligations at Closing.  The Corporation will not, on the Closing Date, be in default on the payment of any of its obligations, and Corporation is not at this time and will not on the Closing Date be a party to any agreement, contract, lease, license or commitment which extends beyond the Closing of this transaction.

**M)**    No Defaults.  The Corporation is not in violation of any provision of its Articles of Incorporation or Bylaws or of any provision of law having a material adverse effect to it or its business, nor is it in material default under any agreement or other instrument to which it is a party or by which it is bound.

**N)**    No Breach.  The execution, delivery, and performance of this Agreement by the Corporation or the Seller and the consummation by the Corporation or the Seller of the transactions contemplated hereby will not, with or without the giving of notice and the lapse of time, or both:

INITIALS

DR. HUYNH                                    PAGE 12                                    INITIALS

DR. ISRAEL

**1.**  violate any provision of law, statute, rule, or regulation to which the Corporation or the Seller is subject;

**2.**  violate any judgment, order, writ, or decree of any court applicable to the Corporation or the Seller; or

**3.**  result in the breach of or conflict with any term, covenant, condition, or provision of, result in the modification or termination of, constitute a material default under, or result in the creation or imposition of any lien, security interest, charge, or encumbrance upon any of the assets of the Corporation or the Seller pursuant to any corporate charter, by-law, commitment, contract, or other agreement or instrument to which the Corporation or the Seller is a party or by which any of the assets of the Corporation or the Seller is or may be bound or affected.

**O)**  <u>Compliance With Applicable Laws</u>.  The Corporation is in compliance, in all material respects, with all applicable laws, statutes, ordinances, regulations, decrees, or orders now in effect, including but not limited to, state and county, environmental, civil rights, occupational safety and health, hazardous substances, zoning laws and building codes with respect to its business, employment and the Americans with Disabilities Act.  No notice from any governmental body has been served upon the Corporation claiming any violation of any law, statute, ordinance, regulation, decree, or order.

**CORPORATION'S FINANCIAL LIABILITIES**:  All outstanding liabilities of the Seller that have been secured by the assets of the Practice (other than those being specifically assumed by the Purchaser in writing) shall be paid immediately by the Seller prior to or at the Closing. Any other Practice-related accounts payable owed by the Seller shall be paid when due or within ninety (90) days of the Closing, whichever date occurs first. All local, state, and federal withholding tax, FICA, unemployment taxes due up until the time of the Closing shall be payable when due.

<u>Employee Benefits:</u> The cost of any pre-Closing accrued (but not used) employee vacation, sick, or well time shall be paid by the Corporation to those employees due such benefits at Closing. Such costs shall include FICA, unemployment insurance, and any other payroll costs associated with the accrued benefits.  Any prepaid items which will accrue to Purchaser's benefit after Closing shall be prorated between Purchaser and Corporation as of the Closing Date with Purchaser paying to Corporation that portion of such prepaid items relating to the period after Closing.

<u>Pro-ration Of Property Taxes:</u>  Personal property taxes of the Practice shall be prorated between the Purchaser and the Corporation.  Should these property taxes normally be paid in arrears, then the Corporation agrees to pay the Purchaser at Closing, the Corporation's prorated amount of these taxes.  Any unpaid personal property taxes paid by the Purchaser

INITIALS
DR. HUYNH

PAGE 13

INITIALS
DR. ISRAEL

that are due on behalf of the Corporation may be deducted from any compensation or other monies due the Corporation at the time the Purchaser pays such taxes.

<u>Continued Insurance Coverage</u>:  In addition, the Corporation agrees to maintain and pay for, malpractice liability insurance, (including any necessary "tail" coverage) covering the Corporation for services rendered prior to the Closing in coverage amounts maintained by Corporation prior to Closing, or for any post-Closing clinical services that may be provided by the Corporation in the Practice after the Closing.  The Corporation shall immediately notify the Purchaser in the event the Corporation's malpractice insurance has been cancelled, suspended, revoked or terminated.

**8.    PURCHASER'S WARRANTIES, REPRESENTATIONS, and ACKNOWLEDGMENTS**:    The Purchaser represents and warrants that:

**A)**    the Purchaser is licensed to practice dentistry in the State of Georgia; and

**B)**    as of the Closing, there are no claims or known investigations against the Purchaser which would have an adverse effect on the assets or affairs of the Purchaser, including any threatened disciplinary action from any state dental regulatory board; and

**C)**    the Purchaser has examined, or will examine, the assets being purchased as part of this Practice Assets Sale Agreement, and accepts them "where and as is" as of the Closing; and

**D)**    the Purchaser is personally guaranteeing the Purchaser's obligations under this Agreement regardless of any corporate entity that may now exist or in the future to which Purchaser may assign this Agreement; and the Purchaser has no known medical conditions that would prevent the    Purchaser from practicing dentistry until all indebtedness owed the Seller by the  Purchaser has been satisfied

**E)**    no representation or warranty made by the Purchaser in this Agreement, and no document, statement or certificate furnished or to be furnished to the Sellers in connection with the transactions contemplated hereby is false, inaccurate, or misleading in any material respect, or omits any material fact necessary to make the statements contained therein not misleading

**F)**    The Purchaser further warrants and covenants that they are fully aware that there is no guarantee that they will achieve any particular level of revenue in the Sellers' practice based on many factors that may change, including Sellers': level of technical skills, ability to communicate with both patients and office staff, promotional skills, practice management skills, ability to delegate duties within the practice, desire to succeed, as well as the level of teamwork that exists with the present office staff, the existing competition within dental communities in which the present practice is located and the existing economic climate.

INITIALS                                              PAGE 14                                              INITIALS
DR. HUYNH                                                                                                  DR. ISRAEL

9.    **SERVICES LIABILITY AND PATIENT RE-TREATMENT**:  Following the Closing, and for the twelve (12) month period following the date that the Seller discontinues practicing on the Purchaser's Premises, the Purchaser shall assist the Seller with any re-treatment and/or redoing of any services previously rendered by the Seller prior to date of closing on patients of the Practice.  However, the Purchaser is not assuming any blanket responsibility or liability for such corrective or replacement of services.

Should any of the Seller's patients require such corrective services or replacement, and to the extent consented by the patient, the Purchaser may, at the Purchaser's option, provide such corrective services with no compensation due for such services from the Seller.  However, should the Purchaser request compensation from the Seller for corrective services on any restorative work done by the seller the previous year, then the following shall apply:

**Seller Provides Re-treatment:**  The Seller shall first be given the option of examining the patient needing re-treatment and/or give the Seller the option of providing the necessary re-treatment in the Purchaser's office, provided that the Seller is licensed to practice dentistry in the State of Georgia at that time, and has professional malpractice insurance coverage. The Seller shall pay the Purchaser for all direct expenses associated with the service(s) at the time such service(s) are rendered, which shall be limited to all supply and lab costs, as well as any personnel costs.

Should the patient have third party coverage for any needed re-treatment, then the fee received shall be divided equally between the Purchaser and Seller and shall be in lieu of the Seller paying the Purchaser for any direct costs as previously described.

**Purchaser Provides Re-treatment:** Should the Seller be unable or unwilling to provide the necessary service, then after receiving written consent from the Seller, the Purchaser may provide the re-treatment services for one-hundred percent (100%) of the Purchaser's normal fee at the time such service is rendered. This fee shall then be paid to the Purchaser by the Seller within thirty (30) days of receiving written notice from the Purchaser that such services have been completed. Should the patient have third party coverage for any needed re-treatment, then the Purchaser shall be compensated for any difference between the coverage, and the Purchaser's normal fee for the service rendered.

On all patients of the Seller being re-treated by the Purchaser (where compensation for such services is being requested by the Purchaser from the Seller), the Purchaser agrees to provide the Seller with:

(a) applicable radiographs of the tooth or teeth,
(b) progress notes of proposed treatment fees, and
(c) copies of all applicable ledger cards or computerized billing statements.

INITIALS
DR. HUYNH                                    PAGE 15                                    INITIALS
                                                                                        DR. ISRAEL

Should the patient have third party coverage for any needed re-treatment, then the Purchaser shall accept the third party carrier's fee in lieu of payment from the Seller.

Expiration of Re-treatment Clause: This re-treatment compensation provision shall expire at the end of twelve months from the Closing, at which time the Seller and Purchaser shall mutually agree upon any future re-treatment of the Seller's patients on a case by case basis.

**10.    CORPORATION'S SELLER'S EMPLOYEES**:  The Corporation agrees to cooperate with the Purchaser in retaining as many of the existing employees of the Practice that the Purchaser wishes to retain.   However, the Purchaser is not obligated in any way to continue the employment of any of the Corporation's employees, other than the Seller.  In addition:

The Corporation shall be responsible for any employee-related expenses incurred prior to the date of the Closing including but not limited to, salary or other compensation, workmen's compensation and unemployment insurance, withholding taxes, and any accrued but unpaid employee benefits, including, but not limited to sums due for accrued but unused sick days and/or vacation time.

Neither the Corporation nor the Seller will solicit for hire, any of the employees of the Corporation's Practice unless specifically waived in writing by the Purchaser.

**11.    BILLS OF SALE AND ASSIGNMENT**:  The Corporation and the Seller shall execute and deliver to the Purchaser, at the Closing, the attached respective BILLS OF SALE AND ASSIGNMENT for the assets being purchased.

**12.    THE SELLERS CORPORATION'S PATIENT RECORDS**:  Both the Purchaser and Corporation shall maintain the confidentiality of the patient records of the Practice, and shall abide by any state laws regarding their transfer.  At Closing the Purchaser shall become the custodian of all patient records of the Corporation, and shall continue to maintain the records unless the Practice is transferred to another dentist, in which case the Purchaser shall obligate that dentist with the same duty.  Only copies of patient records are to be released by the Purchaser and shall be furnished at the expense of the Purchaser.  Both the Corporation and the Purchaser shall have access to the records of their treatment of patients throughout the ten (10) year period that the records are required to be maintained by the Purchaser.  The Purchaser must notify the Corporation of any change in the location or control of the records.

**Third Party Requests For Records:**  The Purchaser shall make the patient records available to the Corporation in the event of any malpractice or other third party action against the Corporation.  All patient records shall be returned to the Purchaser upon completion of such action, unless otherwise determined by the courts.  Copies of these patient records shall be made available to their respective patients provided such patients have complied with all applicable statutory requirements relating to obtaining such copies.

INITIALS                                        PAGE 16                                        INITIALS
DR. HUYNH                                                                                DR. ISRAEL

**13.   USE OF THE SELLER'S NAME**:  Provided that the Purchaser is not in default of this Practice Assets Sale Agreement and is licensed to practice dentistry in the State of Georgia, the Purchaser shall have the right to the use of the Seller's name for a period of one year after the Seller discontinues practicing, directly or indirectly, in the Practice (subject to the state dental regulatory boards or any laws of the State of Georgia).  The use of the Seller's name shall be limited to the following:

**A)**   When answering the telephone,

**B)**   In any mutually agreed-upon announcements,

**C)**   On any stationary, invoice or newsletters sent to patients of record,

**D)**   On any exterior signs allowed on the Premises, and

**E)**   On any website or social media, and

**F)**   In any reasonable listing in any reasonable advertising, or billboards.

The Purchaser agrees to defend, hold harmless and indemnify the Seller from any and all liability, claim or demand arising out of any acts of the Purchaser, any agent or representative in connection with the use of the Seller's name.  The obligation to indemnify includes, but shall not be limited to all costs, awards and attorney's fees.

In addition, all rights to the use of any generic or trade name used by the Practice shall be conveyed to the Purchaser.

**14.   PREMISES USE:**  As of the Closing, the Purchaser acknowledges that the Purchaser has obtained a lease on the premises presently housing the Practice, which shall be attached to this Practice Assets Sale Agreement. The Purchaser acknowledges that this lease has been separately bargained for with the landlord and has accepted all of the terms and conditions thereof. The Seller's lease of the premises has been terminated, and Seller shall have no liability or obligation of any nature under Purchaser's lease.

**REMOVAL OF EFFECTS BY THE SELLER**:  Should the Seller be removing any personal effects, art or fixtures from the Premises which are excluded from the sale, the Seller agrees to replace any items removed with items that will restore the office to a similar "finished" appearance.

**TRANSFER OF UTILITIES**:  On or before the Closing, the Corporation shall cooperate with the Purchaser in having all electrical, water, telephone and other utilities transferred to the name of the Purchaser.

INITIALS                                                PAGE 17                                                INITIALS
DR. HUYNH                                                                                                DR. ISRAEL

**15.   LETTERS TO PATIENTS AND REFERRAL SOURCES**:  The Corporation and the Seller shall make every effort to promote the Purchaser, and shall encourage patients to remain with the Practice, as well as encourage all referral sources (where applicable) to continue referring to the Practice.

**LETTER UPON CLOSING**:  On or before fifteen (15) days following the Closing, the Seller agrees to send a mutually approved letter ("Letter of Introduction") introducing the Purchaser to each "head of household" of each active family of the Practice ("active" shall be defined as having treatment rendered within the two (2) year period prior to the Closing).  In addition, this Letter of Introduction shall be sent to current referral sources of the Practice (where applicable). The expense of such letters shall be shared equally by both parties and shall announce the transfer of the Practice to the Purchaser. The envelopes to the patients shall be stamped "Address Correction Requested."

**16.   FAMILY TREATMENT**:  After the Closing, as well as after the Seller has retired from the Practice, the Purchaser shall allow the Seller to use the Purchaser's dental office (at mutually agreed-upon times, as long as the Seller has maintained the required malpractice insurance and all necessary licenses) to render dental services to the immediate family of the Seller, as long as such treatment does not interfere with the normal business of the Purchaser. The names of those family members are listed on the attached IMMEDIATE FAMILY NAMES EXHIBIT. The Seller agrees to pay for all of the costs associated with such treatment, and to inform those family members that are treated that there is no business affiliation in any way with the Purchaser, and further agrees to indemnify and hold the Purchaser harmless for any liability which may arise out of the treatment of those patients by the Seller.

**17.   TAXES**:  The cost of any imposed sales taxes on the sale of the assets of the Practice shall be paid by the Corporation.  The cost of any transfer taxes, UCC-1 filings, documentary taxes or stamps on the promissory note and security agreement (where applicable) shall be paid by the Purchaser.

**18.   SPECIFIC PERFORMANCE**:  Any breach of the covenants contained in this Practice Assets Sale Agreement shall be subject to specific performance by temporary, as well as permanent injunction.  If any court of competent jurisdiction determines that either party has breached any of the covenants, then that party shall pay all the costs of enforcement, including, but not limited to, court costs and reasonable attorneys' fees.

**19.   DISPUTES; MEDIATION AND ARBITRATION**:  Except as hereinafter provided, it is the intention of both parties that no dispute under this Agreement shall be the subject of any court action or litigation in the court system.  The parties recognize that the processes of mediation and arbitration are proper to resolve issues between the parties.  The provisions of this section shall not apply to any action brought by Seller to enforce the Promissory Note or the Security Agreement.

INITIALS                                                    INITIALS
DR. HUYNH                          PAGE 18                  DR. ISRAEL

If any party wishes to resolve an issue under or relating to this Practice Assets Sale Agreement, then such party must give notice of a request for mediation to the other party, which notice shall set forth the names of not less than four court approved mediators from the lists available from the local circuit court. The party receiving such notice shall agree upon one or more of such mediators within seven (7) days of receipt of such notice and a mediation will be scheduled as soon as feasible between the parties and their respective advisors. The parties and their advisors will cooperate fully with respect to sharing of information and attendance at meetings in order to seek resolution. The parties will share mediation expenses with the party requesting mediation to pay one-half of such expenses of the mediator fees and the other party to pay the other one-half of such expenses. However, if the mediator should find the charge of the complaining party to be groundless, the mediator may direct that all expenses shall be paid by the complaining party.

If resolution of the matters between the parties cannot be resolved in mediation within twenty days of the selection of a mediator by the party receiving such notice, then the matter shall be presented to formal arbitration pursuant to the rules of the American Arbitration Association with a single arbitrator to be retained on behalf of the parties by the mediator that has been working with the parties. Arbitration shall take place as soon as possible and the decision of the arbitrator shall be binding upon the parties for all purposes. Any party in violation of this Agreement shall pay all reasonable fees and costs, including attorneys' fees, incurred by the other party relating to such violation and all other fees and costs shall be paid as agreed in mediation or as determined appropriate in the arbitration proceeding.

It is the intention of the parties that this Agreement shall be construed and interpreted in a fair and equitable manner based upon the facts and circumstances of the parties, taking into account the present intention of the parties to have a fair and equitable agreement under the terms and conditions set forth herein.

**20.    EXPENSES**: Should a court of competent jurisdiction determine a judgment for either party, or be called upon to enforce any arbitration award, then and in such event the prevailing party shall be entitled to recover from the other party, in addition to the relief awarded the prevailing party in or by judgment, all court costs, investigation expenses, and reasonable attorneys' and/or arbitrators' or mediators' fees, including appellate proceedings and proceedings in bankruptcy, incurred by the prevailing party in such action. A dismissal, with prejudice, by the party commencing such action, shall be deemed to be a judgment in favor of the other party for the purpose of this section.

**21.    INDEMNIFICATION**: The Sellers and the Purchaser shall hold harmless and indemnify the other party from all liability (including reasonable attorneys' fees and expenses) arising out of any acts or any breach of any representation or warranty or covenant of the indemnifying party contained in this Practice Assets Sale Agreement and all of the exhibits. Such acts shall include

INITIALS
DR. HUYNH

INITIALS
DR. ISRAEL

any malpractice or other claim arising from services provided by either the Purchaser or the Sellers.

The Sellers (and the heirs, assigns, successors, and legal representatives of both) agree to indemnify, defend, and hold harmless, the Purchaser free, clear and harmless of any claim, demand or liability relating to the Practice not being expressly assumed in writing by the Purchaser. In addition, the Seller agrees to indemnify the Purchaser from any and all liability arising out of any conduct of the Seller prior to and through the time the Seller discontinues practicing on the Premises, except to the extent any malpractice insurance provides coverage for any such liability. The Purchaser agrees to defend, hold harmless and indemnify the Sellers against and from any liability, claim, demand, relating to the Practice or arising out of any conduct of the Purchaser after the Closing.

Upon receipt of a claim or demand for which a party is entitled to indemnification, the indemnified party shall notify the indemnifying party in writing of the nature of the claim, and cooperate with the indemnifying party and its counsel including, but not limited to, appearing as a witness as may be reasonably required, and responding to all reasonable requests for documents. The obligation to indemnify includes, but shall not be limited to all costs including reasonable attorney's fees.

22. **DISCLAIMER OF PARTNERSHIP:** The parties hereby agree that there shall be no Partnership, Shareholder, Joint Venture or other business arrangement inferred by this Practice Assets Sale Agreement, nor shall either party have any authority to bind the other party to any agreement in any way whatsoever. Neither party shall be responsible for the other party's acts or actions (including malpractice), obligations, or liabilities in any way. Both parties agree to release the other, and agree to indemnify and defend the other against any claims or liabilities imposed upon the other based upon an alleged Partnership, Shareholder, or Joint Venture relationship.

23. **CHOICE OF LAW:** This Practice Assets Sale Agreement and all attached Exhibits shall be interpreted and enforced in accordance with the laws of the State of Georgia.

24. **BINDING EFFECT, ASSIGNMENT:** Except to the extent of any contrary provisions herein, all of the terms of this Practice Assets Sale Agreement and the attached Exhibits shall be binding upon the respective heirs, executors, personal representatives, successors and assigns of the parties hereto, and shall be enforceable by the parties hereto and their respective heirs, executors, personal representatives, successors and assigns.

Provided that the Purchaser is not in default, the Purchaser shall have the right to assign the Sellers' warranties and covenants contained herein. However, the Purchaser shall remain liable for all of the terms and conditions of this Practice Assets Sale Agreement, and all of the attached Exhibits.

INITIALS                                     PAGE 20                                     INITIALS
DR. HUYNH                                                                                DR. ISRAEL

**25.   SEVERABILITY:**  In the event any part of this Practice Assets Sale Agreement or any of its attached Exhibits should be adjudged invalid, unenforceable, or unconstitutional, such adjudication shall in no manner affect any other section or exhibits.

**26.   MISCELLANEOUS:**  This Practice Asset Sale Agreement may be executed in any number of counterparts, each of which shall be deemed to be one and the same instrument, and shall become effective when one or more counterparts have been signed by the Seller and the Purchaser.  If a covenant or agreement provided in this Practice Asset Sale Agreement to be performed is contrary to applicable law, the covenant or agreement shall be deemed separable from the remaining covenants and agreements and shall not affect the validity of the other provisions of this Practice Asset Sale Agreement.  This Practice Asset Sale Agreement shall not be modified or amended except by an instrument in writing signed by the Seller and the Purchaser.

**27.   NOTICE:**  Any notice or payment required or permitted hereunder shall be in writing and may be delivered personally, or sent by certified U. S. Mail, return receipt requested, and addressed to the principal office of the Purchaser and the last known residence of the Seller or if to the Corporation, the Corporation.  The party receiving notice of any default shall have thirty (30) days from actual receipt thereof to cure such default before the other party may proceed with legal action against the other.

**28.   REPRESENTATIONS AND THE PARTIES' RIGHTS TO COUNSEL:**  The parties acknowledge that this Agreement has been provided by U.S. Dental Transitions to assist their respective attorneys in completing this transaction.  Both parties have the right and have been advised by U. S. Dental Transitions to seek counsel regarding the consequences of this transaction, including legal and tax ramifications.  In the event that either the Purchaser or Seller has declined to seek counsel, such waiver has been freely given by such declining party.

Both parties agree to make no claim against U. S. Dental Transitions and any agent thereof, against any damages arising as a result of the anticipated purchase, or consummated purchase of the Practice.  U. S. Dental Transitions has made no claims or guarantees, express or implied, as to the performance of any equipment, person, intangible entity such as good will, or any other asset or commodity offered for sale or contracting. All information provided by U. S. Dental Transitions to Purchaser was obtained from Seller and has not been audited or verified. U. S. Dental Transitions offers no opinion thereon. Purchaser shall be responsible for performing his own due diligence along with any and all advisors to determine the quality and value of any and all assets being purchased. U. S. Dental Transitions makes no claims or warranties on any practice assets being transferred, including

**A)**   Goodwill

**B)**   Employees or the retention of any employees

INITIALS                                          PAGE 21                                          INITIALS
DR. HUYNH                                                                                        DR. ISRAEL

**C)**   The patient base or the retention of any patients

**D)**   The quality of Seller's work

**E)**   The reputation of Seller

**F)**   Any other factors affecting the future performance of the Practice.

**29.   WAIVER OF BREACH OR VIOLATION NOT DEEMED CONTINUING**: The waiver by either party of any provision of this Practice Assets Sale Agreement shall not operate as, or be construed to be, a waiver of any continuing or subsequent breach hereof. No provision may be waived except by an agreement in writing signed by the waiving party.

**30.   COMPLETE AGREEMENT**: This Practice Assets Sale Agreement and all of the attached exhibits* contain the final, complete, and exclusive expression of the understanding of the parties with respect to the rights and obligations created hereunder and supersedes any prior or contemporaneous agreement or representation, oral or written, by either of them. This Practice Assets Sale Agreement may not be modified or amended except by an agreement in writing signed by each party to this Practice Assets Sale Agreement.

* EXHIBITS:    Exhibit: Seller Acknowledgement
Exhibit: Bill of Sale and Assignment – Corporate
Exhibit: Bill of Sale and Assignment – Personal
Exhibit: Non-Competition Agreement-Corporate
Exhibit: Non-Competition Agreement – Personal
Exhibit: Assignment of Telephone, Website, Social Media & Advertising Rights
Exhibit: Miscellaneous Pro-Ration Agreement
Exhibit: Post-Sale Provider Agreement
Exhibit: Prepaid Services/Patient Contracts/Treatment in Progress
Exhibit: Equipment, Furniture and Fixtures
Exhibit: Equipment, Furniture, and Fixtures Excluded from Sale Exhibit
Exhibit: Immediate Family Exhibit

**31.   SURVIVAL OF COVENANTS**: All representations, warranties, agreements, and covenants made in this Practice Assets Sale Agreement shall be true and correct as of the Closing, and shall thereafter survive the Closing.

**32.   INTERPRETATION/NO PRESUMPTION**: It is acknowledged by the parties that this Agreement is the result of negotiated suggestions of all parties and, therefore, no presumptions shall arise favoring any party by virtue of the authorship of any of the provisions herein or the modification, addition or deletion of provisions in prior drafts hereof.

**33.   FURTHER ASSURANCES**: Each party shall execute any reasonable additional documents or instruments which are reasonably necessary to (i) carry out or facilitate the understanding

INITIALS
DR. HUYNH                                    PAGE 22                                    INITIALS
DR. ISRAEL

represented by this Practice Assets Sale Agreement and/or (ii) more clearly establish the rights of one or more parties under this Practice Assets Sale Agreement.

**IN WITNESS WHEREOF**, each party has executed this Practice Assets Sale Agreement on the aforementioned Closing on December 8, 2020.

_____          _____
Witness                                                       ROBERT S. ISRAEL, DDS

                                                                    WILDWOOD DENTAL CARE, PC
_____          _____
Witness                                                       (ROBERT S. ISRAEL, DDS)
                                                                    Its:  President

_____          _____
Witness                                                       SCOTT L. HUYNH, DMD

                                                                    DENTCORP MANAGEMENT, LLC
_____          _____
Witness                                                       (SCOTT L. HUYNH, DMD)
                                                                    Its:  Managing Member

INITIALS                                                     INITIALS
DR. HUYNH                     PAGE 23                DR. ISRAEL

**CONSENT IN LIEU OF MEETINGS**
**OF**
**BOARD OF DIRECTORS AND SHAREHOLDER**
**OF**
**WILDWOOD DENTAL CARE, PC**

The undersigned, being all the directors and the sole shareholder of WILDWOOD DENTAL CARE, PC, do hereby consent to and do hereby take the following action and adopt the following resolution pursuant to the by-Laws of said corporation and the applicable business corporation code of the State of Georgia.

RESOLVED that the President of the Corporation be and is hereby authorized and directed to enter into all such agreements which are necessary and proper to the sale of assets of WILDWOOD DENTAL CARE, PC, as per the attached Practice Assets Sale Agreement.

_____12/7/20_____

Date

_____

ROBERT S. ISRAEL, DDS
Shareholder / Director

INITIALS
DR. HUYNH

PAGE 24

INITIALS
DR. ISRAEL

## BILL OF SALE AND ASSIGNMENT-CORPORATE

Attached to and made part of the Practice Assets Sale Agreement by and between ROBERT S. ISRAEL, DDS, WILDWOOD DENTAL CARE, PC, and SCOTT L. HUYNH, DMD, DENTCORP MANAGEMENT, LLC

KNOW ALL MEN BY THESE PRESENTS, THAT WILDWOOD DENTAL CARE, PC, hereinafter referred to in this Bill of Sale and Assignment as the Grantor, for good and valuable consideration paid by SCOTT L. HUYNH, DMD & DENTCORP MANAGEMENT, LLC, hereinafter referred to in this Bill Of Sale and Assignment as the Grantee, the receipt and adequacy of which is acknowledged by the Grantor, does hereby sell, set over, transfer, assign and convey unto Grantee, Grantee's heirs, executors, administrators, personal representatives, and assigns, all Grantor's right, title and interest in the Grantor's office and clinical supplies, business and patient records, telephone number, website, and other intangible assets, as well as those assets described in the attached Equipment, Furniture and Fixtures Exhibit of the Practice Assets Sale Agreement (such conveyance being subject to the terms, conditions, warranties, and covenants described in the Practice Assets Sale Agreement), together with all manufacturer's warranties and any maintenance agreements relating thereto (to the extent automatically transferable).

And for the same consideration, Grantor, for itself, its successors and assigns, covenants with and warrants unto the Grantee, his heirs, executors, administrators, personal representatives and assigns that Grantor is the lawful owner of the property hereby conveyed; that Grantor has good and marketable title to Grantor's interest in said property, and, to the extent described in the Practice Assets Sale Agreement, that said property is free and clear of any liens and encumbrances of any kind, character or nature, and that Grantor, and its successors and assigns will defend the same against all lawful claims and demands whatsoever.

If any provisions of the Bill of Sale and Assignment and said Practice Assets Sale Agreement are inconsistent, the Practice Assets Sale Agreement controls.

**IN WITNESS WHEREOF**, Grantor has executed and delivered this Bill of Sale and Assignment, effective on December 8, 2020.

WILDWOOD DENTAL CARE, PC

By: _____

Witness

ROBERT S. ISRAEL, DDS
Its: President

INITIALS
DR. HUYNH

PAGE 25

INITIALS
DR. ISRAEL

## BILL OF SALE AND ASSIGNMENT-PERSONAL

Attached to and made part of the Practice Assets Sale Agreement by and between ROBERT S. ISRAEL, DDS, WILDWOOD DENTAL CARE, PC, and SCOTT L. HUYNH, DMD, DENTCORP MANAGEMENT, LLC.

KNOW ALL MEN BY THESE PRESENTS, THAT ROBERT S. ISRAEL, DDS, hereinafter referred to in this Bill of Sale and Assignment as the Grantor, for good and valuable consideration paid by SCOTT L. HUYNH, DMD & DENTCORP MANAGEMENT, LLC, hereinafter referred to in this Bill Of Sale and Assignment as the Grantee, the receipt and adequacy of which is acknowledged by the Grantor, does hereby sell, set over, transfer, assign and convey unto Grantee, Grantee's heirs, executors, administrators, personal representatives, and assigns, all Grantor's right, title and interest in Grantor's personal professional goodwill relating to his practice of dentistry as described in said Practice Assets Sale Agreement (such conveyance being subject to the terms, conditions, warranties, and covenants described in the Practice Assets Sale Agreement).

And for the same consideration, Grantor, for himself, his heirs, executors, administrators, personal representatives, and assigns, covenants with and warrants unto the Grantee, his heirs, executors, administrators, personal representatives and assigns that Grantor is the lawful owner of the property hereby conveyed; that Grantor has good and marketable title to Grantor's interest in said property, and, to the extent described in the Practice Assets Sale Agreement, that said property is free and clear of any liens and encumbrances of any kind, character or nature, and that Grantor, and his heirs, executors, administrators, personal representatives, and assigns will defend the same against all lawful claims and demands whatsoever.

If any provisions of the Bill of Sale and Assignment and said Practice Assets Sale Agreement are inconsistent, the Practice Assets Sale Agreement controls.

**IN WITNESS WHEREOF,** Grantor has executed and delivered this Bill of Sale and Assignment, effective this December 8, 2020.


Witness                                    ROBERT S. ISRAEL, DDS


INITIALS                                                                INITIALS
DR. HUYNH                          PAGE 26                          DR. ISRAEL

## NON-COMPETITION AGREEMENT-CORPORATE

This Non-Competition Agreement between WILDWOOD DENTAL CARE, PC (which shall be referred to as the "Corporation" throughout this Non-Competition Agreement) and SCOTT L. HUYNH, DMD, DENTCORP MANAGEMENT, LLC (who shall be referred to as the "Purchaser" throughout this Non-Competition Agreement) is attached to and made part of this Practice Assets Sale Agreement.

EFFECTIVE DATE: December 8, 2020.

**TERMS**

WHEREAS, pursuant to that certain Practice Assets Sale Agreement, December 8, 2020, by and between ROBERT S. ISRAEL, DDS, a licensed Georgia dentist ("The Seller"), Corporation and Purchaser, Purchaser has acquired substantially all of the assets of Corporation and has also acquired the personal professional goodwill of The Corporation in and to his dental practice; and

WHEREAS, prior to consummation of the Practice Assets Sale Agreement, Corporation had control over and was familiar with Corporation's practice as well as the confidential and proprietary information concerning Corporation's practice ("Confidential Information");

WHEREAS, competition by Corporation in the practice acquired or the use or disclosure of Confidential Information would result in damage and cause loss to Purchaser of the benefit of the bargain in the purchase of Corporation's practice;

WHEREAS, Corporation will directly benefit from the sale of Corporation's practice and will receive substantial consideration which has a result of the consummation of the Practice Assets Sale Agreement;

WHEREAS, the parties hereto acknowledge and agree that Purchaser would not be willing to acquire the assets pursuant to the Practice Assets Sale Agreement unless Corporation is willing to enter into this Non-Competition Agreement (the Practice Assets Sale Agreement and Non-Competition Agreement are hereafter collectively referred to as the "Agreements");

WHEREAS, Corporation agrees to restrictions on its ability to compete against Purchaser in accordance with the terms of this Agreement.

NOW, THEREFORE, for and in consideration of the premises, agreements and other good and valuable consideration set forth herein and in the Agreements, the receipt and adequacy of which are acknowledged, the parties hereto agree as follows:

INITIALS
DR. HUYNH

PAGE 27

INITIALS
DR. ISRAEL

**1.    NON-COMPETITION AGREEMENT**.  In order to induce Purchaser to acquire the assets, Corporation covenants and agrees that for the duration of the post sale provider agreement and five (5) years after the Seller discontinues practicing for the Purchaser on the premises (the "Effective Date"), it will not, directly or indirectly, own, operate, provide assistance to the owner of, manage, be employed by, be an agent of, act as a consultant for, or be financially interested in, any entity or business which competes, directly or indirectly with the practice of Corporation ("Competing Practice") within a ten (10) mile radius of the office at 1230 Satellite Blvd., Ste. 100, Suwanee, GA 30024 at which Corporation has been engaged in its Practice as of the Effective Date (the "Geographic Area").

The Corporation hereby agrees (except for any agreed upon post-sale working relationship between the Corporation and the Purchaser as described in the attached Post-Sale Provider Agreement) not to:

(A)     practice dentistry (including any of the specialties of dentistry) directly or indirectly, within the Geographic Area, for a period of five (5) years after the Seller discontinues practicing for the Purchaser on the premises;

(B)     lend the Corporation's name to any competitive organization within this same time period or within the Geographic Area.  However, the Seller may practice dentistry in any military or government-sponsored public health or other institutional practice (including schools or universities) that is limited to the treatment of non-private patients.

The parties have attempted to limit the right of the Corporation to compete only to the extent necessary to preserve the goodwill acquired from Corporation and to protect the Purchaser from unfair competition from the Corporation.  The Corporation agrees that the duration and geographical limitations are reasonable, and agrees to waive the right to protest the reasonableness.

**2.    NO SOLICITATION**. Corporation further agrees, for the duration of the post sale provider agreement and five years following its termination that they shall not: solicit or otherwise attempt to contact, either directly or indirectly:

(a)     any patients of record of whom Corporation treated for the purposes of providing them dental services (other than soliciting them to the Purchaser's office), or

(b)     any professional referral sources of the Practice for the purpose of directing patients of the practice to be referred to any other dental office than that of the Purchaser, and

(c)     or employees of the Practice (those employed by the Corporation at the time of Closing) to work with the Corporation at any dental practice location other than the premises of the Purchaser's Practice.

INITIALS
DR. HUYNH                           PAGE 28                           INITIALS
                                                                      DR. ISRAEL

Solicitation includes, but is not limited to informing the patients of the Practice verbally or in writing (by mail, telephone, or other means) of the availability of the Corporation's professional services at an office location other than that of the Purchaser's Practice. This non-solicitation shall be in effect as of the Closing, and shall continue thereafter for the five-year period.

**3.     CONFIDENTIAL INFORMATION**.     Corporation acknowledges and agrees that all Confidential Information, and all physical embodiments thereof, are confidential to and shall be and remain the sole and exclusive property of Purchaser. Corporation agrees that it will not, without the prior written consent of Purchaser: (i) disclose or make available any Confidential Information to any person or entity; or (ii) make or cause to be made or permit either on his own  behalf, or on behalf of others, any use of such Confidential Information; provided, however, that Corporation may disclose Confidential Information to its attorneys, accountants, and other persons responsible for the preparation and filing of local, state, and federal tax returns, and subsequent disclosure of such Confidential Information to government authorities in the form of tax filings or in response to tax or other government audits or inquiries and such disclosure shall not be deemed a breach of this Section 3.

**4.     VIOLATION OF NON-COMPETITION AGREEMENT.**

a.     It is agreed and understood by and among the parties to this Non-Competition Agreement that the restrictive covenants set forth in Sections 1, 2 and 3 are each individually essential elements of the Agreements and that, but for the agreement of Corporation, to comply with such covenants, Purchaser would not have agreed to enter into the Agreements. Further, Corporation expressly acknowledge that the restrictions contained in Sections 1, 2 and 3 are reasonable and necessary to accomplish the mutual objectives of the parties and to protect Purchaser's legitimate business interest as defined and to protect its business and business relationships.  Corporation acknowledges that enforcement of the restrictions contained herein will not deprive it, or any of its agents, servants, or employees, of the ability to earn reasonable livings and that any violation of the restrictions contained in this Agreement will cause irreparable injury to Purchaser.  Such covenants of Corporation shall be construed as agreements independent of any other provision of the Agreements.

b.     It is agreed by the parties hereto that if any portion of the restrictive covenants set forth in Sections 1, 2 and 3 are held to be invalid, unreasonable, arbitrary or against public policy, then each such covenant shall be considered divisible both as to time, geographical area and any other relevant feature, with each of a specified period being deemed a separate period of time and each geographical market area being deemed a separate geographical area, it being the intention of the parties that a lesser period of time, geographical area or other relevant feature shall be enforced so long as the same is not unreasonable, arbitrary or against public policy, a lesser time period, geographical area or other relevant feature which is determined to be reasonable, non-arbitrary and not against public policy may be enforced against Corporation, and Corporation agrees to be bound thereby.

INITIALS                                                            INITIALS
DR. HUYNH                          PAGE 29                          DR. ISRAEL

c.    The parties hereto agree that damages at law, including, but not limited to, monetary damages, will be an insufficient remedy to Purchaser in the event that the restrictive covenants of Sections 1, 2 and 3 are violated and that in addition to any remedies or rights that may be available to Purchaser, all of which other remedies or rights shall be deemed to be cumulative, retained by Purchaser and not waived by the enforcement of any remedy available hereunder, including, but not limited to, the right to sue for monetary damages, Purchaser also shall be entitled, upon application to a court of competent jurisdiction, to obtain injunctive relief, including, but not limited to, a temporary restraining order of temporary, preliminary or permanent injunction, to enforce the provisions of this Agreement as well as an equitable accounting of all profits or benefits arising out of any such violation, all of which shall constitute rights and remedies to which Purchaser may be entitled.

**5.    DEFAULT.** Should the Corporation violate the terms of this Non-Competition Agreement, and continue this violation after being given thirty (30) days written notice by the Purchaser of such default and Purchaser brings legal action for injunctive or other relief, the Purchaser shall not, as a result of the time involved in obtaining the relief, be deprived of the benefit of the full period of the Non-Competition Agreement. Accordingly, the Non-Competition Agreement shall be deemed to have the duration specified in this Non-Competition Agreement, computed from the date the relief is granted but reduced by the time between the period when the restriction began to run and the date of the first violation of the covenant by the Corporation.

**6.    ASSIGNMENT.** This Non-Competition Agreement shall be assignable by the Purchaser.

**7.    NOTICES.** All notices, demands and other communications required or permitted hereunder shall be in writing, certified mail, return receipt requested, or actually delivered to the party or the address set forth below and addressed as follows:

    If to the Purchaser: 1230 Satellite Blvd., Ste. 100, Suwanee, GA 30024

    If to the Corporation: 12190 Dancliff Trace, Alpharetta, GA 30009

**8.    GOVERNING LAW.** This Non-Competition Agreement shall be governed by, and construed, and enforced in accordance with, the laws of the State of Georgia.

**9.    BINDING EFFECT.** This Non-Competition Agreement may not be modified except in writing by the parties hereto. This Non-Competition Agreement shall be binding upon, and inure to the benefit of, the parties hereto and their respective heirs, personal representatives, successors, and assigns.

**10.    AMENDMENTS.** This Non-Competition Agreement may be amended or modified at any time and in all respects, and an instrument in writing may waive any provisions, if executed by the Purchaser and the Corporation, or either of them in the case of a waiver.

INITIALS
DR. HUYNH

PAGE 30

INITIALS
DR. ISRAEL

**11.   COUNTERPARTS.**   This Non-Competition Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute but one and the same instrument.

**12.   POST-SALE PROVIDER AGREEMENT.**   The Purchaser and Corporation agree that any post-Closing clinical services provided by the Corporation in the Purchaser's practice shall not be deemed to be a breach of this Non-Competition Agreement.

**13.   DISPUTES.**   In the event of any dispute under this Non-Competition Agreement, the Purchaser shall be entitled to file an equitable action in the appropriate county courts to enforce any provision hereof with respect to any injunctive relief as to the non-competition and non-solicitation provisions hereof.  Any other dispute with respect to the Practice Assets Sale Agreement shall be resolved by mediation and/or arbitration pursuant to the terms of the Practice Assets Sale Agreement at Section 18.

**14.   ENTIRE AGREEMENT.**  This Non-Competition Agreement constitutes the entire agreement between the parties hereto, and there are no agreements, understandings, restrictions, warranties, or representations between the parties other than those set forth herein or herein provided for.

**IN WITNESS WHEREOF,** the Corporation has duly executed this Non-Competition Agreement as of the abovementioned date.

WILDWOOD DENTAL CARE, PC

_____        By: _____
Witness                           ROBERT S. ISRAEL, DDS
                                  Its: President

_____        _____
Witness                           SCOTT L. HUYNH, DMD

                                  DENTCORP MANAGEMENT, LLC

_____        By: _____
Witness                           SCOTT L. HUYNH, DMD
                                  Its: Managing Member

INITIALS                                                    INITIALS
DR. HUYNH                          PAGE 31                   DR. ISRAEL

## NON-COMPETITION AGREEMENT-PERSONAL

This Non-Competition Agreement between ROBERT S. ISRAEL, DDS (who shall be referred to as the "Seller" throughout this Non-Competition Agreement) and SCOTT L. HUYNH, DMD, DENTCORP MANAGEMENT, LLC (who shall be referred to as the "Purchaser" throughout this Non-Competition Agreement) is attached to and made part of this Practice Assets Sale Agreement.

EFFECTIVE DATE: December 8, 2020.

**TERMS**

WHEREAS, pursuant to that certain Practice Assets Sale Agreement, December 8, 2020, by and between WILDWOOD DENTAL CARE, PC, a Georgia professional corporation (the "Corporation"), Seller and Purchaser, Purchaser has acquired substantially all of the assets of the Corporation and has also acquired the personal professional goodwill of Seller in and to his dental practice; and

WHEREAS, prior to consummation of the Practice Assets Sale Agreement, Seller had control over and was familiar with Seller's practice as well as the confidential and proprietary information concerning Seller's practice ("Confidential Information");

WHEREAS, competition by Seller in the practice acquired or the use or disclosure of Confidential Information would result in damage and cause loss to Purchaser of the benefit of the bargain in the purchase of Seller's practice;

WHEREAS, Seller will directly benefit from the sale of Seller's goodwill relating to his practice and will receive substantial consideration which has a result of the consummation of the Practice Assets Sale Agreement;

WHEREAS, the parties hereto acknowledge and agree that Purchaser would not be willing to acquire the assets pursuant to the Practice Assets Sale Agreement unless Seller is willing to enter into this Non-Competition Agreement (the Practice Assets Sale Agreement and Non-Competition Agreement are hereafter collectively referred to as the "Agreements");

WHEREAS, Seller agrees to restrictions on his ability to compete against Purchaser in accordance with the terms of this Agreement.

NOW, THEREFORE, for and in consideration of the premises, agreements and other good and valuable consideration set forth herein and in the Agreements, the receipt and adequacy of which are acknowledged, the parties hereto agree as follows:

INITIALS
DR. HUYNH

PAGE 32

INITIALS
DR. ISRAEL

**1.    NON-COMPETITION AGREEMENT**.  In order to induce Purchaser to acquire the assets, Seller covenants and agrees that for the duration of the post sale provider agreement and five (5) years after the Seller discontinues practicing for the Purchaser on the premises (the "Effective Date"), he will not, directly or indirectly, own, operate, provide assistance to the owner of, manage, be employed by, be an agent of, act as a consultant for, or be financially interested in, any entity or business which competes, directly or indirectly with the practice of Seller ("Competing Practice") within a ten (10) mile radius of the office at 1230 Satellite Blvd., Ste. 100, Suwanee, GA 30024 at which Seller has been engaged in his Practice as of the Effective Date (the "Geographic Area").

The Seller hereby agrees (except for any agreed upon post-sale working relationship between the Seller and the Purchaser as described in the attached Post-Sale Provider Agreement) not to:

(A)    practice dentistry (including any of the specialties of dentistry) directly or indirectly, within the Geographic Area, for a period of five (5) years after the Seller discontinues practicing for the Purchaser on the premises;

(B)    lend the Seller's name to any competitive organization within this same time period or within the Geographic Area.  However, the Seller may practice dentistry in any military or government-sponsored public health or other institutional practice (including schools or universities) that is limited to the treatment of non-private patients.

The parties have attempted to limit the right of the Seller to compete only to the extent necessary to preserve the goodwill acquired from Seller and to protect the Purchaser from unfair competition from the Seller.  The Seller agrees that the duration and geographical limitations are reasonable, and agrees to waive the right to protest the reasonableness.

**2.    NO SOLICITATION**.  Seller further agrees, for the duration of the post sale provider agreement and five (5) years following its termination that they shall not: solicit or otherwise attempt to contact, either directly or indirectly

(a)    any patients of record of whom Seller treated for the purposes of providing them dental services (other than soliciting them to the Purchaser's office), or

(b)    any professional referral sources of the Practice for the purpose of directing patients of the practice to be referred to any other dental office than that of the Purchaser, and

(c)    or employees of the Practice (those employed by the Corporation at the time of Closing) to work with the Seller at any dental practice location other than the premises of the Purchaser's Practice.

Solicitation includes, but is not limited to informing the patients of the Practice verbally or in writing (by mail, telephone, or other means) of the availability of the Seller's professional

INITIALS
DR. HUYNH                                        PAGE 33                                        INITIALS
                                                                                              DR. ISRAEL

services at an office location other than that of the Purchaser's Practice. This non-solicitation shall be in effect as of the Closing, and shall continue thereafter for the five-year period.

**3.    CONFIDENTIAL INFORMATION.**  Seller acknowledges and agrees that all Confidential Information, and all physical embodiments thereof, are confidential to and shall be and remain the sole and exclusive property of Purchaser.  Seller agree that he will not, without the prior written consent of Purchaser: (i) disclose or make available any Confidential Information to any person or entity; or (ii) make or cause to be made or permit either on his own  behalf, or on behalf of others, any use of such Confidential Information; provided, however, that Seller may disclose Confidential Information to his attorneys, accountants, and other persons responsible for the preparation and filing of local, state, and federal tax returns, and subsequent disclosure of such Confidential Information to government authorities in the form of tax filings or in response to tax or other government audits or inquiries and such disclosure shall not be deemed a breach of this Section 3.

**4.    VIOLATION OF NON-COMPETITION AGREEMENT.**

a.    It is agreed and understood by and among the parties to this Non-Competition Agreement that the restrictive covenants set forth in Sections 1, 2 and 3 are each individually essential elements of the Agreements and that, but for the agreement of Seller, to comply with such covenants, Purchaser would not have agreed to enter into the Agreements. Further, Seller expressly acknowledge that the restrictions contained in Sections 1, 2 and 3 are reasonable and necessary to accomplish the mutual objectives of the parties and to protect Purchaser's legitimate business interest as defined and to protect its business and business relationships. Seller acknowledges that enforcement of the restrictions contained herein will not deprive him of the ability to earn reasonable livings and that any violation of the restrictions contained in this Agreement will cause irreparable injury to Purchaser.  Such covenants of Seller shall be construed as agreements independent of any other provision of the Agreements.

b.    It is agreed by the parties hereto that if any portion of the restrictive covenants set forth in Sections 1, 2 and 3 are held to be invalid, unreasonable, arbitrary or against public policy, then each such covenant shall be considered divisible both as to time, geographical area and any other relevant feature, with each month of a specified period being deemed a separate period of time and each geographical market area being deemed a separate geographical area, it being the intention of the parties that a lesser period of time, geographical area or other relevant feature shall be enforced so long as the same is not unreasonable, arbitrary or against public policy, a lesser time period, geographical area or other relevant feature which is determined to be reasonable, non-arbitrary and not against public policy may be enforced against Seller, and Seller agrees to be bound thereby.

c.    The parties hereto agree that damages at law, including, but not limited to, monetary damages, will be an insufficient remedy to Purchaser in the event that the restrictive covenants

INITIALS
DR. HUYNH                                    PAGE 34                                    INITIALS
DR. ISRAEL

of Sections 1, 2 and 3 are violated and that in addition to any remedies or rights that may be available to Purchaser, all of which other remedies or rights shall be deemed to be cumulative, retained by Purchaser and not waived by the enforcement of any remedy available hereunder, including, but not limited to, the right to sue for monetary damages, Purchaser also shall be entitled, upon application to a court of competent jurisdiction, to obtain injunctive relief, including, but not limited to, a temporary restraining order of temporary, preliminary or permanent injunction, to enforce the provisions of this Agreement as well as an equitable accounting of all profits or benefits arising out of any such violation, all of which shall constitute rights and remedies to which Purchaser may be entitled.

5.    **DEFAULT.**  Should the Seller violate the terms of this Non-Competition Agreement, and continue this violation after being given thirty (30) days written notice by the Purchaser of such default and Purchaser brings legal action for injunctive or other relief, the Purchaser shall not, as a result of the time involved in obtaining the relief, be deprived of the benefit of the full period of the Non-Competition Agreement.  Accordingly, the Non-Competition Agreement shall be deemed to have the duration specified in this Non-Competition Agreement, computed from the date the relief is granted but reduced by the time between the period when the restriction began to run and the date of the first violation of the covenant by the Seller.

6.    **ASSIGNMENT.**  This Non-Competition Agreement shall be assignable by the Purchaser.

7.    **NOTICES.**   All notices, demands and other communications required or permitted hereunder shall be in writing, certified mail, return receipt requested, or actually delivered to the party or the address set forth below and addressed as follows:

> If to the Purchaser: 1230 Satellite Blvd., Ste. 100, Suwanee, GA 30024

> If to the Seller: 12190 Dancliff Trace, Alpharetta, GA 30009

8.    **GOVERNING LAW.**   This Non-Competition Agreement shall be governed by, and construed, and enforced in accordance with, the laws of the State of Georgia.

9.    **BINDING EFFECT.**   This Non-Competition Agreement may not be modified except in writing by the parties hereto.  This Non-Competition Agreement shall be binding upon, and inure to the benefit of, the parties hereto and their respective heirs, personal representatives, and assigns.

10.   **AMENDMENTS**.  This Non-Competition Agreement may be amended or modified at any time and in all respects, and an instrument in writing may waive any provisions, if executed by the Purchaser and the Seller, or either of them in the case of a waiver.

INITIALS
DR. HUYNH

PAGE 35

INITIALS
DR. ISRAEL

**11.  COUNTERPARTS**.  This Non-Competition Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute but one and the same instrument.

**12.  POST-SALE PROVIDER AGREEMENT**.  The Purchaser and Seller agree that any post-Closing clinical services provided by Seller in the Purchaser's practice shall not be deemed to be a breach of this Non-Competition Agreement.

**13.  DISPUTES**.   In the event of any dispute under this Non-Competition Agreement, the Purchaser shall be entitled to file an equitable action in the appropriate county courts to enforce any provision hereof with respect to any injunctive relief as to the non-competition and non-solicitation provisions hereof.  Any other dispute with respect to the Practice Assets Sale Agreement shall be resolved by mediation and/or arbitration pursuant to the terms of the Practice Assets Sale Agreement at Section 18.

**14.  ENTIRE AGREEMENT**.  This Non-Competition Agreement constitutes the entire agreement between the parties hereto, and there are no agreements, understandings, restrictions, warranties, or representations between the parties other than those set forth herein or herein provided for.

**IN WITNESS WHEREOF**, the Seller has duly executed this Non-Competition Agreement as of the abovementioned date.

_____          _____
Witness                                                          ROBERT S. ISRAEL, DDS

_____          _____
Witness                                                          SCOTT L. HUYNH, DMD

                                                                 DENTCORP MANAGEMENT, LLC

_____          By: _____
Witness                                                          SCOTT L. HUYNH, DMD
                                                                 Its: Managing Member

_____                                 _____
INITIALS                                                                                    INITIALS
DR. HUYNH                          PAGE 36                        DR. ISRAEL

## ASSIGNMENT OF TELEPHONE, WEBSITE, SOCIAL MEDIA
## & ADVERTISING RIGHTS

THIS AGREEMENT entered into on December 8, 2020 by and between SCOTT L. HUYNH, DMD (Purchaser) and WILDWOOD DENTAL CARE, PC (Seller).

WHEREAS, the Purchaser has purchased the assets and the dental practice of the Seller; and,

WHEREAS, the Purchaser desires to continue the telephone service and telephone advertising the Seller has contracted for in connection with the dental practice purchased,

WHEREAS, the Purchasers desire to continue to utilize the Sellers' current websites,

NOW, THEREFORE, the Sellers hereby assign and transfer the ownership and rights in:

     (a)    the telephone numbers of the Practice, with the trade names utilized by Sellers, to include 470-839-6398, 770-476-9192 and any other numbers currently being used by the Practice or at the Practice Premises;

     (b)    rights to any websites contracted for by the Sellers, to specifically include https://www.mygwinnettdentist.com, and any other websites utilized by the Practice, and the Purchaser agrees to perform, carry out and be bound by covenants and conditions of any agreements pertaining thereto;

     Purchaser indemnifies and holds harmless the Sellers from any obligations arising from use of the advertising or assignment of the assets set forth herein.

**[SIGNATURES ON FOLLOWING PAGE]**

_____
INITIALS
DR. HUYNH

PAGE 37

_____
INITIALS
DR. ISRAEL

IN WITNESS WHEREOF, the parties have hereunto set their hands and seals the date first above written.

WILDWOOD DENTAL CARE, PC

By: _____

ROBERT S. ISRAEL, DDS

Its: President

_____
Witness

_____
SCOTT L. HUYNH, DMD

_____
Witness

DENTCORP MANAGEMENT, LLC

By: _____

SCOTT L. HUYNH, DMD

_____
Witness

Its: Managing Member

INITIALS
DR. HUYNH

PAGE 38

INITIALS
DR. ISRAEL

## MISCELLANEOUS PRORATION AGREEMENT

THIS AGREEMENT is made and entered into on the December 8, 2020 by and between WILDWOOD DENTAL CARE, PC (Seller) and SCOTT L. HUYNH, DMD & DENTCORP MANAGEMENT, LLC (Purchaser).

WHEREAS, the Purchaser has purchased the assets and the dental practice of the Seller; and,

WHEREAS, the Purchaser desires to continue the utility services the Seller has contracted for in connection with the dental practice; and

WHEREAS, the personal property taxes on the property purchased and service fees for the services provided to the practice are billed on a yearly or monthly basis; and

WHEREAS, the parties are desirous of paying for their share of the taxes and service fees.

NOW, THEREFORE, the undersigned to hereby acknowledge that miscellaneous expenses, including utilities, insurance, etc. related to the sale of the dental practice assets may be outstanding at the time of Closing and that any and all pro-ration of same and any reimbursement to Seller from Purchaser for utilities and telephone deposits shall be handled between the parties outside of the closing.

IN WITNESS WHEREOF, the parties have hereunto set their hands and seals the date first above written.

WILDWOOD DENTAL CARE, PC

_____     By: _____
Witness                     ROBERT S. ISRAEL, DDS
                            Its: President

_____     _____
Witness                     SCOTT L. HUYNH, DMD

                            DENTCORP MANAGEMENT, LLC

_____     By: _____
Witness                     SCOTT L. HUYNH, DMD
                            Its: Managing Member

_____                     _____
INITIALS                                    INITIALS
DR. HUYNH                   PAGE 39          DR. ISRAEL

**POST-SALE PROVIDER AGREEMENT**

Attached to and made part of this Practice Assets Sale Agreement between ROBERT S. ISRAEL, DDS & WILDWOOD DENTAL CARE, PC and SCOTT L. HUYNH, DMD & DENTCORP MANAGEMENT, LLC.

THIS POST-SALE PROVIDER AGREEMENT is entered into by and between DENTCORP MANAGEMENT, LLC (the "Host") and WILDWOOD DENTAL CARE, PC (the "Provider").

WHEREAS, the Host and Provider wish to enter into an arrangement subject to the terms of the attached Practice Assets Sale Agreement, whereby the Provider shall practice dentistry on behalf of the Host as an independent contractor.  Now, therefore, in consideration of the mutual covenants and conditions set forth in this Practice Assets Sale Agreement, the receipt and consideration of which are acknowledged, the parties have agreed as follows:

**1.    TERM**:  The Host hereby engages the Provider to provide dentistry services in the Host's practice located at 1230 Satellite Blvd., Ste. 100, Suwanee, GA 30024 for a period to begin on December 8, 2020, and to end as per the terms and conditions as stated in the Termination section of this Post-Sale Provider Agreement.

**2.    PROVIDER DUTIES**:  During the term of this Post-Sale Provider Agreement, the Provider shall:

**(A)**   Provide dental services for patients of the Host in accordance with the Host's policies and procedures, so long as they do not conflict with any laws or dental practice acts of the State of Georgia.

**(B)**   Contribute the Provider's best professional skill and services at all times for the benefit of the Host's Practice, and maintain a satisfactory level of competence subject to review from time to time by the Host.

**(C)**   Follow and abide by the ethics of the profession of dentistry, the rules and regulations of all governing boards, all federal, state, and municipal laws and ordinances regulating the practice of dentistry, and the policies, standards and regulations of the Host.

**(D)**   Follow reasonable rules with respect to office conduct, scheduling, and use of the Host's equipment.

The Host shall not impose duties or constraints of any kind which would require the Provider to violate the rules of conduct governing the practice of dentistry or violate any local ordinance or other law.

INITIALS                                                                                                          INITIALS
DR. HUYNH                                       PAGE 40                                       DR. ISRAEL

**3.    PATIENT RECORDS**:  The Provider shall maintain appropriate records relating to all services rendered by the Provider and shall have access to those records at all times during the term of this Post-Sale Provider Agreement.

**4.    SCHEDULING**:  The Provider agrees to put forth reasonable efforts to accomplish an orderly transfer of the referral sources and patients of the Practice to the Host prior to termination of this Post-Sale Provider Agreement.

**5.    LIMITATIONS**:  The Provider shall not, without written consent first being given by the Host:

**(A)**    withhold any monies received by Provider for services performed in the Host's office; or

**(B)**    cause the Host to become a guarantor or endorser on any note for any person whomsoever; or

**(C)**    commit any intentional act whereby the Host's property may be subject to attachment or seizure; or

**(D)**    release without receiving payment, or discharge any debt due to the Host, including, but not limited to, rendering services to the Host's patients without compensation; or

**(E)**    use any money belonging to the Host or pledge Host's credit (other than extending normal credit to patients for professional services)

**6.    PROFESSIONAL FEES AND COMPENSATION**: The Provider shall be considered an independent contractor; therefore, the Provider's compensation shall not be subject to withholding. All fees shall be made payable to the Host or Provider and deposited in the Host's Practice account.  A bookkeeping system will be used that will differentiate between the Provider's collections and those of the rest of the Practice.  These records will be available to the Provider at all times during normal business hours.  The Provider shall maintain a fee schedule comparable to the Host's.

**The Provider shall be paid thirty percent (30%) of the Provider's Gross Collections**

**Provider's Gross Collections:** "Provider's Gross Collections" shall be defined as all fees collected for     services rendered by the Provider, including;

a)    any normal Doctor's Exam Fees charged by the Provider as part of the patient's hygiene visits, and

b) any fees for services provided by an auxiliary under the direct supervision of the Provider.

INITIALS                                    INITIALS
DR. HUYNH                  PAGE 41                  DR. ISRAEL

The Provider's Gross Collections shall exclude all hygiene services that are provided by hygienists in the Purchaser's practice, but shall include services rendered by the Provider's chairside assistant (such as radiographs, sealants, polishing teeth, etc.) provided that these services are rendered during times that the Provider is in the Purchaser's office directly supervising the service being rendered.

The Provider's compensation shall be paid twice per month as follows; the first pay period shall be on the fifth day of the month for collections received from the fifteenth to the end of the prior month; the second pay period shall be on the twentieth of the month for collections received from the first through the fifteenth of that month.

7.      **VACATION:**  The Provider shall give the Host at least thirty (30) days' written notice prior to its professional taking vacation time.  Emergency leave shall require no such notice.

8.      **WORKING FACILITIES AND EXPENSES**:  The Provider shall have the right to use the equipment, furniture and fixtures, instruments and supplies, records and personnel on the Premises.  The Provider shall be listed in the telephone directory.  The Host shall be responsible for the payment of all necessary expenses for the conduct of the Practice including, but not limited to, payment of the Provider's laboratory bill.

 The Provider shall pay for a minimum malpractice policy of $1,000,000 per occurrence, and $3,000,000 aggregate (and, where applicable, tail coverage), as well as Provider's own business license, professional fees and dues, long distance telephone calls except those directly related to the business of the Practice, travel and entertainment expenses, continuing education.  The Provider shall provide the Host with an annual certificate as proof of malpractice insurance coverage.  Should the Provider not maintain such a policy, the Host may (after giving the Provider ten (10) days' written notice) either (a) immediately terminate this Post-Sale Provider Agreement, or (b) pay the premiums on such a policy on behalf of the Provider, and deduct the cost of such premiums from the Provider's compensation.

9.      **DEATH AND DISABILITY:** In the event of Provider's death during the term of this Post-Sale Provider Agreement, this Post-Sale Provider Agreement shall be deemed to have been terminated. In the event of the permanent disability of Provider that renders him unable to practice dentistry during the term of this Post-Sale Provider Agreement, at the option of the Provider, Provider shall have the right to terminate this Post-Sale Provider Agreement immediately by giving written notice to the Host.  In the event that the Provider does not terminate this Agreement, the Host shall have the right to approve any other dentist that Provider proposes to provide its services hereunder. "Disability" shall mean Maker's inability for any reason whatsoever to engage in the full time practice of dentistry for 90 consecutive days (the "disability Period"). If the Provider shall have been disabled and shall have returned to work after the end of such disability, then any new disability commencing within one hundred and eighty (180) days of the termination of the prior disability shall be deemed to be a

INITIALS                                                                                          INITIALS
DR. HUYNH                              PAGE 42                                    DR. ISRAEL

continuation of the prior disability, and the periods of all such disabilities shall be added together to determine the rights of the parties hereunder.

**10.    TERMINATION**:   The Provider agrees to provide clinical services for the Host for a minimum period of nine (9) months following the signature date of this Post-Sale Provider Agreement, through September 8, 2021.  The Provider may terminate this Post-Sale Provider Agreement effective at any time after September 8, 2021 by giving the Host at least thirty (30) days' written notice in advance, except for cause, being a breach or default by Host in the performance of its obligations hereunder or under the Practice Assets Sale Agreement, in which case no notice is necessary.

The Host agrees to allow the Provider to provide clinical services in the Host's office for a minimum period of nine (9) months following the signature date of this Post-Sale Provider Agreement, through September 8, 2020.  The Host may terminate this Post-Sale Provider Agreement effective at any time after September 8, 2020 by giving the Provider at least thirty (30) days' written notice in advance, except for cause, in which case no notice is necessary.

This Post-Sale Provider Agreement shall automatically terminate for cause if any of the previously mentioned events in Section 5 occur without the Host's written consent, as well as any of the following events:

**(A)**    Cancellation of (or failure to renew) the Provider's malpractice insurance; or

**(B)**    The Provider's continued failure to perform the Provider's usual customary duties as prescribed in this Post-Sale Provider Agreement for a period of twenty (20) days after receipt of notice from the Host that specifies in detail such failure; or

**(C)**    Loss or suspension of the Provider's license to practice dentistry in the State of Georgia; or

**(D)**    Conviction of a felony on the part of the Provider.

**11.    PROFESSIONAL CORPORATION**:   The Host may elect to assign this Post-Sale Provider Agreement to a professional corporation controlled by him without requiring the consent of the Provider party, but such assignment shall not relieve either party of their obligations to perform all of the conditions of this Post-Sale Provider Agreement.

**12.    PROFESSIONAL LICENSE AND MALPRACTICE INSURANCE**: The Provider shall immediately notify the Host in the event Provider's license to practice dentistry or Provider's malpractice insurance is canceled, suspended, revoked or terminated by the State Dental Boards.  The Provider agrees to maintain, at the Provider's expense, adequate malpractice tail insurance coverage (where applicable) to cover any possible claims for services performed by the Provider on the patients of the Practice prior to the termination of this Post-Sale Provider Agreement.

INITIALS
DR. HUYNH

PAGE 43

INITIALS
DR. ISRAEL

**13.   WAIVER OF BREACH OR VIOLATION NOT DEEMED CONTINUING**: The waiver by either party of any provision of this Post-Sale Provider Agreement shall not be construed to be, a waiver of any subsequent breach hereof. No provision may be waived except by an agreement in writing signed by the waiving party.

**14.   INDEMNIFICATION**: In addition to the terms of indemnification outlined in the attached Practice Assets Sale Agreement, the parties hereby agree that there shall be no partnership inferred by this Post-Sale Provider Agreement, and that neither party is an agent of the other party. Neither party shall be responsible for the other party's acts or actions, obligations, or liabilities in any way, and both parties agree to release the other, and agree to indemnify and defend the other against any claims or liabilities imposed upon the other.

**15.   DISPUTES; MEDIATION AND ARBITRATION**: It is the intention of both parties that no dispute under this Agreement shall be the subject of any court action or litigation in the court system. The parties recognize that the processes of mediation and arbitration are proper to resolve issues between the parties.

If any party wishes to resolve an issue under or relating to this Post-Sale Provider Agreement, then such party must give notice of a request for mediation to the other party, which notice shall set forth the names of not less than four court approved mediators from the lists available from the local circuit court. The party receiving such notice shall agree upon one or more of such mediators within seven days of receipt of such notice and mediation will be scheduled as soon as feasible between the parties and their respective advisors. The parties and their advisors will cooperate fully with respect to sharing of information and attendance at meetings in order to seek resolution. The parties will share mediation expenses with the party requesting mediation to pay one-half of such expenses of the mediator fees and the other party to pay the other one-half of such expenses.

If resolution of the matters between the parties cannot be resolved in mediation within twenty days of the selection of a mediator by the party receiving such notice, then the matter shall be presented to formal arbitration pursuant to the rules of the American Arbitration Association with a single arbitrator to be retained on behalf of the parties by the mediator that has been working with the parties. Arbitration shall take place as soon as possible and the decision of the arbitrator shall be binding upon the parties for all purposes. Any party in violation of this Agreement shall pay all reasonable fees and costs, including attorneys' fees, incurred by the other party relating to such violation and all other fees and costs shall be paid as agreed in mediation or as determined appropriate in the arbitration proceeding.

It is the intention of the parties that this Agreement shall be construed and interpreted in a fair and equitable manner based upon the facts and circumstances of the parties, taking into account the present intention of the parties to have a fair and equitable agreement under the terms and conditions set forth herein.

INITIALS
DR. HUYNH

PAGE 44

INITIALS
DR. ISRAEL

**16.    WAIVER OF BREACH OR VIOLATION NOT DEEMED CONTINUING**:  The waiver by either party of any provision of this Post-Sale Provider Agreement shall not be construed to be a waiver of any subsequent breach hereof.  No provision may be waived except by an agreement in writing signed by the waiving party.

**17.    NOTICE**:  Any notice required or permitted to be given under this Post-Sale Provider Agreement shall be sufficient if in writing, and if sent by certified mail, return receipt requested, to the Provider's business address, or the Host's place of business.

**18.    AMENDMENT**:  Without in any way voiding the whole thereof, any and all parts of this Post-Sale Provider Agreement may be amended in writing by mutual agreement of the parties, as provided above.

**19.    GOVERNING LAW**:  This Post-Sale Provider Agreement shall be governed and construed with the laws of the State of Georgia.

**20.    HEADINGS**:  The paragraph headings throughout this Post-Sale Provider Agreement are for convenience of reference only and shall not be resorted to for interpretation of this Post-Sale Provider Agreement.

**21.    COUNTERPARTS**:  This Post-Sale Provider Agreement may be executed in several counterparts, each of which shall be considered an original.

**22.    SEVERABILITY**:  If any term, covenant, or condition of this Post-Sale Provider Agreement or the application thereof to any person or circumstance shall be invalid or unenforceable, the remainder of this Post-Sale Provider Agreement and the application of any term or provision to persons or circumstances other than those as to which it is held invalid or unenforceable thereby, and all other terms shall be valid and enforceable to the fullest extent permitted by law.

**23.    INTERPRETATION/NO PRESUMPTION**:  It is acknowledged by the parties that this Agreement is the result of negotiated suggestions of all parties and, therefore, no presumptions shall arise favoring any party by virtue of the authorship of any of the provisions herein or the modification, addition or deletion of provisions in prior drafts hereof.

**[SIGNATURES ON FOLLOWING PAGE]**

INITIALS
DR. HUYNH

PAGE 45

INITIALS
DR. ISRAEL

**IN WITNESS WHEREOF**, the parties hereto have executed this Post-Sale Provider Agreement on December 8, 2020.

_____
Witness

_____
SCOTT L. HUYNH, DMD

DENTCORP MANAGEMENT, LLC

_____
Witness

By: _____
SCOTT L. HUYNH, DMD
Its: President

WILDWOOD DENTAL CARE, PC

_____
Witness

By: _____
ROBERT S. ISRAEL, DDS
Its: Managing Member

_____
INITIALS
DR. HUYNH

_____
INITIALS
DR. ISRAEL

## PREPAID SERVICES/PATIENT CONTRACTS/
## SERVICES IN PROGRESS

Attached to and made part of this Practice Assets Sale Agreement between ROBERT S. ISRAEL, DDS, WILDWOOD DENTAL CARE, PC, and SCOTT L. HUYNH, DMD, DENTCORP MANAGEMENT, LLC.

**EQUIPMENT EXHIBIT**
**EQUIPMENT FURNITURE AND FIXTURES**

Attached and made a part of the Practice Assets Sale Agreement by and between ROBERT S. ISRAEL, DDS, WILDWOOD DENTAL CARE, PC, and SCOTT L. HUYNH, DMD, DENTCORP MANAGEMENT, LLC

- Planmeca Pro One Digital Pan
- 2 Beaverstate Hygiene Carts
- 2 Dentsply Prophyjets
- 2 Progeny Previa x-ray units
- 3 ADEC priority Chairs
- 1 Mobile nitrous cart with 2 Q and 2N2O E-Tanks Porter Head Unit
- Midmark M-11 Autoclave
- Midmark M250 Ultrasonic
- 2 European Design 12o'clock delivery units with Fiber Optics
- 1 Phillips Densmat x-ray unit
- 1 Gendex G770 x-ray unit
- 2 Midmark operatory lights Wall Mounted
- 2 Midmark ceiling mounted light
- 1 ADEC 1021 Chair
- 1 ADEC 1221 Chair
- 1 Airtech Airstar30 compressor
- 1 dentalEZ vacuum 2 1 HP motors
- 1 Fosterlabmaster trimmer MT 10 1 United glazing Furnace
- 1 Vacuformer
- 1 RedWing lathe with Quick Chuck
- 1 Picasso Lite Soft Tissue Laser
- 10 Dell SFF computers with 22" monitors
- 1 Dell server poweredgeT320
- 1 Canon MF4770n Fax/scanner
- 1 HP 2015DN printer 1 Microtek i800 Scanner
- 1 Avaya phone system
- 9 22" Viewsonic TV
- 1 40" Samsung TV

INITIALS
DR. HUYNH

PAGE 48

INITIALS
DR. ISRAEL

**ASSETS EXCLUDED FROM SALE EXHIBIT**

Attached to and made a part of the Practice Assets Sale Agreement by and between ROBERT S. ISRAEL, DDS, WILDWOOD DENTAL CARE, PC, and SCOTT L. HUYNH, DMD, DENTCORP MANAGEMENT, LLC.

- Personal Computer in private office
- All removable hard drives
- Personal photos Awards etc.
- Signed Photograph in hallway (near lab)
- Books
- Camera
- Loupes

INITIALS
DR. HUYNH

PAGE 49

INITIALS
DR. ISRAEL

**IMMEDIATE FAMILY NAMES EXHIBIT**

Attached and made a part of the Practice Assets Sale Agreement by and between ROBERT S. ISRAEL, DDS, WILDWOOD DENTAL CARE, PC, and SCOTT L. HUYNH, DMD, DENTCORP MANAGEMENT, LLC

Dale Israel
Scott Israel
Jamie Israel
Michael Israel
Jessica Israel
Noah Israel
Haley Israel
Sarah Duwell
Rochelle Notrica
Les Capouya
Zack Mendelson
Lexy Rockhill
Stacie Mundahl
Jake Mundahl
Emmma Mundahl
Jeff Notrica
Elyse Kreitner
Sarah Kreitner
Cam Kreitner
Andrew Kreitner
Ben Kreitner
Dr Glen Mcintosh
Dr Anne Koenig
Gail Reid
Sarah Israel

INITIALS
DR. HUYNH

PAGE 50

INITIALS
DR. ISRAEL

**EXHIBIT "B"**

**Bill of Sale and Assignment**

18737182v1

## BILL OF SALE AND ASSIGNMENT-CORPORATE

Attached to and made part of the Practice Assets Sale Agreement by and between ROBERT S. ISRAEL, DDS, WILDWOOD DENTAL CARE, PC, and SCOTT L. HUYNH, DMD, DENTCORP MANAGEMENT, LLC

KNOW ALL MEN BY THESE PRESENTS, THAT WILDWOOD DENTAL CARE, PC, hereinafter referred to in this Bill of Sale and Assignment as the Grantor, for good and valuable consideration paid by SCOTT L. HUYNH, DMD & DENTCORP MANAGEMENT, LLC, hereinafter referred to in this Bill Of Sale and Assignment as the Grantee, the receipt and adequacy of which is acknowledged by the Grantor, does hereby sell, set over, transfer, assign and convey unto Grantee, Grantee's heirs, executors, administrators, personal representatives, and assigns, all Grantor's right, title and interest in the Grantor's office and clinical supplies, business and patient records, telephone number, website, and other intangible assets, as well as those assets described in the attached Equipment, Furniture and Fixtures Exhibit of the Practice Assets Sale Agreement (such conveyance being subject to the terms, conditions, warranties, and covenants described in the Practice Assets Sale Agreement), together with all manufacturer's warranties and any maintenance agreements relating thereto (to the extent automatically transferable).

And for the same consideration, Grantor, for itself, its successors and assigns, covenants with and warrants unto the Grantee, his heirs, executors, administrators, personal representatives and assigns that Grantor is the lawful owner of the property hereby conveyed; that Grantor has good and marketable title to Grantor's interest in said property, and, to the extent described in the Practice Assets Sale Agreement, that said property is free and clear of any liens and encumbrances of any kind, character or nature, and that Grantor, and its successors and assigns will defend the same against all lawful claims and demands whatsoever.

If any provisions of the Bill of Sale and Assignment and said Practice Assets Sale Agreement are inconsistent, the Practice Assets Sale Agreement controls.

**IN WITNESS WHEREOF**, Grantor has executed and delivered this Bill of Sale and Assignment, effective on December 8, 2020.

WILDWOOD DENTAL CARE, PC

By: _____

Witness _____

ROBERT S. ISRAEL, DDS
Its: President

INITIALS
DR. HUYNH

PAGE 25

INITIALS
DR. ISRAEL

## BILL OF SALE AND ASSIGNMENT-PERSONAL

Attached to and made part of the Practice Assets Sale Agreement by and between ROBERT S. ISRAEL, DDS, WILDWOOD DENTAL CARE, PC, and SCOTT L. HUYNH, DMD, DENTCORP MANAGEMENT, LLC.

KNOW ALL MEN BY THESE PRESENTS, THAT ROBERT S. ISRAEL, DDS, hereinafter referred to in this Bill of Sale and Assignment as the Grantor, for good and valuable consideration paid by SCOTT L. HUYNH, DMD & DENTCORP MANAGEMENT, LLC, hereinafter referred to in this Bill Of Sale and Assignment as the Grantee, the receipt and adequacy of which is acknowledged by the Grantor, does hereby sell, set over, transfer, assign and convey unto Grantee, Grantee's heirs, executors, administrators, personal representatives, and assigns, all Grantor's right, title and interest in Grantor's personal professional goodwill relating to his practice of dentistry as described in said Practice Assets Sale Agreement (such conveyance being subject to the terms, conditions, warranties, and covenants described in the Practice Assets Sale Agreement).

And for the same consideration, Grantor, for himself, his heirs, executors, administrators, personal representatives, and assigns, covenants with and warrants unto the Grantee, his heirs, executors, administrators, personal representatives and assigns that Grantor is the lawful owner of the property hereby conveyed; that Grantor has good and marketable title to Grantor's interest in said property, and, to the extent described in the Practice Assets Sale Agreement, that said property is free and clear of any liens and encumbrances of any kind, character or nature, and that Grantor, and his heirs, executors, administrators, personal representatives, and assigns will defend the same against all lawful claims and demands whatsoever.

If any provisions of the Bill of Sale and Assignment and said Practice Assets Sale Agreement are inconsistent, the Practice Assets Sale Agreement controls.

**IN WITNESS WHEREOF**, Grantor has executed and delivered this Bill of Sale and Assignment, effective this December 8, 2020.


_____
Witness

_____
ROBERT S. ISRAEL, DDS


_____
INITIALS
DR. HUYNH

PAGE 26

_____
INITIALS
DR. ISRAEL

## CERTIFICATE OF SERVICE

This is to certify that I have on September  24, 2022, filed the foregoing *Motion to Approve Sale of Estate's Interest in Property* (the "Motion") using the Bankruptcy Court's Electronic Case Filing program, which sends a notice of this document and an accompanying link to this document to the following parties who have appeared in this case under the Bankruptcy Court's Electronic Case Filing program:

| | |
|---|---|
| Garrett A. Nail | gnail@pgnlaw.com |
| Eric W. Anderson | eanderson@phrd.com |
| G. Frank Nason, IV | fnason@lcenlaw.com |
| Jason B. Godwin | jgodwin@godwinlawgroup.com |
| Joshua A. Mayes | jmayes@robbinsfirm.com |
| Griffin B. Bell, III | gbb@gb3pc.com |

Service of the Motion on other parties will be certified by separate document.

This 24th day of September, 2022.

*/s/ Neil C. Gordon*
Neil C. Gordon
Georgia Bar No. 302387

18737182v1